## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| OKLAHOMA FIREFIGHTERS PENSION AND RETIREMENT SYSTEM, on behalf of itself and all others similarly situated,<br><br>     Plaintiff,<br><br>  v.<br><br>INTEGRAL AD SCIENCE HOLDING CORP., LISA UTZSCHNEIDER, TANIA SECOR, and VISTA EQUITY PARTNERS MANAGEMENT, LLC<br><br>     Defendants. | Case No. 1:25-cv-847<br><br>CLASS ACTION<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Oklahoma Firefighters Pension and Retirement System ("Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, *inter alia*, counsel's investigation, which includes, among other things: (a) review and analysis of regulatory filings made by Integral Ad Science Holding Corp. ("IAS" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"); (b) transcripts of IAS conference calls; (c) press releases issued by the Company; (d) investor presentations prepared by the Company; (e) analyst and media reports concerning the Company; (f) court filings in the Court of Chancery of the State of Delaware in *Scarantino v. Vista Equity Partners Management, LLC ("Vista")*, C.A. No. 2024-1103-JTL, and (f) other public information concerning the Company.

## INTRODUCTION

1.  This is a securities class action on behalf of persons and entities that purchased shares of IAS common stock between March 2, 2023, and February 27, 2024, inclusive (the "Class

Period"). Plaintiff asserts claims against Defendants under Sections 10(b), 20(a) and 20A of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, promulgated thereunder.

2. IAS is a global software company specializing in digital advertising. IAS offers a suite of digital ad verification and optimization solutions, which help advertisers and publishers "ensur[e] that every digital ad reaches real consumers in brand-appropriate environments, and has the opportunity to be seen by consumers." These solutions are designed to enable "advertisers [to] optimize their ad spend and better measure consumer engagement with campaigns across platforms, while enabling publishers to improve their inventory yield and revenue."

3. The ad verification and measurement industry is dominated by IAS and its main competitor DoubleVerify, Inc. ("DoubleVerify"). Indeed, a Truist Securities analyst has referred to this as a "virtual duopoly." As such, concerns over a potential pricing war with DoubleVerify, have led the Company to reassure investors about its ability to defend pricing. Indeed, during a May 11, 2022, earnings call the Company told analysts:

> As we continue to accelerate both in programmatic and we saw additional higher-value products like contextual, which we're taking an advantage of this shift away from display over to video as more and more consumers are consuming video content. And you double that with what's going on with CTV and the [ph] explosion of the adoption of CTV. ***It just gives us momentum to further accelerate our pricing upside in the future***.

4. In a February 13, 2023, report, a Raymond James analyst commented:

> Investors are largely positive on the positioning of verification players [like IAS] within the digital ad space, ***potential for pricing leverage***, and the competitive market settling into a duopoly.

5. Unbeknownst to investors, by February 23, 2023, senior management was aware that demand had started to slow. In a non-public presentation, senior management told the Board of Directors ("Board") that the Company was experiencing "***pricing pressure***" in its ad verification and optimization businesses, and that the Company had resorted to cutting rates when renewing and securing new contracts, leading to fee compression.

6.      In another non-public "CEO Session" on May 11, 2023, senior management admitted that one of the "lowlights" of the "state of the business" was "increased customer pressure to prove Programmatic [*i.e.*, optimization] value vs. agency or free alternatives."  The Board also learned in a finance presentation made during this meeting that another "lowlight" was "***continued pricing pressure*** to win marquis [sic] customers and focus on ROI and efficiency leading clients to look at lower-priced / free programmatic [*i.e.*, optimization] solutions."  Indeed, one of the "Top Loss Reasons" for why the Company was failing to secure new business was competitors' "***Aggressive Pricing***."

7.      Despite this knowledge, throughout the Class Period, the Company concealed this trend from investors which was impacting demand for its solutions.  Instead, the Company touted "increased demand across our product portfolio" and a "[f]avorable pricing structure" as a key "driver[] of sustainable growth."  Moreover, the Company touted large deals without disclosing that such deals were the product of price cuts.

8.      News of IAS's weakening demand first began to emerge on August 3, 2023, after the market closed, when the Company reported its second quarter financial results revealing that the growth of its optimization revenue had meaningfully slowed.  In response to this news, on August 4, 2023, the Company's stock price declined $3.66 (or approximately 20%) to $15.17 per share from the previous day's close of $18.83 per share.  However, the Company continued to conceal that pricing pressure was a key factor underlying the Company's slowing revenue growth.  Indeed, during an August 3, 2023, earnings call to discuss second quarter results, analysts asked about the Company's pricing.  Chief Financial Officer ("CFO") Tania Secor ("Secor") pivoted, instead blaming "maturing Context Control growth" and "slower demand from tech/telco clients."

9.      On February 27, 2024, after the market closed, IAS reported fourth quarter results for 2023 and announced lackluster revenue guidance below analysts' estimates.  On an earnings call that same day, the Company admitted that these disappointing revenue numbers resulted from pricing cuts issued to customers across the Company's measurement and optimization businesses.  Chief Executive Officer ("CEO") Lisa Utzschneider ("Utzschneider") stated, "[w]e are seeing

more competitive pricing in measurement on a select group of large contract renewals in exchange for increased volume commitments and multi-year exclusive agreements."

10.    In response to this news, on February 28, 2024, the Company's stock price declined $7.09 (or approximately 41%) to $10.01 per share from the previous day's close of $17.10 per share.

11.    Analysts were stunned by the revelation of the competitive pricing issue stating, "the desire to become more aggressive was surprising," "IAS' pricing power is called into question after last night's reveal," and "[t]his was not expected by the investment community, and will raise fears about the competitive market."

12.    While the Company concealed the competitive pricing pressure which materialized in February 2023, Vista Equity Partners Management, LLC, which was in possession of this material non-public information, from its five representatives on the Board, proceeded to dump millions of shares of IAS common stock, avoiding millions in losses.

13.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's shares, Plaintiff and putative class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

14.    The claims asserted herein arise under Sections 10(b), 20(a) and 20A of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).  This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa).

15.    Venue is proper in this District under Section 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. § 1391(b) because IAS's principal executive offices are located in this District at 12 E 49th Street, 20th Floor, New York, NY 10017 and Defendants conducted substantial economic activity in this District.  As such, substantial acts in furtherance of the alleged fraud occurred in this District, including the dissemination of materially false and/or misleading information.

16.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

17.    Plaintiff Oklahoma Firefighters Pension and Retirement System ("Plaintiff") is a public pension fund established to administer pension benefits for Oklahoma firefighters.  Plaintiff purchased IAS stock during the Class Period and, as detailed in the Certification attached hereto and incorporated herein, has been damaged thereby.

18.    Defendant Integral Ad Science Holding Corp. ("IAS" or the "Company") is a global media measurement and optimization platform.  The Company provides independent measurement and verification of digital advertising.  The Company is incorporated in Delaware and maintains its corporate headquarters in New York, New York.  IAS's common stock trades on NASDAQ under ticker symbol "IAS."

19.    Defendant Lisa Utzschneider ("Utzschneider") is, and was at all relevant times, IAS's CEO and a member of the Company's Board.

20.    Defendant Tania Secor ("Secor") was at all relevant times, IAS's CFO, until January 3, 2025, when Secor departed from the Company.

21.    Defendants Utzschneider and Secor are referred to herein as the "Officer Defendants."

22.    Defendant Vista Equity Partners Management, LLC ("Vista") is a Delaware limited liability company headquartered in Austin, Texas.  It is among the largest private equity firms in the world, with over $100 billion in assets under management.  Vista held (and holds) its stake in IAS through three affiliated funds: Vista Equity Partners Fund VI, L.P., Vista Equity Partners Fund VI-A, L.P. and VEPF VI FAF, L.P. (collectively, the "Vista Funds").  As disclosed in IAS's public filings, VEPF Management, L.P. ("Management Company") is the sole management company of each of the Vista Funds.  The Management Company's sole general partner is VEP Group, LLC

("VEP Group"), and the Management Company's sole limited partner is Vista Equity Partners Management, LLC.

23.     Vista has representatives on the Board:

- Rod Aliabadi ("Aliabadi") has served as a member of the Board since June 2018.  Aliabadi is a Managing Director at Vista and sits on the Flagship Funds' Investment Committee.

- Michael Fosnaugh ("Fosnaugh") has served as a member of the Board since June 2018 and currently serves as the Chair of the Board.  Fosnaugh is a Senior Managing Director at Vista, where he is also Co-Head of the Flagship Fund and sits on its Investment Committee.  Fosnaugh also serves as a member of Vista's Executive Committee, Vista's governing and decision-making body for all matters affecting its overall management and strategic direction, and Vista's Private Equity Management Committee, the decision-making body for matters affecting Vista's overall private equity platform.

- Christina Lema ("Lema") has served as a member of the Board since June 2021. Lema serves as Managing Director, Deputy Chief Legal Officer and General Counsel of Vista and also serves as a member of Vista's Private Equity Management Committee.

- Brooke Nakatsukasa ("Nakatsukasa") has served as a member of the Board since December 2020.  Nakatsukasa currently is a Vice President on the Vista's private equity Flagship team.

- Martin Taylor ("Taylor") has served as a member of the Board since June 2018.  Taylor is a Senior Managing Director at Vista and is Vista's Co-Head of the Foundation Funds and sits on its Investment Committee.  Taylor also serves as a member of Vista's Executive Committee and Vista's Private Equity Management Committee.

## **BACKGROUND**

24.     IAS is a global software company specializing in digital advertising.  IAS was founded in 2009 as AdSafe Media and rebranded itself as Integral Ad Science in 2012.  IAS "provide[s] advertisers, agencies, publishers, and platforms with measurement, optimization, and publisher solutions that address viewability, brand safety and suitability, ad fraud prevention, contextual targeting, reporting, and inventory yield management."  "The Company's customers include advertisers and publishers"—IAS "help[s] advertisers optimize their ad spend and better measure consumer engagement with campaigns across platforms, while enabling publishers to improve their inventory yield and revenue."

25.     "The Company's revenue is derived from three distinct channels," which the Company describes as follows:

- **Optimization revenue** (f/k/a programmatic revenue) represents pre-bid solutions which help optimize return on ad spend by directing budgets to the most effective inventory.

- **Measurement revenue** (f/k/a advertiser direct revenue) represents post-bid solutions which measure campaign performance and value across viewability, ad fraud prevention, brand safety and suitability, attention, and more.

- **Publisher revenue** (f/k/a supply side revenue) represents solutions with publisher customers that identify high quality ad inventory that is fraud free, viewable, brand safe and suitable, and geographically targeted on a global basis.

26.     Optimization solutions help advertisers identify and purchase the ideal digital ad space, measurement solutions help advertisers gauge the success of their digital ad campaigns, and publisher solutions help publishers select the ideal digital ads to publish.  In 2022, the Company earned $117.4 million in total revenue with $55.1 million (~47%) attributable to programmatic revenue, $44.7 million (~38%) attributable to advertiser direct revenue and $17.6 million (~15%) attributable to supply side revenue.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

27.     On March 2, 2023, the Company issued a press release announcing fourth quarter and full year ended December 31, 2022 which stated in relevant part as follows:

"We reported positive fourth quarter results with ***growth across all business lines***," said Lisa Utzschneider, CEO of IAS.  "We are off to a solid start to 2023 and expect full-year, double-digit revenue growth as we drive customer adoption of our industry-leading products."

\* \* \*

**Fourth Quarter 2022 Financial Highlights**
- **Total revenue** was $117.4 million, a 15% increase compared to $102.5 million in the prior-year period.

- **Programmatic revenue** was $55.1 million, a 30% increase compared to $42.3 million in the prior-year period.

- **Advertiser direct revenue** was $44.7 million, a 2% increase compared to $43.9 million in the prior-year period.

- **Supply side revenue** was $17.6 million, a 9% increase compared to $16.2 million in the prior-year period.

\* \* \*

**Financial Outlook**

Tania Secor, CFO of IAS, commented, "Our 2023 financial outlook reflects our commitment to profitable growth.  We expect adjusted EBITDA margin improvement resulting from our more streamlined and efficient operations, primarily due to the restructuring in the fourth quarter.  At the same time, we will continue to invest in targeted initiatives in 2023 to support our long-term growth."

IAS expects revenue and adjusted EBITDA for the first quarter and full year 2023 in the following ranges:

**First Quarter Ending March 31, 2023:**

- **Total revenue** of $102 million to $104 million

- **Adjusted EBITDA** of $29 million to $31 million

**Year Ending December 31, 2023:**

- **Total revenue** of $453 million to $463 million

- **Adjusted EBITDA** of $141 million to $149 million

(Footnotes omitted.)

28.    During the earnings call that same day, March 2, 2023, Utzschneider stated:

In 2022, we won several large multiyear deals, including JPMorgan Chase, LinkedIn, Progressive and Kimberly-Clark.  Today, we are excited to announce several new competitive wins that reinforce our standing in the market as the leading provider and formidable competitor.  Ford, Hershey, Bel and Kering selected IAS after extensive tech and product due diligence versus other competitors.  As these are major global wins with marquee brands we'd like to walk you through *why they chose to partner with IAS*.

Ford selected IAS as their global ad verification partner.  We expect to expand our coverage with Ford from 17 to over 50 markets, including the U.S. which has been serviced by an incumbent provider.  We are proud that our robust brand safety technology continues to attract new customers.

Hershey chose IAS based on our differentiate CTV technology, campaign automation and high standard of service.

Bel, a world leader in branded cheese, including Babybel, and a major player in the healthy snacking segment, awarded IAS with a global deal. Bel was impressed by IAS' measurement capabilities, our integrations with the leading tech partners and our superior customer service.

Kering, a major worldwide luxury group with notable brands such as Gucci and Yves Saint Laurent, signed a global deal with IAS in the first quarter of 2023. We clinched this win as a result of our leadership in the luxury vertical, superior technology, integrations with Google, and exceptional client support.

\* \* \*

Our products have never been more relevant as marketers lean into our differentiated solutions. IAS enables safe content to thrive which results in greater efficiency and return on ad spend for marketers and increased yields and optimization for publishers. Our model is highly differentiated as our pricing is independent of the media rates negotiated e-CPMs directly with marketers. We're a volume-based model and not immune to volatility in ad spend. However, the essential nature of our solutions provides us with some level of insulation. Building on our accomplishments in 2022, we plan to continue to innovate further on behalf of our customers with data as the foundation. Under the leadership of our new CTO, we are enhancing our tech stack for greater scale and the ability to access, process and analyze data to feel superior results for marketers. This will enable us to support future growth and innovation in high-growth areas.

In conclusion, we made tremendous strides in 2022 to position IAS for long-term success. We strengthened our leadership team, invested in high-growth areas and solidified our partnerships. We are thrilled to extend our market presence with recent logo wins, which highlights the success of our new go-to-market strategy. I am excited to unleash the potential of IAS in 2023 and beyond. We are geared up and ready to go.

29.     On March 2, 2023, after the close, the Company filed an Annual Report on Form 10-K for the period ending December 21, 2022 ("2022 Form 10-K") with the SEC. The 2022 Form 10-K stated, *inter alia*, that:

[C]ompetitors may be better able to respond quickly to new technologies, develop deeper relationships, or offer competitive services at lower prices. Any of these developments would make it more difficult for us to sell our platform and **could result in increased pricing pressure**.

\* \* \*

9

The intense competition we face in the sales of our products and services and general economic and business conditions *could put pressure on us to change our prices*.

\* \* \*

Some of our competitors may bundle products for promotional purposes or as a long-term pricing strategy, commit to large customer deployments at prices that are unprofitable or provide certain guarantees. *These practices could, over time, significantly constrain the prices that we charge for certain of our offerings*. If we do not adapt our pricing models to reflect changes in customer use of our products or changes in customer demand, our revenues could decrease.

30.     During a March 7, 2023, JMP Securities Technology Conference, CEO Utzschneider was asked, "What do you think differentiates IAS from competitors?"  Utzschneider responded:

> Ford, Hershey, iconic brands.  Few reasons why the team is putting the wins on the board and why these marketers are choosing IAS.  Global footprint, we talked about that before being a big differentiator.  Every single one of those four wins were a competitive RFP jump ball against our competitors.  We directly won the business. All four of them, deep, deep, deep product and tech diligence.  And we were able to demonstrate the sophistication of our technology and also demonstrate our investments in our product and tech.  Global service, so we've been investing heavily in client service.  I—this is my third sort of macroeconomic environment in my career, living through it and marketers, they deeply care about client service, especially in down economies ROI and efficiency.
>
> So I would say it was—it's all those reasons, and then also investments, as we talked about before in brand safety, brand suitability, and CTV.

31.     During a March 8, 2023, Morgan Stanley Technology, Media & Telecom Conference, CEO Utzschneider was asked by analysts, "[w]hen it comes down to the IAS offering, what are the reasons that you would highlight the most that people pick you over your competition? And in the last couple of years, is there anything you've highlighted—you would highlight that you developed that's helped to create that differentiation?"  Utzschneider responded:

> So a couple of reasons for differentiation, and why advertisers like Ford or Hershey's are leaning in and choosing IAS.  I mentioned it before, but our global footprint, IAS was in EMEA.  Almost nine years ago, placed ourselves in EMEA and APAC, and we have deep roots in both regions.  We've also been investing in

emerging markets.  So think of emerging markets like Latin America, Southeast Asia, India, Northern Europe.  These global marketers like Nestlé, Coke, GlaxoSmithKline are having a broad global footprint, it really matters to the marketers because they are running their branded advertising everywhere.

So, global footprint matters.  The differentiation of our product offering and technology.  I would say in particular, our context control technology, the fact that we can classify content both based on semantic and sentiment or emotion, that's a big differentiator that our tech can detect things like hate speech.  Our multimedia classification within the live feeds of the social platforms.  TikTok, we have an incredible global partnership with TikTok.  And we're now able to classify live video, image, audio.  I know it's cool, and text within the live feed of TikTok.  We're able to identify objects.  We're able to put a timestamp on when—I don't know how many of you use TikTok, how many amounts of you use TikTok, but within these TikTok videos, we can identify the objects, time stamp it, identify brands, identify celebrities, it's incredibly cool technology, it's ML AI-based, it's getting smarter, as we go and we've just gotten started.  So I'd say technology.  And then, I would say the third reason is global service.  I mentioned it before, but we invested early on in global service to make sure, especially for these really large multimillion dollar accounts that we're providing high-touch service.  Because they are leaning into IAS they're investing with us and they expect a level of service.  So I would say those are the three reasons, global footprint, quality and accuracy of our technology, and our service.

32.    On May 4, 2023, after the close, the Company issued a press release announcing first quarter 2023 financial results.  The press release stated, in relevant part, as follows:

"We exceeded our first quarter outlook with ***increased demand across our product portfolio*** and benefited from several recent new customer wins," said Lisa Utzschneider, CEO of IAS.  "Marketers trust IAS to measure and optimize their digital advertising spend while protecting brand safety.  We are advancing our technology and platform partnerships to ensure our customers leverage actionable data in fast-growing channels."

**First Quarter 2023 Financial Highlights**

- **Total revenue** was $106.1 million, a 19% increase compared to $89.2 million in the prior-year period.

- **Programmatic revenue** was $51.0 million, a 26% increase compared to $40.6 million in the prior-year period.

- **Advertiser direct revenue** was $40.7 million, an 18% increase compared to $34.6 million in the prior-year period.

- **Supply side revenue** was $14.4 million, a 2% increase compared to $14.1 million in the prior-year period.

* * *

**Financial Outlook**

"In addition to strong top-line performance, we grew net income and adjusted EBITDA in the first quarter," said Tania Secor, CFO of IAS.  "Our strong balance sheet and healthy cash flows allow us to invest in the growth of the business.  We are raising our 2023 outlook to reflect our first quarter results and positive business momentum highlighted by new customer wins and expanded market opportunities."

IAS is introducing the following financial outlook for the second quarter of 2023 and increasing its full year 2023 outlook for revenue and adjusted EBITDA:

**Quarter Ending June 30, 2023:**

- **Total revenue** in the range of $111 million to $113 million

- **Adjusted EBITDA** in the range of $35 million to $37 million

**Year Ending December 31, 2023:**

- **Total revenue** in the range of $457 million to $465 million

- **Adjusted EBITDA** in the range of $147 million to $153 million

(Footnotes omitted.)

33.     During the June 13, 2023 Analyst and Investor Day, Utzschneider concerns over the stability of pricing, stating:

So let's spend a couple of minutes on pricing.  *I know many of you are also very interested to hear about how our pricing works,* because we've had a lot of questions on this in some of our one-on-ones.  So I wanted to put together just a very simple explanation of how our pricing works because it is actually quite simple.

In terms of measurement, optimization and publisher, we charge a fixed cost per 1,000 of impressions multiplied by the number of impressions.  The CPMs are fixed, we negotiate those CPMs either with the agency, the advertiser or the publisher.  And our volume is variable based on industry trends and economic conditions.  This approach provides us with stability and visibility into our rates, and we do not have volatility based on the media rates.

Another slide on pricing.  The bars in this chart represent our CPM for some of our most popular offerings.  The customer journey starts with measurement.  It expands to optimization.  And you can see, because of the strong customer value proposition that our tech provides, we have a much higher CPM for our optimization business than we do for our measurement business.  As a result, the total cart value or the cumulative CPM of our offerings can be as high as six times our measurement CPM.

Now, I know you've seen the slide, both Yannis and Lisa presented it today, but I wanted to bring it up again because it's a very good framework of how to think about what's driven our revenue growth historically and what will continue to drive our revenue going forward.

Another point I'd like to make is that we have sticky and deep integrations with our platform partners.  The nature of our revenue is reoccurring.  And while the economic environment is a factor that influences impressions, we are well diversified across a variety of industries and we have stability from our fixed CPMs.

34.    During the Analyst and Investor Day, Secor further stated

To conclude, ***we have a very attractive and sustainable financial profile.***  And we will continue to pursue this balance of both revenue growth and profitability.  You've heard today about the multiple drivers of growth for our business and how we are very well-positioned to continue to benefit from these trends.  So going forward, we will focus on maintaining double-digit revenue growth and 30% plus percent EBITDA margins for the foreseeable future.  And finally, we expect to continue to generate very strong free cash flow to continue to enhance our already strong balance sheet.

\* \* \*

I would say to that, … with the fixed CPMs that we have across our offerings, we do benefit when we see big spikes in volume like we did in the first quarter.  Our measurement volume was up 29%.  At the same time, especially given all of the different offerings we have across the different markets, ***we also have a very strong pricing function*** and we always look for opportunity to look at where there could be opportunity, especially given the value that our tech provides and the customer value proposition for the customer.

35.    During the Analyst and Investor Day, a Barclays analyst asked, "How are customer conversations going around price elasticity or like elasticity… ?  And so how are they thinking about the price as part of this whole equation?" Similarly, a Truist analyst noted that the Company's "immediate peer in the last 12 months has raised prices," and asked, "how do you guys

compare on that basis? When was the last time you guys have actually increased your prices?" In response, Utzschneider optimistically stated: "as the world continues to shift to video, everyone knows, video, CTV demand a higher eCPM and I think that will also balance out any pricing fluctuations in the ecosystem, not with us. *We have been able to maintain price*."

36. In a presentation for the June 13, 2023 Analyst and Investor Day, IAS attributed its "ATTRACTIVE AND SUSTAINABLE FINANCIAL PROFILE" in part to the Company's "Favorable pricing structure," which the presentation identifies as one of two "DRIVERS OF SUSTAINABLE GROWTH":

## ATTRACTIVE AND SUSTAINABLE FINANCIAL PROFILE

| TRACK RECORD OF PROFITABLE GROWTH | ■ 11 straight quarters of double-digit revenue growth<br>■ Adjusted EBITDA margin of 32% in Q1'23<br>■ Net income profitable for 5 straight quarters |
| MULTIPLE DRIVERS OF SUSTAINABLE GROWTH | ■ Multiple expansion opportunities and favorable industry trends<br>■ Favorable pricing structure with cart value up to 6x base |
| LOYAL CUSTOMER BASE THAT GROWS WITH IAS | ■ Net revenue retention rate of 118%+ past 7 quarters<br>■ Growing revenue per large customer<br>■ Average customer tenure of ~8 years |
| STRONG FCF GENERATION AND CAPITAL POSITION | ■ Attractive free cash flow generation<br>■ Strong capital position with excess cash and revolver capacity<br>■ Productivity gains enabling investment for growth |

37. On August 9, 2023, Oppenheimer Technology, Internet & Communications event, an Oppenheimer stock analyst asked the Company's CFO, Secor, to "unpack price versus volume trends," and in response, Secor stated "Our revenue is a function it's a very simple revenue model. It's a function of price, …"

38. The above statements identified in ¶¶27-37 were materially false and misleading and failed to disclose materially adverse facts about the Company's business and operations. Specifically, Defendants misrepresented and/or failed to disclose (i) that IAS was experiencing a new material trend of increased competitive pricing pressures and that, as a result, IAS had been forced to cut prices to compensate for weakening demand and slowing revenue

growth; (ii) that IAS's pricing function was no longer "favorable" and IAS could not sustain its pricing and drive price increases; (iii) that pricing had become a key differentiator between IAS and its competitor necessary to close major renewals and new deals; (iv) that the risks that competition "***could*** result in increased pricing pressure" or "***could*** put pressure on us to change our prices" had in fact transpired;  and (v) as a result, the IAS's public statements were materially false and misleading at all relevant times.

<u>**The Truth Begins to Be Revealed**</u>

39.    On August 3, 2023, after the close, the Company issued a press release announcing second quarter 2023 financial results.  The press release stated, in relevant part, as follows:

> "We continue to execute on our growth strategy with results for the second quarter ahead of our prior expectations," said Lisa Utzschneider, CEO of IAS.  "We are leading with innovation as we scale our products to new markets with our platform partners and unlock valuable insights with increasingly actionable data.  ***Our global business momentum continues with several new brand logos added recently***."

> **Second Quarter 2023 Financial Highlights**
>
> - **Total revenue** was $113.7 million, a 13% increase compared to $100.3 million in the prior-year period.
>
> - **Optimization revenue** (f/k/a programmatic) was $52.8 million, a 10% increase compared to $47.9 million in the prior-year period.
>
> - **Measurement revenue** (f/k/a advertiser direct) was $44.9 million, a 23% increase compared to $36.6 million in the prior-year period.
>
> - **Publisher revenue** (f/k/a supply side) was $15.9 million, a 1% increase compared to $15.8 million in the prior-year period.
>
> * * *
>
> **Financial Outlook**
>
> "Our financial performance in the second quarter reflects our ability to meet our customers' needs with diverse offerings across the digital media ecosystem," said Tania Secor, CFO of IAS.  "We expanded our margins during the quarter while investing in key growth areas.  We continued to generate strong cash flow, which enabled us to pay down $20 million of debt in the period.  We are on track to deliver a healthy mix of revenue growth and profitability for the full year."

IAS is introducing the following financial outlook for the third quarter of 2023 and increasing the midpoint of its full year 2023 outlook for revenue and adjusted EBITDA:

**Third Quarter Ending September 30, 2023**:

- **Total revenue** of $112 million to $114 million

- **Adjusted EBITDA** of $35 million to $37 million

**Year Ending December 31, 2023**:

- Total revenue of $459 million to $465 million

- **Adjusted EBITDA** of $149 million to $153 million

(Footnotes omitted.)

40.    Optimization (f/k/a programmatic) revenue's increase of merely 10% was a substantial decline in the Company's year-over-year optimization revenue growth rate as compared to every previous fiscal quarter reported since the Company's IPO in June 2021:

| Fiscal Quarter | Optimization Revenue Growth YoY |
|---|---|
| Q2 2023 | +10% |
| Q1 2023 | +26% |
| Q4 2022 | +30% |
| Q3 2022 | +40% |
| Q2 2022 | +51% |
| Q1 2022 | +53% |
| Q4 2021 | +43% |
| Q3 2021 | +49% |
| Q2 2021 | +94% |

41.    During the Company's second quarter ("Q2") 2023 earnings call on August 3, 2023, Secor attributed the decline in optimization growth to factors other than pricing pressure:

Optimization revenue formerly known as programmatic revenue grew 10% year-over-year in the second quarter to $52.8 million.  Optimization revenue growth in the period reflects ***maturing context-controlled growth*** in line with our prior expectations, the contribution from new logo wins, and strength in the CPG vertical, partially ***offset by slower demand from tech/telco clients***.  We are investing in

optimization to drive continued adoption of our offerings.  We are enhancing both our product capabilities and go-to-market engine.

42.    Also, on the Q2 2023 earnings call, Utzschneider reassured the market about the Company's pricing power, suggesting that a "slight" decline in CPM in the optimization segment was just normal fluctuation and not a trend that the Company expected to continue:

> [I]n the second quarter, we were really pleased to see optimization volumes continuing at Q1 levels of 14%.  We did see a ***slight decline*** in the average CPM for the period, and it is an average, and that will reflect—averages is will reflect shifts in our product mix, shifts in our customers.  And that can fluctuate from quarter-to-quarter, and ***we do not expect that trend to continue on optimization***.  But, turning over to measurement, we were pleased for the measurement average CPM for the quarter the uptick, which was a reversal of what we saw in the first quarter, of down 6%.  And that reflects the increase in video we reached a—50% of our measurement revenue was video-related.  And as you all know, video is a premium to display, and that is what drove up the CPM in the second quarter on the measurement side.

43.    On August 4, 2023, after the earnings release, the Company's stock price declined $3.66 (or approximately 20%) to $15.17 per share from the previous day's close of $18.83 per share.

44.    During a September 8, 2023 Citi Global Technology Conference, a Citi analyst asked Secor about her "thoughts on this broader pricing leverage in the platform and then just the effect of pricing and what that means across."  Secor responded:

> We have a really compelling business model and you see it in our strong net revenue retention, which was 115% in the second quarter.  And what's driving that is the customer journey typically starts with measurement.  Our pricing on measurement is at a certain level.  And then as the customer expands into our products, particularly on the optimization side, which has a much higher CPM, there's an opportunity to drive velocity in our pricing of up to 5 to 6 times as the customer goes on that journey.  So a lot of our revenue growth is driven by internal adoption.
>
> ***And what we're finding too is that our pricing, when the tech is there and we have such a strong customer value proposition, our pricing is higher.***  And as the customer moves along that journey, they really value that value proposition and the enhancements that our tech solutions are driving on their digital media spend, and we're able to capture that price and you can see that in our uplift as customers expand revenue within our product suite.

45.     During a December 5, 2023, Raymond James TMT and Consumer Conference, a Raymond James analyst inquired about the "the environment for pricing." Secor responded:

> We enter into one- to three-year contracts with our clients and these are exclusive many times global contracts where we negotiate a CPM with these clients. These are fixed CPMs. But at times when we're introducing new technology like TMQ, *we're able to drive a bit of a price increase*.

> Now, we're really focused on volume. We were really pleased in the third quarter to see our volume acceleration from the second quarter. So, volume growth across measurement and optimization were 25% and 19% respectively, which was up from the second quarter. And we did that *while pricing was still consistent* and so pleased to see that dynamic.

46.     The above statements identified in ¶¶39-45 were materially false and misleading and failed to materially adverse facts about the Company's business and operations. Specifically, Defendants misrepresented and/or failed to disclose (i) that IAS was experiencing a new material trend of increased competitive pricing pressures and that, as a result, IAS had been forced to cut prices to compensate for weakening demand and slowing revenue growth; (ii) that IAS's pricing function was no longer "favorable" and IAS could not sustain its pricing and drive price increases; (iii) that pricing had become a key differentiator between IAS and its competitor necessary to close major renewals and new deals; and (iv) as a result, the IAS's public statements were materially false and misleading at all relevant times.

47.     On February 27, 2024, after the close, the Company announced fourth quarter and full year ended December 31, 2023 financial results and reported lackluster guidance for 2024. Revenue guidance for the first quarter of 2024 was "$111 million to $113 million," which was below analyst estimates of $119.8 million (Bloomberg Consensus). Revenue guidance for the full year 2024 was "$530 million to $540 million," which was below analyst estimates of $544.2 million.

48.     During a conference call that same day, Utzschneider revealed:

> Our business today is weighted towards a loyal base of large advertising customers with an average tenure of over eight years for our top 100 marketers. At the end of

the fourth quarter, we had 222 large advertising customers with annual spend of at least $200,000 per year.

Revenue from these large advertising customers represented 87% of our total advertising revenue for the trailing twelve-month period. ***We are seeing more competitive pricing and measurement on a select group of large contract renewals in exchange for increased volume commitments and multi-year exclusive agreements. We have factored this dynamic into our growth outlook for 2024***.

49.    During that same conference call, Secor stated:

[O]ur first quarter outlook reflects ***more competitive pricing*** and measurement on a select group of large contract renewals in exchange for increased volume commitments and multi-year exclusive agreements. We have also factored into our Q1 outlook the implementation of previously negotiated pricing by one optimization account.

50.    During the call a Stifel analyst asked: "I was hoping maybe you could expand a little bit on the pricing pressure that you're seeing beyond what you said in the prepared remarks. I guess, can we expect that to continue and be something that is a headwind throughout the year? I know you gave us full year guidance, but I guess what's the right way to think about that? And then second, I guess, just Q1, the growth rate, pretty big decel and then the second half, or I guess the remaining three quarters, a pretty nice uptick to get you to the full year, I guess. What are the moving pieces that should reaccelerate the growth beyond Q1?"

51.    Utzschneider responded to the Stifel analyst as follows:

***So, in terms of competitive pricing dynamics that we're seeing, as we mentioned in the script, we offered more competitive pricing*** and measurement on a select group of large contract renewals in exchange for volume commitments and multi-year exclusive agreements. The way to think about that is, yes, we were facing those competitive dynamics, but we thought it was the strategic thing to do is to ensure that we renew these large accounts and ensure that they drive up volume. Also, our strategy has been to secure measurement renewals so that we can upsell and cross-sell our offerings, expand geographies and ramp over time.

52.    Analysts were surprised by "competitive pricing dynamics." In a February 28, 2024 report, Barclays stated:

IAS now sees pressure in the short term from some price competitive renewals, which are expected to impact growth negatively. ***This was not expected by the investment community, and will raise fears about the competitive market***, which could be a more longer-term issue.

53.    In a February 28, 2024 report, Raymond James stated:

IAS' pricing moves drew the majority of interest on the call, with management noting competitive dynamics driving a desire to lock in customers to provide cross-sell/up-sell opportunities. ***Historically, IAS has been confident of their ability to defend pricing (noting that competitors' pricing was typically not very divergent). As such, the desire to become more aggressive was surprising.*** The outstanding questions that follow are: 1) is there the risk of contagion to other clients, and 2) could this trigger a downward price spiral.

54.    In a February 28, 2024 report, Benchmark stated:

***IAS' pricing power is called into question after last night's reveal of renegotiated lower pricing terms*** for nearly a dozen measurement clients and one large optimization client …. What we do not know is how many more forward measurement client renewals will require similar renegotiated pricing terms and whether the new minimum volume commitments are above the respective clients' prior run-rates (or did IAS give up net economics for customer duration).

55.    On February 28, 2024, the Company's stock price declined $7.09 (or approximately 41%) to $10.01 per share from the previous day's close of $17.10 per share.

## POST-CLASS PERIOD REVELATIONS

56.    On November 1, 2024, a Public [Redacted] Verified Stockholder Derivative Complaint ("Complaint") was filed in the Court of Chancery of the State of Delaware against Vista and certain of IAS directors affiliated with Vista: Aliabadi, Fosnaugh, Lema, Nakatsukasa and Taylor.

57.    The Complaint is alleged, in part, on the review of documents obtained from the Company in a books and records demand made under 8 Del. C. § 220.

58.    The Complaint alleged, among other things, that Vista "saw fit to front-run negative news about the Company, selling millions of shares of IAS stock based on material non-public information and thereby avoiding nearly $270 million in losses."

59. The Complaint alleged that:

> Through its presence in the boardroom, Vista learned, beginning in February 2023, that IAS's revenue growth had started to slow. In consecutive quarterly Board meetings in February 2023 and May 2023, Vista's representatives and handpicked directors learned that IAS was experiencing "pricing pressure" in its ad verification and optimization businesses, and that the Company had resorted to cutting rates to win "marquis [sic] customers." As IAS management contemporaneously recognized, the Company heavily relies on maintaining a "[f]avorable pricing structure" as a key "driver[] of sustainable growth." Analysts likewise recognized that pricing is critical to the IAS's success and thus were "very interested to hear about how [the Company's] pricing works."

(Alteration in original.)

60. Concerning a February 2023 Board Meeting, the Complaint alleged that "[b]eginning in February 2023, the Board was expressly told that the Company faced pricing pressures." In particular, the Complaint alleged:

> For instance, at a February 23, 2023 board meeting, the Board learned that "client direct contracts and emerging markets growth are the largest contributors to verification pricing pressure." As noted above, "verification" is one aspect of the post-bid measurement services that IAS offers to its advertiser customers. Proceeds attributable to the Company's verification services are categorized as "measurement revenue (f/k/a advertiser direct revenue)," which accounted for approximately 38% of the Company's total revenue in 2022. As the slide below shows, in order to win "marquis [sic] customers," the Company resorted to cutting rates charged when renewing and securing new contracts, leading to fee compression, as shown below.

> [SLIDE REDACTED IN COMPLAINT]

> This meeting was attended by all five Director Defendants—Fosnaugh, Aliabadi, Lema, Nakatsukasa, and Taylor—and two Vista representatives, including Ashley MacNeill, Managing Director and Head of Equity Capital Markets at Vista.

(Footnote omitted.)

61. According to May 2023 Board meeting, the Complaint alleged:

> For instance, on May 11, 2023, the Board held a "CEO Session" during a meeting attended by Director Defendants Fosnaugh, Lema, and Nakatsukasa, and Vista representative and Head of Equity Capital Markets

Ashley MacNeill.  Through this "CEO Session," the Board learned that one of the "lowlights" of the "state of the business" was "increased customer pressure to prove Programmatic [i.e., optimization] value vs. agency or free alternatives."  The Board also learned in a finance presentation made during this meeting that another "lowlight" was "continued pricing pressure to win marquis [sic] customers and focus on ROI and efficiency leading clients to look at lower-priced / free programmatic [i.e., optimization] solutions."  Indeed, one of the "Top Loss Reasons" for why the Company was failing to secure new business was competitors' "Aggressive Pricing."

(Footnotes omitted.)

62.    As to an August 2023 Board meeting, the Complaint alleged:

On August 1, 2023, the Board met with Aliabadi, Fosnaugh, Lema, Nakatsukasa, and Taylor in attendance, among others.  Materials distributed to the Board in advance of the meeting confirmed that the Company experienced "lower than expected Optimization growth[,]" noting that it "expect[ed] this trend to continue."  Revenue results from the first half of 2023 showed that "Optimization growth of 26% [in] Q1 slow[ed] to 10% [in] Q2[,] driven by slowdown of Context Control [REDACTED]"  Pricing concerns were also highlighted, stating that [REDACTED] and that there was "[c]ontinued [c]ompetition in Programmatic" because "[a]dvertisers are increasingly cost conscious due to macroeconomic conditions[.]

(Footnotes omitted.)

63.    As to a November 2023 Board meeting, the Complaint alleged:

On November 9, 2023, the Board met and reviewed a preliminary forecast for 2024, or "Preliminary 2024 AOP [Annual Operating Plan]."  This meeting was attended by the full Board, including Director Defendants Fosnaugh, Aliabadi, Lema, Nakatsukasa, and Taylor, as well as Vista representative and Head of Equity Capital Markets Ashley MacNeill.

During this meeting, as part of the "Executive Summary" of the projections, the Board learned that "[t]he competitive pricing environment has accelerated in the past few months and [is] expected to negatively impact 2024."

(Footnote omitted.)

## VISTA'S INSIDER TRADING

64.    Starting on May 12, 2023, Vista began selling its shares of IAS stock for the first time since the Company's IPO nearly two years earlier, in June 2021.  Notably, Vista began selling these shares only after Vista's representatives on the Board learned of the Company's slowed

growth and its growing struggles with key customer retention leading to a loss of pricing power but prior to this information being public.

65.     On May 12, 2023—just one day after the May 11 Board meeting highlighting the Company's pricing woes—Vista sold 11.5 million shares of the Company's stock at a price of $15.00 per share through a secondary offering (the "May 2023 Offering"), or $172.5 million.  After the May 2023 Offering, Vista held approximately 54% of the Company's voting power.

66.     One month later, on June 15, 2023—two days after the June 13, 2023 Analyst and Investor day—Vista sold another 5.22 million shares of the Company's stock in a block trade at a price of $18.13 per share (the "June 2023 Sale").

67.     Vista strategically timed the May 2023 Offering and June 2023 Sale to lock in a profit before the Company publicly disclosed its pricing and revenue struggles.  As described above, on each of February 23, and May 11, 2023, Vista's representatives on the Board learned that the Company was experiencing pricing pressure due to competitors' aggressive pricing that would likely lead to slowing revenue growth.  Through these two sales, Vista reduced its position in IAS by more than 18%, from 94,380,001 shares to 77,600,001 shares.  In total, Vista sold 16,720,000 shares

68.     On December 7, 2023, Vista conducted another underwritten secondary offering of 11 million shares of the Company's common stock at a price of $14.00 per share (the "December 2023 Offering").  Goldman served as the underwriter for the December 2023 Offering.  Vista granted Goldman an option to purchase up to an additional 1.65 million shares from Vista. On January 4, 2024, Goldman exercised that option in full.  In total, Vista sold 12.65 million shares of IAS stock through the December 2023 Offering, all at a price of $14.00 per share.  Vista reaped proceeds of approximately $177 million from the December 2023 Offering.

## **LOSS CAUSATION**

69.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market.  This artificially inflated the price of IAS shares and operated as a fraud or deceit on the class (as defined

below).  Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market, the price of IAS shares fell precipitously as the prior artificial inflation came out of the price over time.  As a result of their purchases of IAS shares during the Class Period, Plaintiff and other members of the class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

70.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities that purchased shares of IAS common stock during the Class Period.

71.     Excluded from the class are Defendants and their families, directors and officers of IAS and their families and affiliates.

72.     The members of the class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  On February 23, 2024, IAS had 159,520,093 shares of common stock outstanding, owned by hundreds or thousands of investors.

73.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the class which predominate over questions which may affect individual class members include:

(a)     Whether Defendants violated the Exchange Act;

(b)     Whether Defendants omitted and/or misrepresented material facts;

(c)     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether Defendants are personally liable for the alleged misrepresentations and omissions described herein;

(e)     Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(f)     Whether Defendants' conduct impacted the price of IAS common stock;

(g)     Whether Defendants' conduct caused the members of the class to sustain damages; and

(h)     The extent of damage sustained by class members and the appropriate measure of damages.

74.     Plaintiff's claims are typical of those of the class because Plaintiff and the class sustained damages from Defendants' wrongful conduct.

75.     Plaintiff will adequately protect the interests of the class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the class.

76.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Joinder of all class members is impracticable.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

77.     IAS's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

78.     Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of IAS who knew that the statement was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## PRESUMPTION OF RELIANCE

79.     At all relevant times, the market for IAS shares was an efficient market for the following reasons, among others:

(a)     IAS shares met the requirements for listing, and were listed and actively traded on NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, IAS filed periodic public reports with the SEC and NASDAQ;

(c)     IAS regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     IAS was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

80.     As a result of the foregoing, the market for IAS shares promptly digested current information regarding IAS from all publicly available sources and reflected such information in the price of the Company's common stock.  Under these circumstances, all purchasers of IAS common stock during the Class Period suffered similar injury through their purchase of IAS common stock at artificially inflated prices and the presumption of reliance applies.

81.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding IAS's business operations—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of pricing visibility and effective sales practices for the Company's margins and profitability, that requirement is satisfied here.

## COUNT I

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### Against IAS and the Officer Defendants

82.    Plaintiff repeats, incorporates and realleges each and every allegation contained above as if fully set forth herein.

83.    During the Class Period, IAS and the Officer Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, including Plaintiff and other class members, as alleged herein; and (b) cause Plaintiff and other members of the class to purchase IAS shares at artificially inflated prices.

84.    IAS and the Officer Defendants: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's shares in an effort to maintain artificially high market prices for IAS shares in violation of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

85.    IAS and the Officer Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations and prospects.

86.    During the Class Period, IAS and the Officer Defendants made the false statements specified above, which they knew or recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

87.    IAS and the Officer Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. IAS and the Officer Defendants engaged in this misconduct to conceal IAS's

true condition from the investing public and to support the artificially inflated prices of the Company's shares.

88.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for IAS shares.  Plaintiff and the Class would not have purchased the Company's shares at the prices they paid, or at all, had they been aware that the market prices for IAS shares had been artificially inflated by these Defendants' fraudulent course of conduct.

89.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's shares during the Class Period.

90.     By virtue of the foregoing, IAS and the Officer Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

## COUNT II

**For Violations of Section 20(a) of the Exchange Act**
**Against the Officer Defendants and Vista**

91.     Plaintiff repeats, incorporates and realleges each and every allegation contained above as if fully set forth herein.

92.     By reason of the allegations listed herein, IAS, by and through its executive officers and directors, knowingly or recklessly, directly or indirectly violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes and artifices to defraud; (b) failed to disclose material information; or (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class in connection with their purchases of IAS common stock during the Class Period.

93.     The Officer Defendants acted as controlling persons of IAS within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the

Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about IAS, the Officer Defendants had the power and ability to control the actions of IAS and its employees. By reason of such conduct, the Officer Defendants are liable pursuant to Section 20(a) of the Exchange Act.

94.    At all relevant times, Vista was a controlling person of the Company through its direct and indirect control of the Company. Vista has controlled IAS since June 2018, when Vista purchased a majority stake in IAS. Vista has consistently maintained control over IAS, including through the Company's initial public offering in June 2021. Vista held more than 50% of the Company's outstanding common stock until June 2023, when Vista sold a significant block of its IAS shares as discussed herein. As of the proxy statement filed April 3, 2024, Vista owns 41% of the Company's stock. Vista effectively controls the Board's composition. Pursuant to a Director Nomination Agreement, Vista holds the right to designate a set number of nominees to the Board based on how much Company stock Vista beneficially owns. The Board consists of ten directors. The five directors are Vista employees: Fosnaugh, Aliabadi, Lema, Nakatsukasa and Taylor. Three other members of the Board also have ties to Vista: Utzschneider, Jill Putman ("Putman") and Bridgette Heller ("Heller"). Approximately one-third of Utzschneider's options award is contingent on the achievement of a 3x return on investment to Vista. Putman joined Vista in January 2021. Putman is the former CFO of Jamf. Putman joined Jamf when it was a private company in 2014, led "the sale of Jamf to Vista Equity Partners," and stayed after Vista took Jamf public in 2020. Heller joined the IAS Board in May 2021. Just four months earlier, in January 2021, Heller joined the board of another Vista-owned company, Numerator. By reason of such conduct, Vista is liable pursuant to Section 20(a) of the Exchange Act.

## COUNT III

### Violation of Section 20A of the Exchange Act
### Against Vista

95.    Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

96.     This claim is brought pursuant to Section 20A of the Exchange Act, 15 U.S.C. § 78t-1, against Defendant Vista on behalf of all members of the Class damaged by the insider trading by this Defendant during the Class Period.

97.     Lead Plaintiff purchased at least one share of IAS common stock contemporaneously with sales of IAS common stock by Vista.

98.     By virtue of Vista's representation on the IAS Board and the specific facts alleged herein, Vista was in possession of material, adverse, non-public information about IAS contemporaneously with when Vista sold IAS common stock.

99.     Vista violated Section 20A of the Exchange Act and applicable rules and regulations thereto by selling IAS common stock while in possession of material, non-public information about the adverse information detailed herein.

100.    Lead Plaintiff and other members of the Class who traded in IAS securities contemporaneously with the sales of IAS stock by Vista have suffered substantial damages in that they paid artificially inflated prices for IAS stock as a result of the violations of Sections 10(b), 20(a) and 20A herein described.  Moreover, these Class members would not have traded IAS stock at the prices they paid or received, or at all, if they had been aware that the market prices had been artificially inflated by Defendants' false and misleading statements and scheme to defraud.

101.    Vista is required to account for all such stock sales and to disgorge its profits or ill-gotten gains.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d)     Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Lead Plaintiff hereby demand trial by jury of all issues that may be so tried.


Dated:  January 29, 2025                    Respectfully submitted,

                                            **BERMAN TABACCO**

                                            By:  */s/ Patrick T. Egan*

                                            Patrick T. Egan
                                            One Liberty Square
                                            Boston, MA 02109
                                            Telephone: (617) 542-8300
                                            Email: pegan@bermantabacco.com

                                            *Counsel for Plaintiff Oklahoma Firefighters*
                                            *Pension and Retirement System*

## CERTIFICATION

I, Chase Rankin, on behalf of Oklahoma Firefighters Pension and Retirement System ("Oklahoma Firefighters"), as Executive Director of Oklahoma Firefighters, hereby certify that the following is true and correct to the best of my knowledge, information and belief:

1.      I am fully authorized to enter into and execute this Certification on behalf of Oklahoma Firefighters.

2.      I have reviewed the complaint against Integral Ad Science Holding Corp. ("Integral Ad") and others alleging violations of the federal securities laws and have authorized Berman Tabacco to file the complaint on behalf of Oklahoma Firefighters.

3.      Oklahoma Firefighters did not engage in the transactions that are the subject of this action at the direction of counsel or in order to participate in this or any other litigation under the federal securities laws.

4.      Oklahoma Firefighters is willing to serve as a representative party on behalf of the class in this matter, including providing testimony at deposition and trial, as necessary.

5.      Oklahoma Firefighters' transactions in the securities that are the subject of this action are reflected in Schedule A, attached hereto. Other than the transactions set forth in Schedule A, Oklahoma Firefighters has engaged in no transactions during the class period in the securities that are the subject of this action.

6.      Oklahoma Firefighters has sought to serve as a lead plaintiff and representative party in a class action filed under the federal securities laws during the last three years, and was appointed, in the following:

- *Glazing Employers and Glaziers' Union Local #27 Pension and Retirement Fund v. iRhythm Technologies Inc.*, No. 24-cv-00706 (N.D. Cal.);

- *Steamfitters Local 449 Pension & Retirement Security Funds v. Extreme Networks Inc.,* No. 24-cv-05102 (N.D. Cal.);

- *Lee v. Goldman Sachs Group Inc.*, No. 22-cv-00169 (S.D.N.Y.);

- *Oklahoma Firefighters Pension and Retirement System v. Biogen Inc.*, No. 22-cv-10200 (D. Mass.);

- *Rasella v. Musk*, No. 22-cv-03026 (S.D.N.Y.);

- *In re Unity Software Inc. Sec. Litig.*, No. 22-cv-03962 (N.D. Cal.); and

- *City of Hollywood Firefighters Pension Fund v. Atlassian Corp.*, No. 23-cv-00519 (N.D. Cal.).

7.      Oklahoma Firefighters has also sought to serve as a lead plaintiff and/or representative party in a class action filed under the federal securities laws during the last three years, but withdrew its motion, filed a non-opposition to competing motions or was not appointed lead plaintiff, in the following:

- *In re FMC Corp. Sec. Litig.*, No. 23-cv-04398 (E.D. Pa.);

- *Ryan v. FIGS, Inc.*, No. 22-cv-07939 (C.D. Cal.); and

- *Vazquez v. Masimo Corp.*, No. 23-cv-01546 (S.D. Cal.).

8.      Oklahoma Firefighters serves as a representative party, but not as lead plaintiff, in a class action filed under the federal securities laws during the last three years, in the following:

- *In re Mobileye Global Sec. Litig.*, No. 24-cv-310-DLC (S.D.N.Y.) (additional named plaintiff);

- *In re FMC Corp. Sec. Litig.*, No. 23-cv-04398 (E.D. Pa.) (additional named plaintiff); and

- *Lozada v. TaskUs Inc.*, No. 1:22-cv-01479 (S.D.N.Y.) (additional named plaintiff).

9.      Beyond its *pro rata* share of any recovery, Oklahoma Firefighters will not accept payment for serving as a representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses including lost wages as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this ____ day of January, 2025.

Chase Rankin
Executive Director
Oklahoma Firefighters Pension &
Retirement System

**Schedule A**
**Integral Ad Science Holding Corp.**
**Cusip 45828L108**

**Class Period**: 03/02/23-02/27/24
**Shareholder**: Oklahoma Firefighters Pension & Retirement System

| Trade Date | Transaction | Shares | Trade Price |
|------------|-------------|--------|-------------|
| 03/16/23 | BUY | 242 | $12.7409 |
| 03/16/23 | BUY | 629 | $12.6100 |
| 03/16/23 | BUY | 1,428 | $12.8606 |
| 03/17/23 | BUY | 380 | $12.9327 |
| 03/17/23 | BUY | 380 | $12.8700 |
| 03/17/23 | BUY | 1,245 | $12.9072 |
| 03/20/23 | BUY | 380 | $13.3272 |
| 03/20/23 | BUY | 611 | $13.0417 |
| 03/20/23 | BUY | 855 | $13.2279 |
| 03/21/23 | BUY | 634 | $13.8500 |
| 03/21/23 | BUY | 1,152 | $13.8345 |
| 03/22/23 | BUY | 110 | $13.9318 |
| 03/22/23 | BUY | 2,919 | $13.8778 |
| 03/23/23 | BUY | 278 | $14.0835 |
| 03/23/23 | BUY | 809 | $14.1650 |
| 03/23/23 | BUY | 1,915 | $13.9453 |
| 03/24/23 | BUY | 760 | $13.9102 |
| 03/27/23 | BUY | 761 | $13.7682 |
| 03/27/23 | BUY | 1,029 | $13.8127 |
| 03/31/23 | BUY | 263 | $14.1166 |
| 03/31/23 | BUY | 873 | $14.2607 |
| 04/03/23 | BUY | 369 | $14.4955 |
| 04/03/23 | BUY | 379 | $14.3680 |
| 04/04/23 | BUY | 45 | $14.4988 |
| 04/04/23 | BUY | 59 | $14.4851 |
| 04/04/23 | BUY | 269 | $14.4851 |
| 04/04/23 | BUY | 463 | $14.4851 |
| 04/04/23 | BUY | 6,584 | $14.4851 |
| 04/05/23 | BUY | 41 | $14.7229 |
| 04/05/23 | BUY | 510 | $14.3296 |
| 04/05/23 | BUY | 781 | $14.3710 |
| 04/06/23 | BUY | 63 | $14.6476 |
| 04/06/23 | BUY | 239 | $14.6725 |
| 04/06/23 | BUY | 287 | $15.1957 |

| Trade Date | Transaction | Shares | Trade Price |
|---|---|---|---|
| 04/06/23 | BUY | 590 | $15.0005 |
| 04/10/23 | BUY | 56 | $15.0165 |
| 04/10/23 | BUY | 590 | $15.0000 |
| 04/11/23 | BUY | 168 | $15.5641 |
| 04/11/23 | BUY | 177 | $15.6700 |
| 04/12/23 | BUY | 118 | $15.8350 |
| 04/12/23 | BUY | 883 | $15.3680 |
| 05/18/23 | BUY | 2,091 | $16.7103 |
| 05/18/23 | BUY | 2,175 | $16.8924 |
| 05/19/23 | BUY | 948 | $16.8491 |
| 05/19/23 | BUY | 1,354 | $16.9790 |
| 05/22/23 | BUY | 143 | $17.0753 |
| 05/22/23 | BUY | 856 | $17.1000 |
| 05/22/23 | BUY | 2,140 | $17.3117 |
| 05/23/23 | BUY | 434 | $17.5753 |
| 05/23/23 | BUY | 621 | $17.7531 |
| 05/23/23 | BUY | 4,100 | $17.6348 |
| 06/07/23 | BUY | 242 | $18.2691 |
| 06/07/23 | BUY | 486 | $18.6749 |
| 06/23/23 | BUY | 572 | $17.6736 |
| 06/23/23 | BUY | 10,015 | $18.0097 |
| 08/18/23 | BUY | 46 | $14.1522 |
| 08/18/23 | BUY | 396 | $14.0280 |
| 08/21/23 | BUY | 11 | $14.1127 |
| 09/18/23 | SELL | (239) | $12.3827 |
| 09/18/23 | SELL | (1,084) | $12.4200 |
| 09/18/23 | SELL | (1,317) | $12.2457 |
| 09/19/23 | SELL | (215) | $12.0834 |
| 09/19/23 | SELL | (2,858) | $12.3573 |
| 10/03/23 | BUY | 234 | $12.0535 |
| 10/10/23 | BUY | 151 | $12.5096 |
| 10/20/23 | BUY | 335 | $11.7777 |
| 11/14/23 | BUY | 75 | $13.7410 |
| 11/14/23 | BUY | 411 | $13.9601 |
| 12/08/23 | BUY | 7,718 | $14.0012 |
| 01/05/24 | SELL | (112) | $14.1209 |
| 01/05/24 | SELL | (178) | $14.0577 |
| 01/23/24 | BUY | 603 | $15.5090 |
| 02/07/24 | BUY | 660 | $15.8244 |
| 02/08/24 | SELL | (3,173) | $16.2000 |
| 02/21/24 | BUY | 470 | $15.7178 |