## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| OKLAHOMA FIREFIGHTERS PENSION AND RETIREMENT SYSTEM, on behalf of itself and all others similarly situated,<br><br>               Plaintiff,<br><br>   v.<br><br>INTEGRAL AD SCIENCE HOLDING CORP., LISA UTZSCHNEIDER, TANIA SECOR, VISTA EQUITY PARTNERS FUND VI, L.P., VEPF VI, GP, LTD., VEPF MANAGEMENT, L.P., VEP GROUP, LLC, and VISTA EQUITY PARTNERS MANAGEMENT, LLC<br><br>               Defendants. | Case No. 1:25-cv-847<br><br>CLASS ACTION<br><br>DEMAND FOR JURY TRIAL |

## LEAD PLAINTIFF'S AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ................................................................................................1

II.     JURISDICTION AND VENUE ..........................................................................6

III.    PARTIES ............................................................................................................7

IV.     BACKGROUND ...............................................................................................11

      A.  The Company and Its Business..............................................................11

      B.  IAS's Direct Competition in the Marketplace ......................................12

          1.  IAS's "Virtual Duopoly" with DoubleVerify ..................................12

          2.  Emergence of Free and Lower-Cost Alternative Providers ............13

      C.  Vista's Control Over IAS And the Officer Defendants .........................14

V.      THE CONCEALMENT OF IAS'S PRICING PRESSURES IN THE BUSINESS
        AND SLOWING REVENUE GROWTH ..................................................18

      A.  Defendants' Knowledge of Pricing Pressure Negatively Impacting IAS's
          Business ................................................................................................18

      B.  Former IAS Employees Further Confirm the Extent to Which Pricing
          Pressures Were Negatively Impacting the Company...............................21

          1.  Confidential Witness 1......................................................................21

          2.  Confidential Witness 2......................................................................24

          3.  Confidential Witness 3......................................................................25

          4.  Confidential Witness 4......................................................................27

VI.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ...28

      A.  Q4 2022 Form 10-K, Press Release, and Earnings Call .......................28

      B.  March 2023 Investor Conferences ........................................................34

      C.  Q1 2023 Form 10-Q, Press Release, and Earnings Call .......................37

D. May 16, 2023 Investor Conference ........................................................41

E. June 13, 2023 Investor Day .................................................................43

F. The Truth Partially Emerges as IAS Continues to Mislead the Investing Public ....................................................................................................48

    i. The Q2 2023 Form 10-Q, Press Release, and Earnings Call ............48

    ii. August 8, 2023 Investor Presentation ............................................52

    iii. September 8, 2023 Citi's Global Technology Conference ..............53

    iv. Q3 2023 Form 10-Q and Earnings Call .........................................55

    v. December 5, 2023 Investor Conference..........................................56

VII. IAS REVEALS ITS STRUGGLES WITH PRICING, AND THE STOCK PRICE DROPS PRECIPITOUSLY..................................................................58

VIII. ADDITIONAL POST-CLASS PERIOD REVELATIONS .........................62

IX. ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER ..........63

X. VISTA'S INSIDER TRADING ..................................................................67

XI. LOSS CAUSATION AND ECONOMIC LOSS.........................................71

XII. *BASIC* AND *AFFILLIATED UTE* PRESUMPTIONS OF RELIANCE ....................72

XIII. NO SAFE HARBOR ...................................................................................74

XIV. CLASS ACTION ALLEGATIONS ............................................................75

XV. COUNTS.......................................................................................................77

XVI. PRAYER FOR RELIEF ...............................................................................83

JURY DEMAND ....................................................................................................84

Lead Plaintiff Oklahoma Firefighters Pension and Retirement System ("Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's information and belief is based upon, *inter alia*, its counsel's investigation, which includes, among other things: (a) review and analysis of regulatory filings made by Integral Ad Science Holding Corp. ("IAS" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"); (b) transcripts of IAS conference calls; (c) press releases issued by the Company; (d) investor presentations prepared by the Company; (e) analyst and media reports concerning the Company; (f) interviews with former IAS employees who were employed at the Company during the Class Period (defined herein); (g) court filings in the Court of Chancery of the State of Delaware in *Scarantino v. Vista Equity Partners Management, LLC, et al.*, C.A. No. 2024-1103-JTL, including the November 1, 2024 public redacted version of the Verified Stockholder Derivative Complaint ("Verified Delaware Complaint") and defendants' answers to the Verified Delaware Complaint; and (h) other public information concerning the Company.

## I.    INTRODUCTION

1.      In the words of legendary investor Warren Buffett, "[t]he single most important decision in evaluating a business is pricing power."  Under this principle, a company with strong pricing power has the ability to raise its prices without fear of losing business to competitors.  This case is about Defendants' material misstatements about IAS maintaining its pricing power, while Company insiders concealed the truth that IAS was facing significant pricing pressure that was dramatically impacting the Company's bottom line.  Before and during the Class Period (defined below), IAS led analysts and the market to believe that it was successfully maintaining pricing power and competing based on the quality of its products and services.  In fact, IAS led analysts to believe that "competitors' pricing was typically not very divergent."  Yet, while the Company

externally trumpeted its "[f]avorable pricing structure," Defendants internally knew as early as February 2023 that that it faced "[a]ggressive [p]ricing" from its key competitor and that the only way IAS could secure and retain large clients was through a "race to the bottom" price war that was impacting the Company's finances and growth. Before the truth was revealed a year later, the Company's controlling shareholder, Vista (defined below), a private equity firm that controlled the Company's board of directors and senior management, dumped nearly 30 million shares of IAS stock on unsuspecting investors at artificially inflated prices, lining Vista's pockets with over $443 million.

2.    Plaintiff brings this action on behalf of itself and all similarly situated investors who purchased or otherwise acquired shares of IAS common stock between March 2, 2023 and February 27, 2024, inclusive (the "Class Period"). Plaintiff asserts claims against Defendants (defined below) under Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, promulgated thereunder.

3.    IAS is a global software company specializing in digital advertising. IAS offers a suite of digital ad verification and optimization solutions that help advertisers and publishers "ensur[e] that every digital ad reaches real consumers in brand-appropriate environments, and has the opportunity to be seen by consumers." These solutions are designed to enable "advertisers [to] optimize their ad spend and better measure consumer engagement with campaigns across platforms, while enabling publishers to improve their inventory yield and revenue." In simpler terms, IAS purports to provide superior technologies to ensure that advertisers reach their targeted audiences by placing ads alongside programming or online content that is relevant and brand-appropriate.

4.      The digital advertising verification industry has been dominated by two companies: IAS and DoubleVerify, Inc. ("DoubleVerify").  Indeed, a Truist Securities analyst has referred to this market as a "virtual duopoly."  To head off investor concerns about a potential pricing war with DoubleVerify in their concentrated market, the Company historically reassured investors about its ability to defend—if not increase—the pricing for its services.  For example, during a May 11, 2022 earnings call, in response to a question about "macro" pricing issues in the industry, the Company told analysts about its growth in certain markets in which IAS had an advantage, stressing that such growth "*just gives us momentum to further accelerate our pricing upside in the future.*"[1]  Similarly, during an August 4, 2022 earnings call, when asked about whether clients push IAS on pricing during contract renewals, the Company assured analysts that "*our price has been holding, and we expect that our price will continue to hold*."

5.      The market took such statements to heart and investors were led to believe that IAS offered unique services in the digital advertising industry and was insulated from price competition.  For example, a Raymond James analyst commented in a February 13, 2023 report, issued shortly before the Class Period: "Investors are largely positive on the positioning of verification players [like IAS] within the digital ad space, *potential for pricing leverage*, and the competitive market settling into a duopoly . . . ."

6.      Unbeknownst to investors, however, by February 23, 2023 (before the Class Period), IAS was no longer able to exert pricing power and was, in fact, slashing prices to win and retain business, particularly contracts with large and well-known "marquee" customers that the Company relied on and its leadership touted to investors repeatedly.  Indeed, before the Class Period, Defendants were aware that demand was slowing and the Company had lost any "pricing

---

[1] All emphasis herein has been added, unless otherwise noted.

leverage."  In a non-public presentation from February 23, 2023, senior management told IAS's Board of Directors ("Board"), including Defendant Utzschneider and multiple Vista employees and designees, that the Company was experiencing ***"pricing pressure"*** in its ad verification and optimization businesses, and that the Company had resorted to cutting rates when renewing and securing new contracts, leading to significant fee compression.

7.      Then, on May 11, 2023, Defendant Utzschneider privately admitted to the Vista-controlled IAS Board in a "CEO Session" that one of the "***lowlights***" of the current "state of the business" at IAS was "increased customer pressure to prove Programmatic [*i.e.*, optimization] value vs. agency or free alternatives."  Defendants also knew, as demonstrated in a finance presentation made during this meeting, that another "***lowlight***" for the business was "***continued pricing pressure*** to win marquis [sic] customers and focus on ROI and efficiency leading clients to look at lower-priced / free programmatic [*i.e.*, optimization] solutions."  Indeed, as of May 11, 2023, Defendants knew that one of the "Top Loss Reasons" for why the Company was failing to secure new business was competitors' "***Aggressive Pricing***."

8.      Despite real-time updates describing significant adverse business developments prior to—and throughout—the Class Period, Defendants concealed this worsening direction from investors.  Instead, the Company maintained, *inter alia*, that there was "increased demand across our product portfolio" and touted a "[f]avorable pricing structure" as a key "driver[] of sustainable growth."  Moreover, the Company trumpeted new deals with large and notable brand clients without disclosing that such deals were only feasible due to steep price cuts.  These false and misleading statements and material omissions of fact artificially inflated the price of IAS stock throughout the Class Period.

9.     News of IAS's weakening demand first began to emerge after the market closed on August 3, 2023, when the Company reported its second quarter 2023 financial results.  For the first time, the Company revealed that the growth of its "optimization" revenue had meaningfully slowed.  In response to this news, on August 4, 2023, the Company's stock price declined $3.66 per share (or approximately 20%) to close at $15.17 per share, down from the previous day's close of $18.83 per share.  However, the Company continued to conceal that pricing pressure was a key factor underlying its slowing revenue growth.  Indeed, during an August 3, 2023, earnings call to discuss second quarter results, analysts inquired directly about the Company's pricing.   In response, IAS's then-Chief Financial Officer ("CFO") Defendant Tania Secor ("Secor") pivoted, instead blaming "maturing" growth for certain products and "slower demand from tech/telco clients."  But Defendants—including the Officer Defendants—knew otherwise.  "Aggressive Pricing" was the "Top Loss Reason" for failing to secure and maintain core clients.

10.    Then, on February 27, 2024, after the market closed, IAS reported disappointing fourth quarter results for 2023 and announced lackluster revenue guidance far below analysts' estimates.  During an earnings call that same day, the Company admitted that its lower than anticipated revenue numbers resulted from steep pricing cuts issued to customers across the Company's core measurement and optimization businesses.  IAS's Chief Executive Officer ("CEO") Defendant Lisa Utzschneider ("Utzschneider") finally publicly acknowledged what she and Defendants had known since February 2023, "[w]e are seeing more competitive pricing in measurement on a select group of large contract renewals in exchange for increased volume commitments and multi-year exclusive agreements."

11.    In response to this news, on February 28, 2024, the Company's stock price plummeted $7.09 per share (or approximately 41%) to close at $10.01 per share, down from the previous day's close of $17.10 per share.

12.    Analysts were stunned by the revelation of the competitive pricing issue and resulting drag on the Company's financial results and threat to prospects that had depended on IAS's continued pricing power.  Indeed, one analyst summed up the market's negative reaction, stating, "the desire to become more aggressive was surprising," and noting that "IAS' pricing power is called into question after last night's reveal."  That analyst further emphasized, "[t]his was not expected by the investment community, and will raise fears about the competitive market."

13.    While Defendants concealed the competitive pricing pressure that they had known of since February 2023, and while IAS's stock price was artificially inflated due to Defendants' material misrepresentations and omissions, Vista unloaded millions of IAS shares on unsuspecting investors, including Plaintiff and members of the Class.  Vista's stock sales—made while it was in possession of material non-public information concerning pricing pressures on IAS—resulted in over $400 million in proceeds for Vista and avoided hundreds of millions of dollars in losses when the market learned the truth.

14.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's shares, Plaintiff and putative Class members have suffered significant losses and damages.

## II.    JURISDICTION AND VENUE

15.    The claims asserted in this action arise under Sections 10(b), 20(a), and 20A of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1, and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

16.     This Court also has personal jurisdiction over the Defendants pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa).  IAS's principal executive offices are located in this District at 12 E 49th Street, 20th Floor, New York, NY 10017 and the Officer Defendants conducted substantial economic activity in this District.  The Vista Defendants maintain a continuous and systematic presence in this District through its New York office, located at 50 Hudson Yards, Floor 77, New York, New York 10001.  Vista also purposefully availed itself of this District through, *inter alia*, its sales of IAS common stock—which is traded on the New York-based NASDAQ Exchange—to investors in the May 2023 Offering and December 2023 Offering (defined herein) through underwriters whose principal places of business are located in this District, as well as the sale of IAS common stock on the NASDAQ Exchange through the June 2023 Sale (defined herein).  In addition, Vista purposefully availed itself of this District through the Vista-employee members of the IAS Board and their involvement in IAS corporate meetings and decision making in this District.

17.     Venue is proper in this District under Section 27 of the Exchange Act (15 U.S.C. § 78aa), 28 U.S.C. § 1391(b).

18.     As such, the acts and practices complained of herein occurred in substantial part in this District, including the dissemination of materially false and/or misleading information.

19.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges.

## III.    PARTIES

20.     Plaintiff Oklahoma Firefighters Pension and Retirement System ("Plaintiff" or "Oklahoma Fire") is a multiple-employer, cost-sharing public employee retirement plan that

covers 473 cities, 28 fire protection districts, and 135 county fire departments as of June 30, 2024. Oklahoma Fire had $3.4 billion in assets under management as of fiscal year ended June 30, 2024. As set forth in the sworn certification submitted with its motion for appointment as Lead Plaintiff in this action (ECF No. 19-2, at 4-5), incorporated by reference herein, Plaintiff purchased IAS stock during the Class Period, including contemporaneous purchases that match with Vista's insider sales, and has been damaged thereby.

21.     Defendant Integral Ad Science Holding Corp. is a global advertisement measurement and optimization company. The Company provides clients with independent measurement and verification of digital advertising. The Company is incorporated in Delaware and maintains its corporate headquarters in New York, New York. IAS's common stock trades on NASDAQ under ticker symbol "IAS."

22.     Defendant Lisa Utzschneider ("Utzschneider") is, and was at all relevant times, IAS's CEO and a member of the Company's Board.

23.     Defendant Tania Secor ("Secor") was at all relevant times, IAS's CFO, until January 3, 2025, when Secor departed from the Company.

24.     Defendants Utzschneider and Secor are referred to herein as the "Officer Defendants."

25.     Defendant Vista Equity Partners Fund VI, L.P. ("Fund VI GP") is, according to documents filed with the SEC, organized in the Cayman Islands with an address of "C/O VISTA EQUITY PARTNERS, 4 EMBARCADERO CENTER, 20TH FL" in San Francisco, California. Fund VI GP is the sole general partner of three private equity funds—Vista Equity Partners Fund VI, L.P. ("VEPF VI"), Vista Equity Partners Fund VI-A, L.P. ("VEPF VI-A"), and VEPF VI FAF,

L.P. ("FAF"), collectively, the "Vista Funds"—that, during the Class Period, owned as much as 62% of IAS's common stock.

26.    Defendant VEPF VI, GP, Ltd. ("Fund VI UGP") is, according to documents filed with the SEC, organized in the Cayman Islands with an address of "C/O VISTA EQUITY PARTNERS, 4 EMBARCADERO CENTER, 20TH FL" in San Francisco, California.  Fund VI UGP is the sole general partner of Fund VI GP.

27.    Defendant VEPF Management, L.P. ("Management Company") is, according to documents filed with the SEC, organized in Delaware with an address of "C/O VISTA EQUITY PARTNERS, 4 EMBARCADERO CENTER, 20TH FL" in San Francisco, California. Management Company is the sole management company of each of the Vista Funds.

28.    Defendant VEP Group, LLC ("VEP Group") is, according to documents filed with the SEC, organized in Delaware with an address of "C/O VISTA EQUITY PARTNERS, 4 EMBARCADERO CENTER, 20TH FL" in San Francisco, California.  VEP Group is the sole general partner of the Management Company.

29.    Defendant Vista Equity Partners Management, LLC ("VEPM") is a Delaware limited liability company headquartered in Austin, Texas.  VEPM also is the sole limited partner of the Management Company.  VEPM also is among the largest private equity firms in the world, with over $100 billion in assets under management.

30.    Defendants Fund VI GP, Fund VI UGP, Management Company, VEP Group, and VEPM are collectively referred to herein as "Vista" or the "Vista Defendants."  For purposes of the claims asserted herein, the Vista Defendants acted collectively and in concert and are functionally indistinguishable from one another.  The IAS Proxy states that Vista Defendants are "the beneficial owners of the shares held by the Vista Funds."  Moreover, in its public filings,

including its Proxy and Annual Report on Form 10-K, IAS collectively refers to the Vista Defendants—and other non-defendant entities purportedly linked to a generically referenced entity called "Vista Equity Partners"—as "Vista."

    31.    The following is a visual representation of the relevant Vista entities and their relationship to the Vista Funds. The Vista Defendants are colored in red. Rectangles denote Vista entities that have an active management role:



**\* beneficial owners of IAS shares held by the Vista Funds**

## IV.    BACKGROUND

### A.    The Company and Its Business

32.    IAS is a publicly traded advertising technology ("ad tech") company specializing in analysis of digital advertising placement headquartered in New York City.  The Company was founded in 2009 as AdSafe Media and, three years later, rebranded itself as Integral Ad Science. Since its founding, the Company acquired several data and analytics companies, including Simplytics (2014), Veenome (2015), Swarm (2016), ADmantX (2019), Amino Payments (2021), Publica (2021), and Context (2021), establishing itself as a leader in the ad tech industry.

33.    In 2018, the private equity firm Vista acquired IAS.  In 2021, IAS became a publicly traded company through an initial public offering ("IPO"), trading under ticker symbol "IAS" on the NASDAQ stock exchange.  After the IPO, Vista continued to be IAS's majority shareholder and, as alleged herein, continues to exert control over the Company through is complete control over the Company's Board and its management, including the Officer Defendants.

34.    The Company's core business involves digital advertising.  IAS tracks data on ad placement transactions between advertisers, agencies, publishers, and platforms.  The Company derives revenue from three product lines: (1) optimization revenue, (2) measurement revenue, and (3) publisher revenue.[2]

35.    In programmatic online advertising, advertisers offer display space to buyers through a real-time auction.  This offer is referred to as a "bid."  When the bid occurs, an impression is sold and the transaction between ad-space buyer and seller is complete.  In IAS's

---

[2] Optimization and measurement are, by far, the largest revenue drivers for IAS, together accounting for approximately 86% of total revenues.  According to the IAS Annual Report on Form 10-K for the year ended December 31, 2023, the breakdown of the Company's revenue was as follows: (1) optimization revenue at 47%, (2) measurement revenue at 39%, and (3) publisher revenue at 14%.

portfolio of programmatic product offerings, there are "pre-bid" and "post-bid" solutions.  Pre-bid products aim to optimize return on ad spend by directing customer budgets to the most effective inventory.  This pre-bid revenue category is referred to as "optimization revenue."  Post-bid products measure ad campaign performance value, and this revenue category is therefore referred to as "measurement revenue."  To meet its customers' advertising needs, IAS's services measure for fraud, brand safety and suitability, viewability, and geography for each digital ad.  The Company's publisher revenue represents solutions with publisher customers that identify high quality ad inventor.  In 2023, the Company earned $474.4 million in total revenue.

36.     IAS also touts its partnerships with social media platforms, such as TikTok, Meta, and YouTube—which have become an increasingly important avenue for advertisers to reach potential customers—as a particular advantage to advertiser customers.

**B.     IAS's Direct Competition in the Marketplace**

**1.     IAS's "Virtual Duopoly" with DoubleVerify**

37.     As a verification and measurement company, IAS historically has had one primary direct competitor, DoubleVerify.  Founded one year before IAS, DoubleVerify is a global ad tech company offering substantially similar optimization and verification solutions to advertising customers.  Like IAS, DoubleVerify's products measure for fraud, brand safety and suitability, viewability, and geography for each digital ad.

38.     The core similarities between IAS and DoubleVerify emphasize their status as head-to-head competitors in the marketplace offering similar, if not interchangeable, offerings.  Indeed, an article published on the widely-read investment platform Seeking Alpha by financial

research analyst Atlanticus Capital describes the two companies as having "identical business models" and employing similar technologies.[3]

39.     Moreover, as detailed in Section V.B., herein, former employees of IAS describe how, during the Class Period, IAS was intensively focused on DoubleVerify as the Company's principal rival, was aware that, from the perspective of IAS's customers, DoubleVerify offered a similar suite of products and services, and was engaged in aggressive price competition in order to win and retain large and notable clients as part of this competition with DoubleVerify.

## 2.    Emergence of Free and Lower-Cost Alternative Providers

40.     Defendants knew, but did not disclose to investors, that certain of IAS's customers were beginning to turn to "lower-priced" or "free" alternatives to the Company's programmatic (i.e., optimization) services.  For example, many advertising agencies were offering free or bundled programmatic (i.e., optimization) services that directly competed with IAS's services, while individual online service platforms began expanding their own ad safety tools that are intended to give advertisers assurance regarding the placement of their ads near appropriate content.

41.     Large agencies such as GroupM, Publicis Media, or Dentsu reduced the comparative value of IAS's optimization services in several ways.  They began bundling verification and optimization tools as part of their broader media buying contracts; absorbing costs of third-party tools (like IAS) to offer a "zero-cost" experience to clients; and building proprietary tools for brand safety and optimization, especially for mid-sized clients with lower advertising

---

[3] Atlanticus Capital, *Integral Ad Science: Excessive Valuation Gap, Poised to Outperform DoubleVerify*, SEEKING ALPHA (May 21, 2024), https://seekingalpha.com/article/4694748-integral-ad-science-excessive-valuation-gap-poised-to-outperform-doubleverify.

budgets. Certain of IAS's customers began viewing IAS's tools, which they previously paid for directly, as non-essential add-ons once advertising agencies began providing equivalent services.

42.     Advertising platforms were also offering free or integrated solutions that diminished the need for IAS's third-party services.  Among these, Google Ads, YouTube, Meta Ads Manager, and Amazon DSP developed a variety of platform-native (and free) tools for advertisers, leading certain IAS customers to question why they should pay extra for third-party metrics if platforms already provide similar capabilities.

43.     As a result, IAS faced increasingly robust pushback during contract renewals and client churn throughout the Class Period.  Contract renewals and new deals became increasingly weighted on price competitiveness. IAS had trouble justifying its CPM[4] fees and defending the value of its optimization tools.

44.     The emergence and adoption of agency and free alternatives significantly eroded IAS's ability to command pricing for its programmatic (i.e., optimization) products.  As IAS was touting the "differentiated" and "essential" nature of its products to the investing public, its customers increasingly viewed these tools as duplicative or commoditized.

**C.     Vista's Control Over IAS and the Officer Defendants**

45.     Looming large over IAS's business throughout the Class Period was Vista.  Vista owned a controlling interest in the Company and held absolute control over the Company's Board and its senior management, including the Officer Defendants.  This control began before the Class Period, in 2018, when IAS sold a majority stake of the Company to what the Company's public filings refer to broadly as "Vista Equity Partners," which includes the Vista Defendants.

---

[4] In the context of digital advertising, CPM stands for Cost Per Mille, which represents the cost that an advertiser pays for every 1,000 impressions of an ad.  An impression is counted when an ad loads and is displayed on a user's screen.

46.    In June 2021, IAS went public through an initial public offering ("IPO"). Following the IPO, Vista maintained a 63% ownership stake in the Company. At the start of the Class Period, Vista owned approximately 62% of IAS's common stock. Although, as alleged herein, Vista sold massive amounts of IAS stock during the Class Period, it continued to maintain a controlling intertest in IAS, holding over 40% of IAS's common stock at the end of the Class Period.

47.    Vista's control over IAS during the Class Period was cemented through the Company's bylaws and agreements that Vista secured in the context of the IAS IPO. One of those agreements, a Director Nomination Agreement, provided Vista with complete control over IAS's Board—and by extension, the Company's senior management including the Officer Defendants—throughout the Class Period. Under the Director Nomination Agreement, Vista is entitled to designate *all* members of the IAS Board and designate the Chair of the Board so long as Vista maintains ownership of at least 40% of IAS's stock. Because Vista's stock ownership never fell below the 40% threshold during the Class Period, Vista was able to, and did, have complete control over the IAS Board through the Director Nomination Agreement at all relevant times.

48.    Indeed, not only did Vista nominate all of the members of the IAS Board, it installed five members on the Board who were Vista employees, including IAS Board Chair Michael Fosnaugh ("Fosnaugh," a Senior Managing Director at Vista and member of two leadership groups at Vista, the Vista Executive Committee and the Private Equity Management Committee), Rod Aliabadi ("Aliabadi," a Managing Director at Vista), Christina Lema ("Lema," a Managing Director, Deputy Chief Legal Officer, and General Counsel at Vista), Brooke Nakatsukasa ("Nakatsukasa," a Vice President at Vista), and Martin Taylor ("Taylor," a Senior Managing

Director at Vista and member of three leadership groups at Vista, the Vista Executive Committee, the Private Equity Management Committee, and the Investment Committee).

49.     Three Vista-employee directors, Aliabadi, Nakatsukasa, and Taylor, comprise IAS's Compensation and Nominating Committee (the "Comp. Committee"), which gives them particular authority and control over the Officer Defendants given the Comp. Committee's responsibility for IAS officer retention and compensation.   According to the IAS Compensation and Nominating Committee Charter,[5] the Comp. Committee has the sole authority to set compensation for Defendants Utzschneider and Secor (and other members of IAS's management), including to "review and approve annually the corporate goals and objectives applicable to the Compensation of the CEO . . . and recommend to the Board the CEO's compensation level based on this evaluation."

50.     Throughout the Class Period, Vista also controlled the Officer Defendants through the IAS Board's power to appoint and remove officers, meaning that Defendants Utzschneider and Secor served at the pleasure of Vista and could be replaced at Vista's whim.   In addition, Vista had additional control over the Officer Defendants because one-third of the Officer Defendants' stock option compensation was in the form of "Return Target Options."   According to the IAS Proxy, those options would only "vest upon the achievement of a 3x return on investment to Vista," meaning that the Officer Defendants would only receive a substantial portion of their compensation if Vista achieved an eye-popping 300% return on its investment.

51.     Even non-Vista employee members of the IAS Board also had deep connections to Vista.   In addition to Defendant Utzschneider, who was fundamentally beholden to Vista, two

---

[5] *See* https://investors.integralads.com/static-files/be22fd41-da4d-4522-926b-6821421716d2 (last visited June 11, 2025).

other IAS Board members were employees of companies that are similarly controlled by Vista: Jill Putman, who served as the CFO of a Vista-controlled company called Jamf, led the sale of Jamf to Vista, worked with Fosnaugh, Lema, and Taylor who also served on the Jamf board. Similarly, Bridgette Heller, who also served on the board of another Vista-owned company called Numerator, worked with IAS Board members Aliabadi and Fosnaugh (who also served on the Numerator board) and Nakatsukasa (who was actively involved in Vista's investment in Numerator).

52.     IAS acknowledged Vista's insider status and control of the Board in its public filings, including to state—in the context of describing the Company's bylaws and Director Nomination Agreement provisions—that Vista is entitled to "significantly influence the composition of [IAC's] Board," and exert "significant influence with respect to our management, business plans, and policies, including the appointment and removal of our officers."

53.     IAS also explained in its public filings that, even when Vista may own less than 50% of the Company's common stock (as it did at the end of the Class Period following its massive insider sales), Vista nonetheless would have complete control over the Company by being protected against amendments to or alterations of the Company's bylaws that would diminish Vista's control.  Specifically, IAS explained that any shareholder vote to change the Company's bylaws and wrest control from Vista would require a supermajority vote of "at least 66 2/3% in voting power of all the then-outstanding shares."  Given that Vista's ownership never fell below 40% during the Class Period, Vista's control over IAS was absolute and untouchable.  Further, given Vista's special insider role, it had access to confidential, material non-public information and, as alleged herein, it in fact received material, non-public information about IAS.

## V.    THE CONCEALMENT OF IAS'S PRICING PRESSURES IN THE BUSINESS AND SLOWING REVENUE GROWTH

### A.    Defendants' Knowledge of Pricing Pressure Negatively Impacting IAS's Business

54.    Throughout the Class Period, and for years leading up to it, IAS's public disclosures portrayed the Company as able to maintain strong pricing and revenue growth in the digital advertising marketplace.  Indeed, IAS leadership went as far as to state that the Company's pricing was *higher* than that of competitors.  This was the public perception IAS presented to investors.

55.    The truth, however, was that as of February 23, 2023, shortly before the start of the Class Period, IAS had lost its pricing power and was facing aggressive pricing pressure, forcing IAS to cut its rates to secure and retain customer contracts.  This undisclosed pivot to dramatically lowering prices, in turn, led to fee compression and slowing of revenue growth.

56.    Defendants' knowledge of these material undisclosed facts is demonstrated by the fact that at a February 23, 2023 IAS Board meeting (the "February 2023 Board Meeting") the IAS Board—including Defendant Utzschneider and Vista employee directors Fosnaugh, Aliabadi, Lema, Nakatsukasa, and Taylor (as well as other Vista representatives including Ashley MacNeill, Managing Director and Head of Equity Capital Markets at Vista)—learned that "client direct contracts and emerging markets growth are the largest contributors to verification pricing pressure" due to the fact that advertisers and publishers in emerging markets typically have smaller budgets and are more price sensitive, which mechanically leads to lower negotiated prices per impression – i.e., lower CPMs for IAS.  Contrary to IAS's public representations, shifting a greater part of IAS's revenue toward emerging markets would lead to an unfavorable geographic "mix shift."

57.    Materials presented at the February 2023 Board Meeting further indicated that because IAS had been facing pricing pressure, the Company had resorted to cutting its rates when

renewing and securing new contracts, including to win "marquis [sic] customers," which led to fee compression.  The materials presented at this Board meeting further explained that this problem was particularly concerning for "verification services," which are characterized as "measurement revenue" and accounted for approximately 38% of the Company's revenue in 2022.

58.     Despite this insider knowledge of a material change in IAS's business, just seven days later, on March 2, 2023, during the Q4 2022 Earnings Call, Defendant Utzschneider announced four new deals with large and well-known brands: what one might call marquee

59.      (or, as the IAS Board was told, "marquis") customers.  In describing these apparent successes to investors, Defendant Utzschneider attributed the new contract wins to several elements including IAS's "differentiate[d] technology," "exceptional client support," and "measurement capabilities."  Nowhere in her public statements about these new contracts did Utzschneider mention that slashing prices and offering free services was the key factor that led to IAS winning those contracts.

60.     Defendants received regular updates on IAS's loss of pricing power and increased use of discounts to win and retain business.  On May 11, 2023, during a "CEO Session" with the IAS Board (the "May 11, 2023 CEO Session"), presumably run by Defendant Utzschneider and attended by Vista's representatives on the Board, Defendants reported on or learned of ongoing pricing pressure, including that one of the "lowlights" of the "state of the business" at IAS was "increased customer pressure to prove Programmatic value vs. agency or free alternatives." Defendants also learned in a finance presentation made during the May 11, 2023 Board meeting (the May 11, 2023 Finance Presentation") that another "lowlight" for the business was "continued pricing pressure to win marquis [sic] customers and focus on ROI and efficiency leading clients to look at lower-priced / free programmatic solutions."  The May 11, 2023 Finance Presentation also

noted that one of the "Top Loss Reasons" for why the Company was failing to secure new business was competitors' "Aggressive Pricing."  As the CFO of IAS, Defendant Secor likely provided, prepared, or otherwise knew of the content of the May 11, 2023 Finance Presentation.

61.    Defendants continued to receive private information indicating the persistence and escalation of undisclosed pricing pressures.  Defendants Utzschneider and Vista (through its employee members of the IAS Board) learned, in connection with an August 1, 2023 meeting of the IAS Board, that the Company experienced "lower than expected Optimization growth[,]" noting that it "expect[ed] this trend to continue."  Revenue results from the first half of 2023 showed that "Optimization growth of 26% [in] Q1 slow[ed] to 10% [in] Q2[,] driven by slowdown of Context Control."  Pricing concerns were also highlighted, stating that there was "[c]ontinued [c]ompetition in Programmatic" because "[a]dvertisers are increasingly cost conscious due to macroeconomic conditions[.]"

62.    Despite the Company experiencing this "lower than expected" optimization growth, the investing public was again presented with a false narrative about the Company's true business position.  On August 3, 2023—a mere two days after the August 1 Board meeting— Defendant Secor referenced optimization revenue in her remarks during the Company's Q2 2023 Earnings Call.  Rather than admit the pricing difficulties that were known to Defendants, Secor stated that optimization revenue growth "reflects maturing [Context Control product] growth in-line with our prior expectations."

63.    Defendants continued to receive adverse updates of escalating pricing pressures. At a November 9, 2023 meeting of the IAS Board at which Defendant Utzschneider and Vista-employee directors were present, Defendants learned, as part of an "Executive Summary" of the

Company's financial projections, that "[t]he competitive pricing environment has accelerated in the past few months and [is] expected to negatively impact 2024."

**B.    Former IAS Employees Further Confirm the Extent to Which Pricing Pressures Were Negatively Impacting the Company**

**1.    Confidential Witness 1**

64.    Confidential Witness 1 ("CW1") was employed at IAS during the Class Period, from 2023 through late 2024, when CW1 left the Company on good terms.  CW1 reported directly to "C-suite" personnel during their tenure at the Company.  CW1 states that they learned about IAS pricing and client relations issues from conversations with IAS officers and employees who were directly involved with those issues, as well through email correspondence between C-suite personnel that CW1 received in connection with their position at the Company.  Within the context of their position, CW1 had regular exposure to Defendants Utzschneider and Secor.

65.    CW1 states that Defendant Utzschneider was commonly referred to within the Company as "Lisa U."  According to CW1, Defendants Utzschneider and Secor were among the principal group of IAS executives who were responsible for briefing the IAS Board of Directors and Vista personnel on business and financial matters, including through regular meetings of the IAS Board.  CW1 recalls that IAS's C-Suite executives would meet privately in lockdown mode for two-to-three weeks prior to Board meetings to get ready for presentations.  In addition to Board meetings, CW1 states that Utzschneider led weekly meetings with members of upper management, the vice presidents, directors of the IAS business units, and the Chief of Staff.  CW1 also states that Utzschneider led 2-3 weekly meetings with the Company's top executives.  CW1 states that these weekly meetings usually involved discussions of Key Performance Indicators ("KPIs") from the prior week and what was expected for the current week—with pricing and revenue as the focus.

66.     CW1 describes a corporate culture at IAS in which Utzschneider was constantly reacting to DoubleVerify in hopes of responding to them as their main competitor in the industry. Specifically, CW1 states that they were told by the Chief Revenue Officer and Chief Marketing Officer that Utzschneider was concerned about DoubleVerify's act of undercutting IAS in pricing and that IAS would have to respond.  CW1 recalls that internal slide decks often included one-to-one pricing comparisons of IAS and DoubleVerify, and that it was a sales tactic within the Company to undercut DoubleVerify in price.   As CW1 describes it, the tactic utilized was to "get the client so DV (DoubleVerify) doesn't."  CW1 states that CW1 was told that Utzschneider intended to "pull levers" with existing customers to prevent them from leaving IAS and going to DoubleVerify.  CW1 states that these "levers" involved offering discounts and waiving certain fees that IAS usually charges.

67.     As an example of the "levers" used to win clients, CW1 recalls that IAS had rolled out a new service for YouTube advertising that was initially in a developmental "beta" version. CW1 states that this was a service that DoubleVerify did not have at the time—meaning it was of particular value as a new product in the IAS portfolio.  At first, IAS offered this service free to clients.  CW1 understood that new products were not usually "beta" tested for long periods of time at IAS.  However, the new YouTube product was kept in "beta" status for an extended period. During that time, CW1 states that IAS continued to allow customers to use this service for free as an incentive for the customer to sign a new or renewal contract with IAS.

68.     CW1 states that Defendant Secor was concerned about the Company continuing to offer this new YouTube service for free when it was a valuable product for IAS because doing so was a "drag on revenue."  According to CW1, Secor expressed this concern in writing via email to other C-suite executives, including Defendant Utzschneider.  CW1 understands that Secor's

concerns were ignored, including by Utzschneider.  CW1 also states that they recall Secor raising other concerns more broadly about how IAS's offering discounts and free services would impact the bottom line.  According to CW1, those other concerns were similarly ignored by Utzschneider and the other C-suite executives.

69.    CW1 recalls that the term "dynamic pricing" was used frequently at IAS and refers to fluctuating or unstable pricing within the Company.  CW1 states that any statement that IAS customer pricing was maintained at fixed levels was 100% false, and that IAS adjusted pricing to respond to DoubleVerify as its closest competitor.

70.    CW1 describes IAS's relationship to DoubleVerify as being similar to rideshare companies Uber and Lyft in that both competitors cover the relevant market, offer significantly similar services, and tend to follow what the other is doing in a "constant" game of catch up. According to CW1, IAS would alternate between watching DoubleVerify in its rear-view mirror (when IAS started with an advantage) and through its windshield (when IAS started behind).  CW1 recalls that Utzschneider would scrutinize what DoubleVerify did at trade shows and major events such as "CES" (the Consumer Electronics Show in Las Vegas) and "Cannes" (the Cannes Lions International Festival of Creativity).  CW1 also describes IAS and its management as viewing the competition with DoubleVerify in terms similar to that of a sports rivalry.  CW1 recalls two examples of large clients leaving IAS to work with DoubleVerify due to DoubleVerify offering discounts and beating IAS in terms of price: American Express (in 2023) and AT&T (at some point during CW1's tenure).  CW1 states that Utzschneider was concerned about both losses because they left IAS for a better price with DoubleVerify.  CW1 states they believe these losses for IAS resulted in decreased IAS revenue.

71.     CW1 describes Vista as a "helicopter parent" with a powerful, "ever-dominant presence" within the IAS corporate ecosystem.  Summarizing Vista's role as it relates to IAS, CW1 states that "whatever Vista wants, Vista gets."

### 2.     Confidential Witness 2

72.     CW2 was employed as a Program Manager with IAS starting several years prior to the start of the Class Period until CW2 left the Company in late 2023.  In CW2's position at the Company, CW2 was responsible for a team that developed and launched various "programmatic vertical" products for IAS.  In addition to product development, CW2's role involved meeting with potential clients.

73.     Although CW2 was involved in determining costs and suggesting pricing for IAS's services, CW2 was not personally involved in setting prices that customers paid; that task was the responsibility of others at the Company.  CW2 states that, after a product launch, "Sales and Business Development teams" are responsible for pricing and determine the price and other terms of customer contracts.  According to CW2, all IAS prices and contract terms are negotiable, and larger clients (such as Google and Meta, to provide two examples) negotiate more favorable deals than smaller companies for the same product.

74.     CW2 states that IAS competes with DoubleVerify, and CW2 understands that IAS will always try to undercut the price DoubleVerify offers.  CW2 states that this pricing practice goes both ways: DoubleVerify will try to undercut prices that IAS offers.

75.     CW2 states that at one point late in CW2's tenure with IAS, the Company learned that it had been receiving payments for a product segment that did not exist.  CW2 states that for several years, The Trade Desk—one of IAS's larger clients—had been charging its customers for an IAS product segment that had not been released.  According to CW2, The Trade Desk had been overcharging its customers for the new product that did not exist for years and passing along a

portion of the payments it received to IAS.  CW2 states that this was discovered when the new product segment was ready for release.

76.     CW2 states that they attended at least three to five meetings with Defendant Utzschneider and other senior IAS leadership, including former Chief Commercial Officer Yannis Dosios, where the The Trade Desk situation was discussed.  CW2 states that Utzschneider and others decided not to disclose this information—even to The Trade Desk—because it would hurt IAS's relationship with them.  CW2 states that Utzschneider and IAS leadership "did the math" to determine how much money the Company would have to return and, instead, decided to have a "silent release" of the product segment and keep the matter "secret."

### 3.    Confidential Witness 3

77.     CW3 was employed with IAS as a Senior Director from approximately 2020 through after the end of the Class Period.  In that role, CW3 states that CW3 was responsible for "evangelizing" IAS to clients including the Big Five ad agencies (which CW3 referred to as "holding companies") and other potential clients.  CW3 periodically met with C-suite executives including Defendants Utzschneider and Secor, for internal business review and to discuss account performance.  CW3 left IAS voluntarily to take a role with another company.

78.     CW3 states that there was a very well-known and pervasive feeling that IAS was in a "price war" with its main competitor, DoubleVerify.  CW3 describes this pricing war as a "race to the bottom" in terms of pricing between IAS and DoubleVerify.

79.      CW3 states that there were constant "pricing pressures" during their tenure with IAS.  CW3 recalled that in order to win or defend a multi-year contract with "committed revenue" (contracts with guaranteed, and typically increasing, annual spending amounts) against DoubleVerify, IAS would frequently offer significantly discounted rates.  Using IAS's contract with AT&T as an example, CW3 stated that a discount might be as much as 50% to 60% in order

to secure a large "blue chip" account like this and other similar clients.  CW3 states that, in certain cases where IAS would offer discounts directly to large advertisers to gain their business, this strategy could cause a "headache" to IAS sales personnel who managed advertising agency accounts since the agencies' own profits (earned through, among other things, markups on services sold) could suffer from IAS's offering discounted services.

80.     CW3 states that DoubleVerify was recognized as IAS's major competitor. According to CW3, while IAS was engaged in a "price war" with DoubleVerify, it would undercut DoubleVerify's pricing in order to secure large, "blue chip" client contracts.  CW3 states that, if necessary, IAS would undercut DoubleVerify by cutting its rates by 50% to 60%.  CW3 states that while cutting rates did not occur on every contract, it was far from a "once in a blue moon" phenomenon and was a frequent occurrence to secure multi-year contracts with "blue chip" customers.  CW3 stated that IAS did not hesitate to significantly reduce its price to win large contracts.  CW3 recalls IAS's win of an AT&T account as one where this tactic of significantly reducing price to win a multi-year contract was employed.

81.     CW3 also recalls a negotiation with major healthcare company Haleon as another instance in which IAS employed this tactic of aggressive price-cutting, this time unsuccessfully. Specifically, CW3 recalls that Haleon was a pre-existing account that came up for a multi-year renewal during CW3's tenure at IAS.   CW3 further recalls that IAS, with Defendant Utzschneider's sign-off, decided "at the eleventh hour" in the negotiations to offer a significant 50% price reduction to Haleon.  Notwithstanding IAS's major price concession, CW3 recalls that IAS lost the account to DoubleVerify.

82.     CW3 understood that this price reduction strategy was utilized, in part, because of the external optics of how it "looked to the Street" to bring in these "blue chip" accounts.

83.     CW3 states that Utzschneider was personally involved by having "100% sign off" on all large contracts and was aware that IAS was cutting its prices to win new accounts and beat DoubleVerify.  CW3 states that any blanket statement that IAS was able to maintain its pricing across the business is false.  CW3 states that during their four years with the Company, it was not unheard of for IAS to drop its prices (including CPM rates) and offer services to customers and potential customers for no charge to either win and/or secure contracts.  CW3 states that lowering prices led to a reduction in revenue.

### 4.     Confidential Witness 4

84.     Confidential Witness 4 ("CW4") was employed at IAS as a Chief of Staff from 2022 through October 2024, supporting a member of IAS's senior leadership and other C-Suite personnel including Defendant Utzschneider.  Among their responsibilities, CW4 tracked revenue trends and prepared spreadsheets for Financial Planning and Analysis.

85.     CW4 stated that Utzschneider tightly controlled the C-Suite and only allowed members of the Senior Leadership Team ("SLT") to meet with the IAS Board of Directors.  The SLT included Defendants Utzschneider and Secor.

86.     CW4 states that "price pressures" was a constant theme at IAS during the entirety of CW4's tenure with the Company.  According to CW4, everyone at the Company used the term "price pressures" and was aware that the term referred to the pricing competition with DoubleVerify, which CW4 described as a "race to the bottom" by each company.  CW4 states that IAS was lowering its prices to compete with DoubleVerify,

87.     CW4 states that Defendants Utzschneider and Secor, as well as others in IAS's senior management were "100% aware" of this pricing competition with DoubleVerify.  CW4 states that Utzschneider and Secor personally reviewed and approved all IAS deals and contracts, and that each of them was aware of pricing and margins for all deals.

88.     CW4 spoke frequently with IAS employees who worked on client contracts.   CW4 described how DoubleVerify would undercut IAS pricing and, in turn, IAS would undercut DoubleVerify's pricing.   Based on CW4's observations, IAS's pricing was not stable because of it lowering its prices to compete with DoubleVerify.

89.     CW4 states that IAS was losing clients to DoubleVerify and that the effect of IAS's lowering prices was causing revenue to decline. According to CW4, both Utzschneider and Secor were aware of this revenue decline, and IAS management was pushing to replace clients lost to DoubleVerify.   Among other things, CW4 states that these efforts included approaching Google (although CW4 does not believe that IAS was able to sign Google) and expanding in "APAC" (or the Asia-Pacific region).

90.     CW4 states that IAS would sign up big-name clients even if IAS was servicing those accounts "at cost."   According to CW4, IAS management believed that having a big-name client looked good even if it was at cost and generated little revenue.   CW4 recalls that one example of this was IAS's signing of a large Consumer Package Goods (or "CP&G") company as a client.

## VI.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

91.     During the Class Period, Defendants made false and misleading statements and material omissions of fact that artificially inflated the price of IAS stock.

### A.  Q4 2022 Form 10-K, Press Release, and Earnings Call

92.     The Class Period begins on March 2, 2023. On that day, after the market closed, the Company issued a press release (the "Q4 2022 Press Release"), held an earnings call (the "Q4 2022 Earnings Call"), and filed an Annual Report on Form 10-K (the "Q4 2022 Form 10-K") with the SEC announcing fourth quarter and full year financial results for the period ending December 31, 2022 (collectively, the Q4 2022 Press Release, Q4 2022 Earnings Call, and the Q4 2022 Form 10-K are referred to as the "Q4 2022 Statements").   Defendants Utzschneider and Secor were

quoted in the Q4 2022 Press Release and participated in the Q4 2022 Earnings Call.  Defendants Utzschneider and Secor signed the Q4 2022 Form 10-K, as did the Vista-employee members of the IAS Board.  In the Q4 2022 Statements, Defendants made multiple materially false and misleading statements to the investing public.

93.    In the Q4 2022 Press Release, which announced, among other things, "Recent Business Highlights," including the signing of several major deals with new customers, Defendant Utzschneider "reported positive fourth quarter results with growth across all business lines."  She stated that, "[w]e are off to a solid start to 2023 and expect full-year, double-digit revenue growth as we drive customer adoption of our industry-leading products."  Utzschneider went on to emphasize IAS's "technology and product innovation, superior customer service, and deep partner integrations," which provided the Company with "positive business momentum heading into 2023."  Defendant Utzschneider further touted "highlights from 2022," including the signing of "12 new global partnerships" and the winning of "several large multiyear deals," including with JPMorgan Chase, LinkedIn, Progressive, and Kimberly-Clark.

94.    Utzschneider also announced "several new competitive wins that reinforce our standing in the market as the leading provider and formidable competitor," specifically noting new deals with Ford, Hershey, Bel, and Kering, who Utzschneider stated "***selected IAS after extensive tech and product due diligence versus other competitors***."  Utzschneider went on to describe the new deals as "***major global wins with marquee brands***" and then sought to emphasize to investors "***why they chose to partner with IAS***."

95.    Utzschneider first stated that "Ford selected IAS as their global ad verification partner," expanding the Company's "coverage with Ford" by winning Ford's U.S. business from "an incumbent provider."  She went on to state that IAS is "proud that [its] ***robust brand safety***

*technology continues to attract new customers*." Utzschneider went on to state that Hershey "chose IAS **based on [its] differentiated CTV technology, campaign automation and high standard of service**." Regarding cheese maker Bel having "awarded IAS with a global deal," Utzschneider stated that "**Bel was impressed by IAS' measurement capabilities, our integrations with leading tech partners and our superior customer service**." Similarly, luxury goods company Kering was said to have selected IAS "as a result of our leadership in the luxury vertical, superior technology integrations with Google and exceptional client support." Utzschneider went on to attribute these successes to the Company's strategic prowess: "**Our enhanced go-to-market strategy under our new Chief Commercial Officer is yielding returns as highlighted by these global brand wins**."

96.    Later in the Q4 2022 Earnings Call, when reviewing "**some of the key growth drivers**" of IAS's business, Defendant Utzschneider sought to emphasize the importance of IAS's technology to its customers and stated: "**Marketers value our solutions** to avoid inappropriate content and target high-performing content to maximize engagement with consumers. . . . **As a result, marketers are shifting budgets to programmatic and relying on IAS to drive higher return on their ad spend**." Utzschneider went on to describe success in social media advertising: "In social media, we are **accelerating growth based upon our advanced multimedia classification, or MMC technology and platform expansions**."

97.    Utzschneider concluded her portion of the earnings call by stating:

Our products have never been more relevant as marketers lean into our differentiated solutions. . . . **Our model is highly differentiated as our pricing is independent of the media rates negotiated e-CPMs directly with marketers**. We're a volume-based model and not immune to volatility in ad spend. However, the essential nature of our solutions provides us with some level of insulation. . . . Under the leadership of our new CTO, we are enhancing our tech stack for greater scale and the ability to access, process and analyze data to feel superior

results for marketers. ***This will enable us to support future growth and innovation in high-growth areas.***

In conclusion, we made tremendous strides in 2022 to position IAS for long-term success. . . . ***We are thrilled to extend our market presence with recent logo wins, which highlights the success of our new go-to-market strategy***. I am excited to unleash the potential of IAS in 2023 and beyond. We are geared up and ready to go.

98. Defendant Secor, who was presenting at her first earnings call as CFO of IAS, stated that IAS was "off to a strong start in the first quarter of 2023," noting "***continued demand for our differentiated offering with several exciting new wins***" and emphasizing continued investment in "tech innovation to ***enhance our value proposition for marketers and publishers***."

99. Further, a March 2023 "Investor Presentation" slide deck prepared by IAS to present financial results from Q4 2022 contained a slide titled "Why We Win." The slide lists "***Superior technology across all channels***" and "***Leading international footprint***" as some of the main reasons for IAS's purported edge over its competitors. In another slide (copied below), titled "Business Model and Pricing," IAS noted its "flat-fee or minimum commitment with overages" pricing "on larger, multi-year deals," touted its "***[p]remium pricing***" on certain services, and noted that it had "***favorable mix shifts.***" There was no mention of the fact that IAS's "Business Model" depended on aggressive price competition. In another slide, the presentation lists "Re-occurring Revenues," "Strong Revenue Retention," and "High Profitability with Strong Ability to Scale" as highlights of IAS's financial model.

# Business Model and Pricing



**Primarily transactional, volume-based**
Minimum impression commitments on larger, multi-year deals – flat fee or minimum commitment with overages



Negotiate fixed rate CPMs with marketers independent of the media rate



Premium pricing on video, CTV, and Context Control



Favorable mix shifts

IAS 22

100.    The Q4 2022 Form 10-K included purported risk disclosures that included false and

misleading statements and material omissions including, *inter alia*, that:

> [C]ompetitors *may be better able to* respond quickly to new technologies, develop deeper relationships, or *offer competitive services at lower prices*.  Any of these developments *would make it more difficult for us to sell our platform and could result in increased pricing pressure*.

> \* \* \*

> The intense competition we face in the sales of our products and services and general economic and business conditions *could put pressure on us to change our prices*.

> \* \* \*

> Some of our competitors may bundle products for promotional purposes or as a long-term pricing strategy, commit to large customer deployments at prices that are unprofitable or provide certain guarantees.  *These practices could, over time, significantly constrain the prices that we charge for certain of our offerings*.  If we do not adapt our pricing models to reflect changes in customer use of our products or changes in customer demand, *our revenues could decrease*.

32

101.    Defendants' statements in ¶¶ 92–100 were materially false and misleading when made and failed to disclose materially adverse facts about the Company's business and operations for the following reasons:

 (a) Representations regarding IAS's success in securing or retaining clients, demand for IAS's products and services because they are "differentiated" from or otherwise offering advantages compared to competitors, IAS's competitive strengths, reasons for customers selecting IAS over competitors, IAS's insulation from pricing pressures, "premium" or other favorable pricing, and/or ability to maintain pricing power, IAS's purportedly favorable "mix shifts," "revenue retention," or "re-occurring revenue," as well as related statements concerning the Company's revenue and/or sales growth failed to disclose that, as alleged in ¶¶ 54–90, Defendants knew or were reckless in not knowing that, starting prior to the Class Period, IAS was faced with pricing pressures from its competitors and had been forced to aggressively cut prices (and/or offer free or discounted services) to win or retain customer accounts, and that pricing was increasingly the key differentiator between IAS and its principal competitor, DoubleVerify.  In addition, former IAS employees describe how pricing pressures and increasing price competition with DoubleVerify, wherein IAS would slash its prices and/or offer free services to win client contracts, were known concerns at the Company and to the Officer Defendants, including:

  i. CW1 describes Defendant Utzschneider's focus on price competition to win accounts from DoubleVerify and the fact that she would "pull levers" to win business including offering discounted prices and waived fees, which CW1 states Defendant Secor (correctly) understood would result in a "drag on revenue."  Moreover, CW1 states that Defendant Utzschneider led 2-3 weekly meetings that involved discussions of "KPIs" (key performance indicators) that focused on pricing and revenues.

  ii. CW2 describes how IAS would always undercut the price that DoubleVerify offers in effort to win the account.

  iii. CW3 states that it was well-known at IAS that the Company was in a "price war" with DoubleVerify and that price competition between the two companies was a "race to the bottom" in terms of pricing.  CW3 further describes constant "pricing pressures" at IAS and how IAS would not hesitate to discount its rates significantly to win contracts, particularly so that IAS could secure large, "blue chip" clients.

  iv. CW4 states that "price pressures" as a result of competition with DoubleVerify was a constant theme at IAS, and that the Officer Defendants knew about these issues and personally reviewed and approved the pricing in all IAS deals.  CW4 also states that price competition with DoubleVerify was a "race to the bottom" where IAS would seek to undercut

DoubleVerify's pricing. CW4 further states that, to sign up large, big-name clients, IAS could offer its services at cost.

(b) Representations regarding potential risks to IAS as including the prospect that competitors "may be able to . . . offer competitive services at lower prices," which "could result in increased pricing pressure," and that competition "could put pressure on us to change our prices" failed to disclose that, as Defendants were informed prior to the start of the Class Period and as detailed in ¶¶ 54–90 *supra*, IAS was, in fact, *already* experiencing a new and material trend of increased competitive pricing pressures and had resorted to cutting its rates, offering free or discounted services, and/or making other concessions to customers to secure and retain business.

(c) Representations regarding IAS's successes in winning large, well-known brand clients, including to tout "major global wins with marquee brands" failed to disclose that, as Defendants learned in connection with a February 23, 2023 IAS Board meeting, IAS had resorted to cutting its rates to win "marquis [sic] customers."

(d) Representations regarding IAS's margins, past growth, and/or future growth prospects failed to disclose the material context that such growth was primarily dependent on pricing rather than IAS's offering of "differentiated" products or technology; that IAS was no longer able to drive price increases; and that to the extent IAS did or expected to grow its market share or customer base, that would necessarily require undercutting its competition and compressing fees (for the reasons stated in the preceding sub-paragraphs).

(e) Representations portraying IAS's "global footprint" and investments in "emerging markets" as a major differentiator between IAS and its competitors and/or a significant driver of IAS's financial performance and future growth failed to disclose that Defendants knew or were reckless in not knowing, as of the February 2023 Board meeting, that customers in "emerging markets" were one of the main contributors to pricing pressure affecting the Company, and that shifting a greater part of IAS's revenue toward emerging markets would lead to an unfavorable geographic mix shift.

**B. March 2023 Investor Conferences**

102. At two investor conferences on March 7 and 8, 2023, Defendants continued to assure investors that new deals had been and were being secured solely due to the alleged superiority of the Company's technology and products, not through undercutting IAS's competitors on price.

103.    On March 7, 2023, Defendants Utzschneider and Secor participated in the JMP Securities Technology Conference (the "JMP Conference"). At the JMP Conference, Defendant Utzschneider was asked, "What do you think differentiates IAS from competitors?" Utzschneider responded:

> Ford, Hershey, iconic brands, few **reasons why the team is putting the wins on the board and why these marketers are choosing IAS. Global footprint, we talked about that before being a big differentiator. Every single one of those four wins were competitive, our (inaudible) jump ball [ph]against our competitors. We directly won the business. All four of them, deep, deep, deep product and tech diligence and we were able to demonstrate the sophistication of our technology and also demonstrate our investments in our product and tech.** Global service, so we've been investing heavily in client service. I—this is my third sort of macroeconomic environment in my career living through it and marketers. They deeply care about client service, especially in down economies ROI and efficiency.
>
> **So I would say it was—it's all those reasons, and then also investments, as we talked about before in brand safety, brand suitability, and CTV.**

104.    A participant at the JMP conference asked Utzschneider why "the majority of IAS revenue is domestic" even though "60% more or less" of the global advertising market is "outside the U.S." Defendant Utzschneider responded that "global footprint is a big differentiator for IAS" and that IAS was "investing heavily in emerging market[s]" including "Americas, Southeast Asia, India," concluding that investment in emerging markets "is a big reason why we're differentiate[d] and why we're winning some sizeable deals." Secor immediately followed up by adding that "32% of our revenue" came from outside the U.S. and that "one thing that's also notable is the wins that Lisa talked about recently on our earnings call [i.e., newly signed deals with Kering, Bel, Ford, and Hershey], a good number of them were from Europe in particular."

105.    On March 8, 2023, Defendants Utzschneider and Secor participated in the Morgan Stanley Technology, Media & Telecom Conference (the "Morgan Stanley Conference"). At the Morgan Stanley Conference, Defendant Utzschneider was asked a question about competition by a Morgan Stanley analyst, "are there any pockets of strength or weakness that you would call out?"

35

In response to this question, Utzschneider evaded any discussion of weaknesses, stating "I'd love to speak to tailwinds in the environment and what is propelling our business and our growth." Rather than discuss any of the pricing pressures that she knew about as of the February 23, 2023 IAS Board meeting, Utzschneider limited her response to describing the Company's launch of "a very sophisticated contextual solution" and noting that marketers are "leaning into sophisticated contextual solutions," and pointing to opportunities involving social media marketing.  Secor was asked about "verification" revenue and responded by pointing to growth in IAS's "measurement business" and referring to related video services as being "a premium price product."

106.    Also at the Morgan Stanley Conference, the Morgan Stanley analyst asked Defendant Utzschneider about acquiring clients and settling services to existing clients. Utzschneider responded that, "[a]ccounts that are sitting with our competitors that we want to go after and pursue and tell our IAS story and bring them into the IAS house," adding that "the reason is why large advertisers are leaning into our solutions, are leaning away from some of our . . . competitors' offerings, is a few reasons" including IAS's global footprint, "the accuracy and quality of our technology; the investments we've made . . . and brand suitability; and also our investments in global customer service."  The Morgan Stanley analyst asked a follow-up question: "[w]hen it comes down to the IAS offering, what are the reasons that you would highlight the most that people pick you over your competition? And in the last couple of years, is there anything you've highlighted—you would highlight that you developed that's helped to create that differentiation?"  Utzschneider responded:

> So a couple of **reasons for differentiation, and why advertisers like Ford or Hershey's are leaning in and choosing IAS**.  I mentioned it before, but our global footprint . . .  These global marketers like Nestlé, Coke, GlaxoSmithKline are having a broad global footprint, it really matters to the marketers because they are running their branded advertising everywhere.

So, global footprint matters. ***The differentiation of our product offering and technology***… that's a big differentiator . . . . And then, I would say the third reason is global service. I mentioned it before, but we invested early on in global service to make sure, especially for these really large multimillion dollar accounts that we're providing high-touch service. Because they are leaning into IAS they're investing with us and they expect a level of service. ***So I would say those are the three reasons, global footprint, quality and accuracy of our technology, and our service***.

107. Defendants' statements in ¶¶ 103–106 were materially false and misleading when made and failed to disclose materially adverse facts about the Company's business and operations for the following reasons:

(a) Representations regarding IAS's success in securing or retaining clients, demand for IAS's products and services because they are "differentiated" from or otherwise offering advantages compared to competitors, IAS's competitive strengths, reasons for customers selecting IAS over competitors such as IAS's "deep, deep, deep product and tech diligence and we were able to demonstrate the sophistication of our technology and also demonstrate our investments in our product and tech" and "client service," and the failure to address direct analyst questions about any "weakness," failed to disclose that, for the reasons stated in ¶ 101(a), Defendants knew or were reckless in not knowing that, starting prior to the Class Period, IAS was faced with pricing pressures and had been forced to aggressively cut prices (and/or offer free or discounted services) to win or retain customer accounts, and that pricing was increasingly the key differentiator between IAS and its principal competitor, DoubleVerify.

(b) Representations portraying IAS's "global footprint" and investments in "emerging markets" as a major differentiator between IAS and its competitors and/or a significant driver of IAS's financial performance and future growth failed to disclose that Defendants knew or were reckless in not knowing, as of the February 2023 Board meeting, that customers in "emerging markets" were one of the main contributors to pricing pressure affecting the Company, and that shifting a greater part of IAS's revenue toward emerging markets would lead to an unfavorable geographic mix shift.

## C. Q1 2023 Form 10-Q, Press Release, and Earnings Call

108. On May 4, 2023, the Company issued a press release (the "Q1 2023 Press Release"), held an earnings call (the "Q1 2023 Earnings Call"), and filed a Quarterly Report on Form 10-Q (the Q1 2023 Form 10-Q") with the SEC announcing first quarter results for the period ending March 31, 2023 (collectively, the Q1 2023 Press Release, Q1 2023 Earnings Call, and Q1

2023 Form 10-Q are referred to as the "Q1 2023 Statements"). Defendant Secor signed the Q1 2023 Form 10-Q, and Defendants Utzschneider and Secor were quoted in the Q1 2023 Press Release and the Q1 2023 Earnings Call. In the Q1 2023 Statements, Defendants made multiple materially false and misleading statements to the investing public.

109. In the Q1 2023 Press Release, Defendant Utzschneider reported "*increased demand across our product portfolio*" and stated that IAS "*benefited from several recent new customer wins*," adding that marketers "trust IAS to measure and optimize their digital advertising spend while protecting brand safety."

110. Defendant Secor added in the Q1 2023 Press Release: "We are raising our 2023 outlook *to reflect our first quarter results and positive business momentum highlighted by new customer wins and expanded market opportunities*."

111. The Q1 2023 Form 10-Q states that "there have been no material changes to the risk factors disclosed in Part 1, Item 1A 'Risk Factors' in our Annual Report on Form 10-K for the year ended December 31, 2022," thus repeating the disclosure set forth in ¶ 99.

112. During the Q1 2023 Earnings Call, Defendant Utzschneider opened the call by announcing: "*We accelerated our business momentum* in the first quarter as *demand for our mission-critical products increased*" and added: "*We benefited from strong seasonal demand from marketer campaigns in support of March madness, tax preparation, and new content releases across our streaming partners*."

113. Utzschneider also stated during the Q1 2023 Earnings Call: "*Our leading-edge technology, along with our energized sales effort is driving increased customer adoption and higher conversion of multi-year, multi-million dollar new business opportunities*."

114.    Referring to the previously-signed deals with Ford, Hershey, Kering, and Bel, Utzschneider reiterated her prior characterization of those deals, which continued to be materially false and misleading and omit material information: "***We are winning these deals after extensive head-to-head product and tech due diligence***."

115.    Shifting to newly-signed deals, Utzschneider stated during the Q1 2023 Earnings Call: "Most recently, Canva has selected IAS ***based on our actionable attention data, ability to drive greater efficiencies across programmatic buying, and enhanced CTV offerings*** as Canva shifts more budgets to the space.  In addition, we won several new accounts outside the U.S.  In Europe, BT selected IAS, ***based on our differentiated product innovation***.  ***In APAC***, we're delighted to welcome Singapore Airlines and Panasonic.  ***Our global presence stands as a key differentiator for IAS as marketers consolidate their buying decision around one provider across geographies***."

116.    Utzschneider concluded her opening remarks during the Q1 2023 Earnings Call by stating: "***We have a robust new business pipeline and we are benefiting from our enhanced go-to-market strategy***."

117.    Also during the Q1 2023 Earnings Call, Secor noted that IAS's revenue increased in the first quarter and stated: "***We generated increased marketer demand across our product offerings in social media, video, and open web, with a strong contribution from seasonal campaigns in the period.***"  Secor also stated: "***Year-over-year growth was driven by customer adoption of our post-bid solutions for TikTok, as well as revenue from our existing partnerships with Meta and YouTube, which continue to diversify and scale.***"

118.    Regarding international revenue, Secor stated: "International revenue growth, excluding the Americas, accelerated to 11%, outpacing growth of 6% in the fourth quarter of 2022, *fueled by new business wins, adoption of our offerings, and investments in emerging markets.*"

119.    Turning to performance metrics, Secor stated: "First quarter net revenue retention, or NRR, was 118%, *reflecting our ability to grow with our customers*.   Total advertising customers was 2,100 essentially unchanged from the prior year period.   *The total number of large advertising customers with annual revenue over $200,000 increased to 204, compared to 184 last year and up sequentially from 199 in the fourth quarter of 2022*."

120.    Secor then discussed expected revenue growth in the second quarter and stated: "*Advertiser direct revenue in the second quarter is expected to benefit from the ongoing ramp in the adoption of our leading social media products, as well as demand for our open web products from new advertiser customers.*"

121.    Defendants' statements in ¶¶ 109–120 were materially false and misleading when made and failed to disclose materially adverse facts about the Company's business and operations for the following reasons:

> (a) Representations regarding IAS's success in securing or retaining clients (including those concerning IAS's "leading-edge" technology and sales effort as allowing IAS to secure or renew "multi-year, multi-million dollar" contracts with large advertisers or marketers and stating that IAS could drive "customer adoption," that IAS secured new deals as a result of "head-to-head" product or technology due diligence, and that IAS was succeeding in "higher conversion of multi-year, multi-million dollar new business opportunities"), demand for IAS's products and services because they are "differentiated" from or otherwise offering advantages compared to competitors, IAS's competitive strengths, reasons for customers selecting IAS over competitors, as well as related statements concerning the Company's revenue and/or sales growth, failed to disclose that, for the reasons stated in ¶ 101(a), Defendants knew or were reckless in not knowing that, starting prior to the Class Period, IAS was faced with pricing pressures and had been forced to aggressively cut prices (and/or offer free or discounted services) to win or retain customer accounts, and that pricing was increasingly the key differentiator between IAS and its principal competitor, DoubleVerify.

(b) Representations that there have been "no material changes" to the FY 2022 10-K disclosure regarding risks to IAS from the prospect that competitors "may be able to . . . offer competitive services at lower prices," which "could result in increased pricing pressure," and that competition "could put pressure on us to change our prices" failed to disclose that, as Defendants were informed prior to the start of the Class Period and as detailed in ¶¶ 54–90 *supra*, IAS was, in fact, *already* experiencing a new and material trend of increased competitive pricing pressures and had resorted to cutting its rates, offering free or discounted services, and/or making other concessions to customers to secure and retain business.

(c) Representations portraying IAS's "global presence" and move into in emerging markets including APAC as a major differentiator between IAS and its competitors and/or a significant driver of IAS's financial performance and future growth failed to disclose that Defendants knew or were reckless in not knowing, as of the February 2023 Board meeting, that customers in "emerging markets" were one of the main contributors to pricing pressure affecting the Company, and that shifting a greater part of IAS's revenue toward emerging markets would lead to an unfavorable geographic mix shift.

(d) Representations regarding IAS's margins, past growth, and/or future growth prospects failed to disclose the material context that such growth was primarily dependent on pricing rather than IAS's offering of "differentiated" products or technology; that IAS was no longer able to drive price increases; and that to the extent IAS did or expected to grow its market share or customer base, that would necessarily require undercutting its competition and compressing fees (for the reasons stated in the preceding sub-paragraphs).

**D. May 16, 2023 Investor Conference**

122.    On May 16, 2023, Defendants Utzschneider and Secor participated in the Jefferies Virtual Internet Summit (the "Jefferies Summit").    At the Jefferies Summit, Defendant Utzschneider was asked "where [she] see[s] the company going over the next few years."  Her response, which focused on IAS's programmatic segment, omitted any mention of pricing pressure on IAS or the "increased customer pressure" to differentiate IAS's solutions from available agency or free alternatives.  Defendant Utzschneider was fully aware of these realized constraints for the Company at this point, as evidenced by her CEO Session presentation to the IAS Board five days earlier, on May 11, 2023 in which she expressly described "increased customer pressure" on pricing.  Instead, Utzschneider stated: "Yes.  So, when I take a look at where the greenfield

opportunities are and the tailwinds for our business, in terms of channels, there are several. ***So, programmatic now makes up about half of revenue***. Context control is a product within, it's a programmatic product that we launched about three years ago ***that really has accelerated our programmatic offering and is differentiated*** because we're able to classify content based on the sentiment and the semantic of the page... So, ***programmatic will continue to invest and that will help accelerate and drive our business***."

123.    Later during the Jefferies Summit, in response to a question about "what [she] saw in Q4, compared to what [she's] seeing so far in Q1," Defendant Utzschneider again represented to the public that "our products have never been as relevant as they are today, because we are helping marketers find higher quality media."

124.    Defendants' statements in ¶¶ 122–123 were materially false and misleading when made and failed to disclose materially adverse facts about the Company's business and operations for the following reasons:

> (a) Representations regarding advantages of IAS's products and services because they are "differentiated" from or otherwise offering advantages compared to IAS's competitors, IAS's competitive strengths, reasons for customers selecting IAS over competitors, and/or that IAS did or could drive "customer adoption," failed to disclose that, for the reasons stated in ¶ 101(a), Defendants knew or were reckless in not knowing that, starting prior to the Class Period, IAS was faced with pricing pressures and had been forced to aggressively cut prices (and/or offer free or discounted services) to win or retain customer accounts, and that pricing was increasingly the key differentiator between IAS and its principal competitor, DoubleVerify. In addition, as of the May 11, 2023 IAS Board meeting, Defendants knew or were reckless in not knowing that:
>
> > i.   Among the "Top Loss Reasons" for why the Company was failing to secure new business was competitors' "Aggressive Pricing."
> >
> > ii.  According to a finance presentation at the May 11, 2023 IAS Board meeting, a "lowlight" for IAS's business was business was "continued pricing pressure to win marquis [sic] customers and focus on ROI and efficiency leading clients to look at lower-priced / free programmatic [*i.e.*, optimization] solutions."

(b) Representations portraying the importance of IAS's "programmatic" business, including that it will be a significant driver of sales or revenue growth and/or "accelerate and drive our business,"failed to disclose that Defendant Utzschneider provided a "CEO Session" to the IAS Board on May 11, 2023 that stated that one of the "lowlights" of the current "state of the business" at IAS was "increased customer pressure to prove Programmatic [*i.e.*, optimization] value vs. agency or free alternatives."

**E.   June 13, 2023 Investor Day**

125.   On June 13, 2023, IAS held an Investor Day conference call (the "Investor Day"), attended by at least 11 investment analysts.  IAS participants in Investor Day included Defendants Utzschneider and Secor.

126.   In her opening remarks at Investor Day, Defendant Utzschneider repeated that IAS was "***leading with differentiated tech and product***" and that "[i]nternational expansion … continues to be a major differentiator for IAS."

127.   Utzschneider also stated that IAS has "an incredibly sticky, loyal customer base" without disclosing the known material trends of increased pricing pressure, fee compression, or customers increasingly turning to free or low-cost alternatives.

128.   During the Investor Day, a Barclays analyst asked, "How are customer conversations going around price elasticity or like elasticity…?  And so how are they thinking about the price as part of this whole equation?" In response, Defendant Utzschneider unequivocally denied that pricing was a consideration for IAS's customers and stated: "So what's interesting about many of the global wins that . . .  I've talked about this before, ***price is not the number one criteria from these marketers. It is not.*** It is the accuracy of our product, our product capabilities, how much we are innovating in our product and tech, the differentiation of our road map, and I have to say, our differentiation with CTV and Publica."

129.   Similarly, likely referring to DoubleVerify, a Truist analyst noted that the Company's "immediate peer in the last 12 months has raised prices," and asked, "how do you guys

compare on that basis? When was the last time you guys have actually increased your prices?" In response, Utzschneider stated:

> So a good example, I know I keep referring to these demos, but ***we are proving out the value of differentiated products that we're launching***… And by able to quantify and measure the value that we're providing to marketers. It could be we are providing higher quality media. ***This is how we're proving it out***. We are helping you drive greater efficiency, reduce media wastage, drive higher ROI. ***With that, we are able to also justify if we're increasing the price because of backing it up with data. So we feel really bullish about our product and tech roadmap and we are demonstrating both with the stickiness of our customer base and how loyal they are and the fact that we've been able to hold price and maintain price and be able to increase price for these differentiated products***.

130.    In a presentation for the Investor Day, IAS attributed its "ATTRACTIVE AND SUSTAINABLE FINANCIAL PROFILE" in part to the Company's "***Favorable pricing structure***," which the presentation identifies as one of two "DRIVERS OF SUSTAINABLE GROWTH":

## ATTRACTIVE AND SUSTAINABLE FINANCIAL PROFILE

| TRACK RECORD OF PROFITABLE GROWTH | ▪ 11 straight quarters of double-digit revenue growth<br>▪ Adjusted EBITDA margin of 32% in Q1'23<br>▪ Net income profitable for 5 straight quarters |
| --- | --- |
| MULTIPLE DRIVERS OF SUSTAINABLE GROWTH | ▪ Multiple expansion opportunities and favorable industry trends<br>▪ Favorable pricing structure with cart value up to 6x base |
| LOYAL CUSTOMER BASE THAT GROWS WITH IAS | ▪ Net revenue retention rate of 118%+ past 7 quarters<br>▪ Growing revenue per large customer<br>▪ Average customer tenure of ~8 years |
| STRONG FCF GENERATION AND CAPITAL POSITION | ▪ Attractive free cash flow generation<br>▪ Strong capital position with excess cash and revolver capacity<br>▪ Productivity gains enabling investment for growth |

131.    Another analyst asked Defendant Utzschneider about the potential for IAS to augment its market share and increase revenue: "And then stepping back, just considering the

TAM[6] as a whole, if I add up you and some of your competitors, it's still a very small amount of revenue versus the overall TAM.  So how do you change that with product going forward . . . ?" Rather than acknowledge the crucial role played by pricing and price-cutting in IAS's competitive outlook, Defendant Utzschneider focused entirely on purported product differentiation, listing investment in "automation," "end-to-end synching across the major platforms," and the ability to "process massive amounts of measurement, post-bid data" as features that will "absolutely just accelerate the growth of [IAS's] business."

132.    Also during Investor Day, Defendant Secor claimed that "[w]hat's driving the growth of our optimization business is the strong customer adoption of Context Control" (a purportedly differentiated product) without disclosing the increased pricing pressures on the Company to secure and retain business against DoubleVerify or the additional pressure generated by free and low-cost alternatives to IAS's optimization solutions.

133.    With regards to IAS's measurement segment, Defendant Secor noted that revenue from social media and video had both grown significantly on an annual basis since 2020.  She then stated, "We expect these trends to continue" and that the growth was "primarily driven by the end user demand for these formats."  Secor further reiterated that "expansive global footprint is also a key differentiator for IAS."

134.    Secor also spoke directly about the stability of IAS's pricing:

> So let's spend a couple of minutes on pricing.  ***I know many of you are also very interested to hear about how our pricing works, because we've had a lot of questions on this in some of our one-on-one***.  So I wanted to put together just a very simple explanation of how our pricing works, because it is actually quite simple.

---

[6] In the context of digital advertising, TAM stands for Total Addressable Market, which represents the theoretical maximum revenue opportunity for a product or service within a specific market, assuming 100% market capture with no competition.

In terms of measurement, optimization and publisher, we charge a fixed cost per 1,000 of impressions multiplied by the number of impressions. ***The CPMs are fixed, we negotiate those CPMs either with the agency, the advertiser or the publisher***. And our volume is variable based on industry trends and economic conditions. ***This approach provides us with stability and visibility into our rates, and we do not have volatility based on the media rates***.

. . . And you can see, ***because of the strong customer value proposition that our tech provides, we have a much higher CPM for our optimization business than we do for our measurement business***. As a result, the total cart value or the cumulative CPM of our offerings, can be as high as 6x our measurement CPM.

[…]

Another point I'd like to make is that we have sticky and deep integrations with our platform partners. ***The nature of our revenue is reoccurring and while the economic environment is a factor that influences impressions, we are well diversified across a variety of industries and we have stability from our fixed CPMs***.

135.    Secor further stated:

To conclude, ***we have a very attractive and sustainable financial profile.*** And we will continue to pursue this balance of both revenue growth and profitability. ***You've heard today about the multiple drivers of growth for our business and how we are very well-positioned to continue to benefit from these trends.*** So going forward, we will focus on maintaining double-digit revenue growth and 30% plus EBITDA margins for the foreseeable future.

136.    Secor was later asked by an analyst about changing dynamics in the ad market and other slowing of the market. Secor responded by stating, *inter alia*: "***At the same time, especially given all of the different offerings we have across the different markets, we also have a very strong pricing function*** and we always look for opportunity to look at where there could be opportunity, especially given the value that our tech provides and the customer value proposition for the customer."

137.    In response to the same question, Utzschneider followed up by stating: "Right. And just, I completely agree with you. And just to add on to what Tania said is, as we invest more in differentiated products like total media quality, you saw Craig's demo, the 3X that we're seeing

out of that product. ***Highly sophisticated, proving out the value to marketers. We are able to increase the CPM and charge an incremental CPM***. That's the first thing. And then the second thing is as the world continues to shift to video, everyone knows video, CTV demands a higher eCPM and I think that will also balance out any pricing fluctuations in the ecosystem, not with us. ***We have been able to maintain price***."

138. Defendants' statements in ¶¶ 126–137 were materially false and misleading when made and failed to disclose materially adverse facts about the Company's business and operations for the following reasons:

(a) Representations that IAS had the ability to hold, maintain, or increase price; to justify any price increases; or that IAS had a "favorable pricing structure" or strong pricing structure/function or that, for certain customers, "price is not the number one criteria" failed to disclose that, as alleged in ¶¶ 101(a) and 123, Defendants knew or were reckless in not knowing that, starting prior to the Class Period and continuing, based on information provided to Defendants in connection with the May 11, 2023 IAS Board meeting (including that competitors' "Aggressive Pricing" was among the "Top Loss Reasons" for the Company's failure to secure new business), IAS was faced with pricing pressures and had been forced to aggressively cut prices (and/or offer free or discounted services) to win or retain customer accounts, and that pricing was increasingly the key differentiator between IAS and its principal competitor, DoubleVerify. Additionally, IAS recognized internally that it did not have the ability to maintain or increase the price of its products and that IAS's pricing function had ceased to be effective and was not (as Defendant Secor stated) "very strong." Instead, the CPMs negotiated between IAS and its customers (i.e., agencies, advertisers, or publishers) were dependent on prices charged by IAS's competitors for similar products and solutions—in other words, they were neither stable nor predictable.

(b) Representations that IAS's customer base was "loyal" or "sticky" and that price was not the main criteria for marketers' decision to select IAS's products or services over its competitors failed to disclose that, as Defendants learned in connection with a February 23, 2023 IAS Board meeting, IAS had resorted to cutting its rates to win "marquis [sic] customers" and that, as Defendants learned in connection with a May 11, 2023 IAS Board meeting, that competitors' "Aggressive Pricing" was among the "Top Loss Reasons" for IAS's loss of client contracts.

(c) Representations that IAS maintained a "sustainable financial profile" and was "well diversified" with reoccurring, stable revenue due to its pricing function

failed to disclose the material context that such growth was primarily dependent on pricing rather than IAS's offering of "differentiated" products or technology; that IAS was no longer able to drive price increases; and that to the extent IAS did or expected to grow its market share or customer base, that would necessarily require undercutting its competition and compressing fees (for the reasons stated in the preceding sub-paragraphs). Additionally, Defendants failed to disclose the material context that free and lower-priced alternatives to IAS's programmatic/optimization solutions had emerged as of the May 11, 2023 CEO Session or earlier. Indeed, multiple free or low-cost alternatives were operational at the time the statements were made. Major advertising platforms were offering free services allowing marketers to manage and monitor programmatic campaigns. In addition, advertising agencies were either (1) reselling, bundling, or embedding IAS's solutions into their media buying and planning services; (2) using their preferred rates with vendors to offer these solutions at a discount or as part of a flat media fee – which also exerted downward pressure on IAS's pricing function and resulted in compressed fees. As IAS recognized internally, this resulted in increased pricing pressure as customers were increasingly drawn to these alternatives for their optimization needs. The Company experienced difficulty in proving the added value of its products and drive customer adoption.

(d) Representations that IAS's "expansive global footprint is also a key differentiator for IAS," failed to disclose that Defendants knew or were reckless in not knowing, as of the February 2023 Board meeting, that customers in "emerging markets" (a key part of IAS's "global footprint") were one of the main contributors to pricing pressure affecting the Company, and that shifting a greater part of IAS's revenue toward emerging markets would lead to an unfavorable geographic mix shift.

**F. The Truth Partially Emerges as IAS Continues to Mislead the Investing Public**

**i.    The Q2 2023 Form 10-Q, Press Release, and Earnings Call**

139.   On August 3, 2023, the Company issued a press release (the "Q2 2023 Press Release"), held an earnings call (the "Q2 2023 Earnings Call"), and filed a Quarterly Report on Form 10-Q (the "Q2 2023 Form 10-Q") with the SEC announcing second quarter results for the period ending June 30, 2023 (collectively, the Q2 2023 Form 10-Q, Q2 2023 Press Release, and Q2 2023 Earnings Call are referred to as the "Q2 2023 Statements"). Defendant Secor signed the Q2 2023 Form 10-Q. A number of false and misleading statements were communicated to the investing public by Defendants in the Q2 2023 Statements.

140.    In the Q2 2023 Press Release, Defendant Utzschneider is quoted as stating, in relevant part, as follows:

> "We continue to execute on our growth strategy with results for the second quarter ahead of our prior expectations," . . . "We are leading with innovation as we scale our products to new markets with our platform partners and unlock valuable insights with increasingly actionable data. ***Our global business momentum continues with several new brand logos added recently***."

141.    In the Q2 2023 Press Release, Defendant Secor was also quoted, stating that: "Our financial performance in the second quarter reflects our ability to meet our customers' needs with diverse offerings across the digital media ecosystem." Secor also stated that IAS had "expanded our margins during the quarter while investing in key growth areas."

142.    The Q2 2023 Form 10-Q states that "there have been no material changes to the risk factors disclosed in Part 1, Item 1A 'Risk Factors' in our Annual Report on Form 10-K for the year ended December 31, 2022," thus repeating the disclosure set forth in ¶ 99.

143.    IAS presented certain financial results, including a reported result for "Optimization revenue (f/k/a programmatic) [which] was $52.8 million, a 10% increase compared to $47.9 million in the prior-year period."

144.    During the Q2 2023 Earnings Call, Secor directly addressed the decline in optimization growth, attributing the material drop to factors other than pricing pressure:

> Optimization revenue formerly known as programmatic revenue grew 10% year-over-year in the second quarter to $52.8 million. Optimization revenue growth in the period reflects ***maturing context-controlled*** [sic] ***growth*** in line with our prior expectations, ***the contribution from new logo wins, and strength in the CPG vertical, partially offset by slower demand from tech/telco clients***. We are investing in optimization to drive continued adoption of our offerings. We are enhancing both our product capabilities and go-to-market engine.

145.    Also, on the Q2 2023 Earnings Call, Utzschneider reassured the market about the Company's pricing power, suggesting that a "slight" decline in CPM in the optimization segment was just normal fluctuation and not a trend that the Company expected to continue:

[I]n the second quarter, we were really pleased to see optimization volumes continuing at Q1 levels of 14%. We did see a ***slight decline in the average CPM for the period***, and it is an average, and that will reflect—averages will ***reflect shifts in our product mix, shifts in our customers. And that can fluctuate from quarter-to-quarter, and we do not expect that trend to continue on optimization***. But, turning over to measurement, we were pleased for the measurement average CPM for the quarter the uptick, which was a reversal of what we saw in the first quarter, of down 6%. And that reflects the increase in video we reached a—50% of our measurement revenue was video-related. And as you all know, video is a premium to display, and that is what drove up the CPM in the second quarter on the measurement side.

146.    Utzschneider also continued to attribute newly signed deals during the preceding quarter to factors other than pricing: "***Building on our new business momentum from prior quarters, we continue to win major global client opportunities, often following head-to-head product and tech due diligence against other providers***."

147.    Similarly, Utzschneider announced a major new deal and implied that pricing had played no role at all in closing the deal: "We're excited to share the news of L'Oreal's selection of IAS as their global strategic partner for ad verification, expanding our reach to encompass over 45 markets worldwide. IAS will be leveraged for YouTube, but also to bolster brand safety measures across various other channels, including TikTok and Amazon. ***L'Oreal's choice of IAS reflects our robust product roadmaps effectiveness, especially within connected TV and social media platforms.***"

148.    When discussing the Company's social media segment, Utzschneider suggested that the Company's product was so differentiated that it could autonomously generate long-term demand, and failed to disclose the existence and importance of pricing pressures: "***In social media, we are laying the groundwork for accelerated revenue growth globally*** as TikTok, Meta and YouTube launch short-form video-based products that are generating unprecedented user growth. ***We are providing critical solutions for their platforms. We are investing in differentiated***

*technology that is getting smarter and creating a flywheel effect of accelerated growth and increased marketer demand*."

149.    IAS's stock price fell on this news.  On August 4, 2023, after the Q2 2023 Press Release and Earnings Call, the Company's stock price declined by $3.66 per share (or approximately 20%) to close at $15.17 per share, down from the previous day's close of $18.83 per share.  While the market reacted to the unexpected revenue deceleration in IAS's optimization segment, IAS persisted in withholding key information from investors regarding *the cause* of this deceleration: increasing pricing pressure.

150.    Defendants' statements in ¶¶ 140–149 were materially false and misleading when made and failed to disclose materially adverse facts about the Company's business and operations for the following reasons:

(a) Representations regarding the deceleration in optimization (f/k/a programmatic) revenue from Q1 to Q2 2023, and the alleged causes for it including "maturing" of demand for "context-controlled" (likely referring to IAS's "Context Control" product) and statement that the decline in average CPM was not expected to continue failed to disclose that, as alleged in ¶¶ 101(a) and 123, Defendants knew or were reckless in not knowing that, starting prior to the Class Period, IAS was faced with pricing pressures and had been forced to aggressively cut prices (and/or offer free or discounted services) to win or retain customer accounts, and that pricing was increasingly the key differentiator between IAS and its principal competitor, DoubleVerify. Defendants learned, as of the IAS Board meeting on August 1, 2023—just two days before Defendants made the Q2 2023 Statements—that IAS had experienced "lower than expected Optimization growth" and "expect[ed] this trend to continue" which was contrary to what the Company portrayed to investors in the Q2 2023 Statements.  Moreover, pricing concerns were once again specifically highlighted at the August 1, 2023 Board meeting, including "[c]ontinued [c]ompetition in Programmatic" because "[a]dvertisers [were] increasingly cost conscious due to macroeconomic conditions[.]"

(b) Representations that there have been "no material changes" to the FY 2022 10-K disclosure regarding risks to IAS from the prospect that competitors "may be able to . . . offer competitive services at lower prices," which "could result in increased pricing pressure," and that competition "could put pressure on us to change our prices" failed to disclose that, as Defendants were

informed prior to the start of the Class Period and as detailed in ¶¶ 54–90 *supra*, IAS was, in fact, *already* experiencing a new and material trend of increased competitive pricing pressures and had resorted to cutting its rates, offering free or discounted services, and/or making other concessions to customers to secure and retain business.

(c) Representations that IAS was securing new and existing business following "head-to-head" product or tech due diligence, statements about why advertising customers selected IAS's products or services, and statements touting IAS's "business momentum," new "logo" or "brand" wins, and ability to meet customer needs failed to disclose that, as Defendants learned in connection with a February 23, 2023 IAS Board meeting, IAS had resorted to cutting its rates to win "marquis [sic] customers."

(d) Representations that IAS expanded its margins and touting the expanded context regarding IAS's margins, past growth, and/or future growth prospects failed to disclose the material context that such growth was primarily dependent on pricing rather than IAS's offering of "differentiated" products or technology; that IAS was no longer able to drive price increases; and that to the extent IAS did or expected to grow its market share or customer base, that would necessarily require undercutting its competition and compressing fees (for the reasons stated in the preceding sub-paragraphs).

### ii. August 8, 2023 Investor Presentation

151.    Defendants continued to conceal the truth about pricing pressure and related threats to the Company's financial position. In an August 8, 2023 Investor Presentation, IAS again communicated to the investing public that its purported "***Favorable pricing structure***" was as one of the Company's two "DRIVERS OF SUSTAINABLE GROWTH":

152.    The statements in ¶ 150, including that IAS had a "[f]avorable pricing structure" which was one of the two "DRIVERS OF SUSTAINABLE GROWTH" were false and misleading when made, and omitted to state material facts necessary to make the statements not misleading for the same reasons set forth above in ¶¶ 100(a) and 123, including that Defendants knew or were reckless in not knowing that, starting prior to the Class Period, IAS was faced with pricing pressures and had been forced to aggressively cut prices (and/or offer free or discounted services)

to win or retain customer accounts, and that pricing was increasingly the key differentiator between IAS and its principal competitor, DoubleVerify.

### iii. September 8, 2023 Citi's Global Technology Conference

153.    Defendants continued to conceal the truth about pricing pressure and related threats to the Company's financial position at the September 8, 2023 Citi's Global Technology Conference (the "Citi Conference"). Defendants Utzschneider and Secor participated in the Citi Conference on behalf of the Company.

154.    During the Citi Conference, analyst Ron Josey asked Defendant Utzschneider about trends "from a macro perspective" in the digital advertising industry, including what was of significance to IAS's "Fortune 500" and other clients. Utzschneider framed her response as being based on her experience "spend[ing] time with our customers and partners" and "listen[ing] intently to what the brands are saying and what the holdcos are saying." Utzschneider stated that customers are "leaning into solutions like IAS" and "scrutinizing efficiency and efficiency of spend," suggesting that customers were selecting IAS over its competitors based solely on its product offerings. Notably, Utzschneider stated:

> The good news is **they** [customers] **don't view IAS as a tool. They view us more as a must buy, an insurance to ensure that their brands are running adjacent to media quality**. The second thing that we're hearing or I'm hearing from the marketers is they are also doubling down in the known entities, right? **And then the third trend that we are seeing, and we are totally up for it, is greater rigor and scrutiny on our product performance, our product, and tech accuracy. We're seeing a lot of diligence between -- in the RFI, RFP landscape, comparing our product and tech performance against some of our competitors.** And I think it's due in a large part to the efficiency focus that I was speaking to before, but also marketers, they have become much more sophisticated when it comes to brand safety and suitability strategy.

155.    Similarly, when Utzschneider was asked about an exclusive partnership signed in September 2023 with social media company X, she attributed X's decision to partner with IAS solely to factors other than pricing: "***A big reason why X selected IAS is because of everything I***

*just talked about with the sophistication of our total media quality [TMQ] technology. I would also say that marketers gave X very positive feedback about our performance as a partner and also the sophistication and accuracy of our technology.*"

156.    Citi analyst Josey asked Defendant Secor about her "thoughts on this broader pricing leverage in the platform and then just the effect of pricing and what that means across" [sic].  Secor responded:

> We have a really compelling business model and you see it in our strong net revenue retention, which was 115% in the second quarter.  And what's driving that is the customer journey typically starts with measurement.  Our pricing on measurement is at a certain level.  And then as the customer expands into our products, particularly on the optimization side, which has a much higher CPM, there's an opportunity to drive velocity in our pricing of up to 5 to 6 times as the customer goes on that journey.  So a lot of our revenue growth is driven by internal adoption.
>
> ***And what we're finding too is that our pricing, when the tech is there and we have such a strong customer value proposition, our pricing is higher.***  And as the customer moves along that journey, they really value that value proposition and the enhancements that our tech solutions are driving on their digital media spend, and we're able to capture that price and you can see that in our uplift as customers expand revenue within our product suite.

157.    Defendants' statements in ¶¶ 154–156 were materially false and misleading when made and failed to disclose materially adverse facts about the Company's business and operations for the following reasons:

> (a)    Representations that IAS had the ability to set "higher" prices due to its technology and "strong customer value proposition" and statements that customers did not see IAS as a "tool" but rather as a "must buy" or "insurance" failed to disclose that, as alleged in ¶¶ 100(a) and 123, Defendants knew or were reckless in not knowing that, starting prior to the Class Period, IAS was faced with pricing pressures and had been forced to aggressively cut prices (and/or offer free or discounted services) to win or retain customer accounts, and that pricing was increasingly the key differentiator between IAS and its principal competitor, DoubleVerify.
>
> (b)    Representations regarding IAS's "strong" net revenue retention failed to disclose the material context that such growth was primarily dependent on pricing rather than IAS's offering of "differentiated" products or technology; that IAS was no longer able to drive price increases; and that to the extent IAS

54

did or expected to grow its market share or customer base, that would necessarily require undercutting its competition and compressing fees (for the reasons stated in the preceding sub-paragraphs).

### iv.  Q3 2023 Form 10-Q and Earnings Call

158.    On November 2, 2023, the Company held an earnings call (the "Q3 2023 Earnings Call") and filed a Quarterly Report on Form 10-Q (the "Q3 2023 Form 10-Q") with the SEC announcing third quarter results for the period ending September 30, 2023 (collectively, the Q3 2023 Form 10-Q and Q3 2023 Earnings Call as referred to as the "Q3 2023 Statements"). Defendant Secor signed the Q3 2023 Form 10-Q and Defendants Utzschneider and Secor participated in the Q3 2023 Earnings Call on behalf of IAS.  In the Q3 2023 Statements, Defendants made multiple materially false and misleading statements to the investing public.

159.    The Q3 2023 Form 10-Q states that "there have been no material changes to the risk factors disclosed in Part 1, Item 1A 'Risk Factors' in our Annual Report on Form 10-K for the year ended December 31, 2022," thus repeating the disclosure set forth in ¶ 99.

160.    During the Q3 2023 Earnings Call, a Raymond James analyst asked, "Are there any commonalities in the feedback that you're receiving as to why you were selected over competitors, anything that's coming up in multiple of your conversations?"  In response, Utzschneider pointed to recent new client wins mentioned earlier in the call and stated:

> We were delighted to announce those three large brands of (Technical Difficulty) BMW and Mars and expanding our partnership with Mars in the third quarter. Couple of callouts *in terms of why these major marketers are selecting IAS and expanding what -- with IAS due to our product innovation, with products like TMQ, in particular, BMW, our vertical expertise in the auto sector and with all three of the brands extensive international footprint and high-quality service*.

Later in the call, Utzschneider touted IAS's purported "differentiated technology" and made no mention of price as a factor in determining customer adoption and demand: "We're thrilled with *the fact that brands are leaning in to our differentiated technology backed by ML AI, and I'm*

*incredibly proud of the team, of the speed to market, and again delivering differentiated value for our brands*."

161.    Defendants' statements in ¶¶ 159–160 were materially false and misleading when made and failed to disclose materially adverse facts about the Company's business and operations for the following reasons:

> (a)   Representations that "major marketers" were selecting IAS due to product innovation failed to disclose that, as alleged in ¶¶ 100(a) and 123, as Defendants learned in connection with a February 23, 2023 IAS Board meeting, IAS had resorted to cutting its rates to win "marquis [sic] customers."

> (b)   Representations that there have been "no material changes" to the FY 2022 10-K disclosure regarding risks to IAS from the prospect that competitors "may be able to . . . offer competitive services at lower prices," which "could result in increased pricing pressure," and that competition "could put pressure on us to change our prices" failed to disclose that, as Defendants were informed prior to the start of the Class Period and as detailed in ¶¶ 54–90 *supra*, IAS was, in fact, *already* experiencing a new and material trend of increased competitive pricing pressures and had resorted to cutting its rates, offering free or discounted services, and/or making other concessions to customers to secure and retain business.

### v.   December 5, 2023 Investor Conference

162.    On December 5, 2023, Defendants Utzschneider and Secor participated in the Raymond James TMT and Consumer Conference (the "Raymond James Conference").  During the Raymond James Conference, Raymond James analyst Andrew Merrick inquired about "the environment for pricing."  Secor responded:

> We enter into one to three-year contracts with our clients and these are exclusive many times global contracts where we negotiate a CPM with these clients.  These are fixed CPMs.  But at times when we're introducing new technology like TMQ, *we're able to drive a bit of a price increase*.

> Now, we're really focused on volume.  We were really pleased in the third quarter to see our volume acceleration from the second quarter.  So, volume growth across measurement and optimization were 25% and 19% respectively, which was up from the second quarter.  And we did that *while pricing was still consistent* and so pleased to see that dynamic.

163.    Moments later, the same Raymond James analyst directly asked Secor whether she felt that any aspect of the external competitive environment needed to be addressed, or whether the sole driver of IAS's growth was its internal capabilities and capital allocation: "And maybe related to that on capital allocation, I mean you've talked right there about so many of the organic opportunities in terms of reinvestment into the business in front of you. I guess as you think about the capabilities of IAS and looking at the competitive environment, is there anything that you feel like you need to address or is it really just the focus on being that internal drive forward?" In her response, Secor failed to identify or even mention competitive pricing pressures as a factor that could influence IAS's growth prospects or balance sheet:

> So, **we have a very strong balance sheet**. Our debt net of cash is $80 to $83 million which is less than 0.5 times EBITDA. And as you can see **our cash flow has been very strong and we've been paying down debt**. We're pursuing a partner build by strategy and you know we've done four deals in the last four years. ***We're eager to continue to make investments so long as they're synergistic and create value for shareholders***.

164.    To conclude the conference, the Raymond James analyst gave Utzschneider and Secor one final opportunity to inform investors of any significant issues affecting the Company's performance, asking directly: "If you had to pick one aspect of the company that you feel investors should keep an eye or is maybe misunderstood in the story as we get into 2024, what would it be?" In, response, both Utzschneider and Secor persisted in concealing the existence and significance of competitive pricing pressures.  Defendant Utzschneider chose to speak only in terms of touting the company's technology offerings (for example, stating that "science is in the name of Integral Ad Science. The products that we build for years are backed by ML and AI and we continue to invest both for short-term innovation and long-term innovation. We aspire next year that our engineering organization, a third of our team will be data scientists.").  Defendant Secor opted for a similar approach, highlighting IAS's "deep integrations with the platform partners" and stating

that the Company is "continuing on not only the friendly trends in the industry but the value of our

technology and driving value for advertisers as we head into 2024."

165.    Defendants' statements in ¶¶ 162–164 were materially false and misleading when

made and failed to disclose materially adverse facts about the Company's business and operations

for the following reasons:

(a)    Representations that IAS was able to "drive a bit of a price increase," had pricing that was "consistent," touting IAS's differentiated products, and otherwise evading the existence of any pricing pressure on the Company failed to disclose that, as alleged in ¶¶ 100(a) and 123, Defendants knew or were reckless in not knowing that, starting prior to the Class Period, IAS was faced with pricing pressures and had been forced to aggressively cut prices (and/or offer free or discounted services) to win or retain customer accounts, and that pricing was increasingly the key differentiator between IAS and its principal competitor, DoubleVerify.

(b)    Representations regarding IAS's "very strong" balance sheet and cash flow failed to disclose the material context that such growth was primarily dependent on pricing rather than IAS's offering of "differentiated" products or technology; that IAS was no longer able to drive price increases; and that to the extent IAS did or expected to grow its market share or customer base, that would necessarily require undercutting its competition and compressing fees (for the reasons stated in the preceding sub-paragraphs).

## VII.    IAS REVEALS ITS STRUGGLES WITH PRICING, AND THE STOCK PRICE DROPS PRECIPITOUSLY

166.    The Class Period ends on February 27, 2024.  On that date, after markets closed,

the Company announced fourth quarter and full year results for Q4 and FY 2023, the period ended

December 31, 2023, and provided lackluster guidance for FY 2024.  Revenue guidance for the

first quarter of 2024 was "$111 million to $113 million," which was below analyst estimates of

$119.8 million (Bloomberg Consensus).  Revenue guidance for the full year 2024 was "$530

million to $540 million," which was below analyst estimates of $544.2 million.

167.    During a conference call that same day, Utzschneider revealed to investors what Defendants themselves had known for over a year, that any pricing power that IAS may have had was no more:

> Our business today is weighted towards a loyal base of large advertising customers with an average tenure of over eight years for our top 100 marketers.  At the end of the fourth quarter, we had 222 large advertising customers with annual spend of at least $200,000 per year.
>
> Revenue from these large advertising customers represented 87% of our total advertising revenue for the trailing twelve-month period.  ***We are seeing more competitive pricing and measurement on a select group of large contract renewals in exchange for increased volume commitments and multi-year exclusive agreements.  We have factored this dynamic into our growth outlook for 2024***.

168.    During that same conference call, Secor stated:

> [O]ur first quarter outlook reflects ***more competitive pricing*** and measurement on a select group of large contract renewals in exchange for increased volume commitments and multi-year exclusive agreements.  We have also factored into our Q1 outlook the implementation of previously negotiated pricing by one optimization account.

169.    During the call a Stifel analyst asked: "I was hoping maybe you could expand a little bit on the pricing pressure that you're seeing beyond what you said in the prepared remarks.  I guess, can we expect that to continue and be something that is a headwind throughout the year?  I know you gave us full-year guidance, but I guess what's the right way to think about that?  And then second, I guess, just Q1, the growth rate, pretty big decel and then the second half, or I guess the remaining three quarters, a pretty nice uptick to get you to the full year, I guess.  What are the moving pieces that should reaccelerate the growth beyond Q1?"

170.    Utzschneider responded to the Stifel analyst as follows:

> ***So, in terms of competitive pricing dynamics that we're seeing, as we mentioned in the script, we offered more competitive pricing and measurement on a select group of large contract renewals in exchange for volume commitments and multi-year exclusive agreements.  The way to think about that is, yes, we were facing those competitive dynamics, but we thought it was the strategic thing to do***

*is to ensure that we renew these large accounts and ensure that they drive up volume.* Also, our strategy has been to secure measurement renewals so that we can upsell and cross-sell our offerings, expand geographies and ramp over time.

171.    A Wells Fargo analyst then asked: "Maybe really quickly, just to circle back on the pricing question. Sounds like they may have been more defensive in nature thus far, wondering if you're also using pricing more aggressively as a lever to dislodge business from competitors?"

172.    Utzschneider responded as follows: "So, as you know, *it's a highly competitive market. And yes, we made the call to -- in order to shore up and close just under a dozen large advertisers and renew them, we agreed to reduce pricing again for higher volumes and also exclusivity in multi-year contracts. And as you can imagine, we're always in a jump ball. So yes, in terms of pricing, we just ensure that we're maintaining a competitive price and we're on par with what's happening in the industry.*"

173.    In response to another question related to competitive pricing, Utzschneider stated: "And what we saw with some of these renewals and renegotiations is that marketers, they see so much value in our product offerings, *yet they wanted to negotiate more competitive pricing in exchange for higher volume commitments, multi-year exclusive agreements.* And we were comfortable with that, especially given all of the new products that we're launching in 2024 that drive high value, drive differentiation for the brands. And it's *now* our job to *drive adoption* with the marketers with these differentiated products."

174.    Analysts were stunned by IAS's sudden revelation of "competitive pricing dynamics." In a February 28, 2024 report, Barclays stated:

> IAS now sees pressure in the short term from some price competitive renewals, which are expected to impact growth negatively. *This was not expected by the investment community, and will raise fears about the competitive market*, which could be a more longer-term issue.

175.    In a February 28, 2024 report, Raymond James, which downgraded IAS stock from a "Strong Buy" to "Outperform," stated:

> IAS' pricing moves drew the majority of interest on the call, with management noting competitive dynamics driving a desire to lock in customers to provide cross-sell/up-sell opportunities. ***Historically, IAS has been confident of their ability to defend pricing (noting that competitors' pricing was typically not very divergent). As such, the desire to become more aggressive was surprising.*** The outstanding questions that follow are: . . . could this trigger a downward price spiral.

176.    In a February 28, 2024 report, Benchmark stated:

> ***IAS' pricing power is called into question after last night's reveal of renegotiated lower pricing terms*** for nearly a dozen measurement clients and one large optimization client …. What we do not know is how many more forward measurement client renewals will require similar renegotiated pricing terms and whether the new minimum volume commitments are above the respective clients' prior run-rates (or did IAS give up net economics for customer duration).

177.    In a February 28, 2024 report, Jefferies expressed concern about "Competitive Pressures Intensifying" for IAS, noting that the Company's revenue guidance "implies growth could decelerate into the mid-single digits . . . as competitive pricing pressures weigh on growth." Jefferies further observed that "the pricing overhang could pressure the stock," and stating that it is "watching" the impact of pricing pressures due to the fact that "***few investors were prepared for rev growth to slow into the mid-single digits in Q1 due to large contracts being negotiated at lower prices.***" Further, Jefferies stated that "***it worries us that pricing power may not be as strong as we'd previously thought***. We expect investors to remain skeptical . . . especially if other advertiser cohorts try to negotiate more favorable pricing."

178.    In a February 27, 2024 report, KeyBanc Capital Markets noted that IAS's "***commentary on pricing in renewals with large customers have stoked investor fears of a pricing war***." KeyBanc further observed that it "feel[s] more cautious" about IAS because of the Company's disclosure "that it undertook competitive pricing actions on a select group of large advertisers in measurement in exchange for volume commitments and exclusivity" and that these

pricing concessions as having "negative read-throughs on both IAS's pricing power and competitive positioning."

179.    On February 28, 2024, the next trading day following the Company's announcement, IAS's stock price plummeted $7.09 per share (approximately 41%) to close at $10.01 per share from the previous day's close of $17.10 per share on incredibly heavy volume. IAS's stock price has not recovered; the stock is currently trading under $8.50 per share.

## VIII.    ADDITIONAL POST-CLASS PERIOD REVELATIONS

180.    On November 1, 2024, an individual IAS investor filed the Verified Delaware Complaint in the Court of Chancery of the State of Delaware against Vista and certain of IAS directors employed by or affiliated with Vista: Aliabadi, Fosnaugh, Lema, Nakatsukasa, and Taylor.  Although redacted, the Verified Delaware Complaint includes multiple direct quotes from previously undisclosed internal IAS documents and citations verifying the source of those materials as coming from the Company.

181.    The Verified Delaware Complaint alleges, among other things, that Vista "saw fit to front-run negative news about the Company, selling millions of shares of IAS stock based on material non-public information and thereby avoiding nearly $270 million in losses."

182.    The Verified Delaware Complaint alleges, *inter alia*, that Vista had a "presence in the [IAS] boardroom" through its employees on the IAS Board through which it "learned, beginning in February 2023, that IAS's revenue growth had started to slow," and that "IAS was experiencing 'pricing pressure' in its ad verification and optimization business and that the Company had resorted to cutting rates to win 'marquis [sic[ customers.'"  These allegations are supported by citations to Bates-numbered internal IAS documents and the plaintiff's sworn verification.

183.    On January 3, 2025, IAS announced the sudden departure of Defendant Secor from her role as CFO.  In Secor's place, IAS announced that Vista-affiliated IAS Board member Jill Putman had been appointed to serve as the Company's interim CFO.  Putman served as interim CFO until June 10, 2025.

## IX.    ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER

184.    As alleged herein, Defendants acted with scienter in that Defendants knew or recklessly disregarded that the public statements or documents issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and/or knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primarily violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding the then-present and increasing pressure on IAS's pricing of its services, knew or recklessly disregarded that contrary to Defendants' representations to the investing public, pricing pressure posed a clear and present danger to the Company's financial position and future prospects.

185.    As alleged herein, Defendant Utzschneider participated in meetings of the IAS Board at which it was discussed starting in February 2023—before the Class Period—that the Company was experiencing significant "pricing pressure" from its customers and that, in response to those pressures, the Company had resorted to cutting rates when renewing and securing new contracts.  This information was directly contrary to the information shared with IAS' investors. As further alleged herein, Utzschneider herself communicated those and similar messages to the IAS Board at "CEO Session" meetings held during the Class Period.  Similarly, as the Company's CFO and its "Principal Financial Officer" (per the signature line on IAS's SEC filings), Defendant Secor either knew of or was reckless in not knowing of the matters discussed at the same IAS

board meetings because the information presented concerned financial matters, including but not limited to the May 11, 2023 "lowlights" provided in the "financial presentation" from the IAS Board meeting described herein.

186.  As further alleged herein, the Vista Defendants, through their employees and other designees on the IAS Board, participated in meetings of the IAS Board prior to and during the Class Period—and prior to Vista's insider sales of IAS shares described herein.  At these meetings, Vista learned that the Company was experiencing significant "pricing pressure" and that, in response to those pressures, the Company had resorted to cutting rates when renewing and securing new contracts.  This information was directly contrary to the information shared with IAS's investors.  After receiving this adverse material nonpublic information, Vista sold massive volumes of IAS stock, further providing a strong inference of Vista's scienter.

187.  The stark inconsistencies between Defendants' knowledge of relevant issues and the information provided to investors is further demonstrated by the contrast between what Defendants learned through undisclosed internal communications and their public statements on the same or similar topics (as alleged above), including but not limited to Defendants: (a) knowing on or about February 23, 2023 that IAS had resorted to cutting rates to secure new contracts or contract renewals with "marquis [sic] customers," yet publicly touting to investors on March 2, 2023 that IAS had secured "major global wins with marquee brands" because of the Company's differentiated services or superior customer service; and (b) knowing on or about May 11, 2023 that a "Top Loss Reason" leading to lost customer contracts was competitors' "Aggressive Pricing" and that the "lowlights" of IAS's business included "continued pricing pressure to win marquis [sic] customers" and that customers were increasingly "look[ing] at lower-priced/free" alternatives to IAS's products, yet publicly touting to investors on June 13, 2023 that "We have

been able to maintain price" and that "price is not the number one criteria from these marketers. Is it not."

188.    With respect to Defendants Utzschneider and Secor, they directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were thereby privy to material nonpublic information regarding IAS and its competitive pricing issues.

189.    In addition, as alleged herein, Defendants Utzschneider and Secor represented the Company during investor conference calls and were therefore held out as being knowledgeable sources of information regarding the Company and its operations, including the matters alleged to have comprised the misrepresentations and omissions alleged herein.

190.    A strong inference of scienter is also established by the fact that the misconduct alleged herein related to IAS's core business operations.  Indeed, the entirety of IAS's purported business success during the Class Period depended on the Company's ability to maintain pricing power for its services.  Thus, pricing issues were of critical importance to the Company and facts concerning those matters would have been known to IAS's executive officers, including Defendants Utzschneider and Secor.  Similarly, as it relates to Plaintiff's claims against Vista, the critical importance of pricing issues would have been known to Vista through its control over the IAS Board and IAS management.

191.    On January 3, 2025, IAS announced the departure of Tania Secor from her role as CFO after approximately two years, as well as the appointment of Jill Putman as Interim CFO, effective immediately.  In response, an analyst at Barclays wrote: "In the near term, we expect shares to come under pressure as this marks the second CFO transition since the IPO in 2021 . . . and Ms. Secor has only served as CFO since December 2022."  Analyst Matthew Farrell at Piper

Sandler similarly was "a bit surprised to see the CFO transition, particularly as we enter the new year." This sudden departure of a key executive who had been involved in and/or had significant responsibility over matters at the heart of the alleged fraudulent conduct supports a strong inference of scienter.

192. During the Class Period, IAS announced the departure of two other senior executives. On March 10, 2023, IAS announced that Chief Operating Officer Oleg Bershadsky was "separating" from the company after four years. This announcement came on the heels of the February 23, 2023 Board of Directors meeting that first stressed the adverse impact of pricing. Around the same time, Bershadsky sold 237,900 shares of IAS stock for gross proceeds of $3,253,848.50. Then, on August 3, 2023, IAS announced the abrupt departure of Chief Product Officer Kshitij "Tom" Sharma after just three years with the Company. This announcement came just two days after the IAS Board meeting at which it was noted that, for the third quarter in a row, the Company was facing significant pricing pressures. On his way out the door, Sharma sold a significant amount of stock, 168,896 shares, for gross proceeds of $2,638,339.49. Bershadsky's and Sharma's abrupt departures from IAS further supports a strong inference of Defendants' scienter given these individuals' roles and responsibilities over matters at the heart of the alleged fraudulent conduct.

193. Massive insider trading supports a strong inference of scienter. In addition to Bershadsky and Sharma's stock sales alleged in the preceding paragraph, Vista engaged in massive stock sales—earning Vista over $440 million—that were highly suspicious in their timing and amount. *See* Section X, *infra*.

194. The accounts of former employees with relevant knowledge further support a strong inference of scienter. As detailed above in Section V.B., the recollection of CWs 1, 3, and 4 that

IAS was engaged in a "race to the bottom" "price war" with DoubleVerify and that pricing was one of the levers that was often pulled to win or retain business is consistent with and otherwise confirms Plaintiff's allegations that Defendants knew or recklessly disregarded the fact that, contrary to Defendants' public statements to IAS investors, there was significant pricing pressure on IAS throughout the Class Period. Moreover, those pricing issues were discussed during weekly meetings attended or run by Defendant Utzschneider.

195.    Moreover, as alleged herein, under the leadership of Defendants, IAS operated under, fostered, or otherwise tolerated a culture of deceit. As described by CW2, Defendant Utzschneider and the Company's senior management had been made aware of the fact that, for a period of several years, an IAS customer had been improperly billing its clients for IAS-related services that did not exist and passing along payments received for those nonexistent services to IAS. Rather than right this wrong, CW2 describes how Utzschneider and the Company consciously chose to conceal the overpayments and not refund those amounts to the parties that had been improperly billed.

## X.    VISTA'S INSIDER TRADING

196.    Starting on May 12, 2023, Vista began selling its shares of IAS stock for the first time since the Company's IPO nearly two years earlier. Notably, Vista began selling these shares only after Vista's representatives on the IAS Board learned of the Company's slowed growth and its growing struggles with key customer retention leading to a loss of pricing power but prior to this information being public.

197.    Vista's sales were made via three Vista-controlled entities, the Vista Funds. As reported on each of the Vista Funds' Forms 4 filed with the SEC: Fund VI GP is the sole general partner of each of the Vista Funds; Fund VI GP's sole general partner is Fund VI UGP, and Robert F. Smith is the sole director and one of 11 members of Fund VI UGP; Management Company is

the sole management company of each of the Vista Funds; and Management Company's sole general partner is VEP Group; and the Management Company's sole limited partner is VEPM. VEP Group is the Senior Managing Member of VEPM, and Robert F. Smith is the sole Managing Member of VEP Group.  As stated in IAS's public filings, Mr. Smith, Fund VI GP, Fund VI UGP, the Management Company, VEPM, and VEP Group may be deemed the beneficial owners of the shares held by the Vista Funds; they are thus the beneficiaries of any sales of the Vista Funds' IAS shares.[7]

198.    As detailed above, on February 23, 2023, the IAS Board learned that "client direct contracts and emerging markets growth are the largest contributors to verification pricing pressure."  This meeting was attended by all five of Vista-employed IAS Directors: Fosnaugh, Aliabadi, Lema, Nakatsukasa, and Taylor, as well as two additional Vista representatives, including Ashley MacNeill.

199.    Later, during the "CEO Session" on May 11, 2023, the Vista-employed members of the IAS Board learned more about the "lowlights" of the "state of the business" at IAS, including the above-detailed continued pricing pressure and resulting failure to secure new business.

200.    On May 12, 2023—just one day after the May 11, 2023 Board meeting that once again privately highlighted the Company's pricing woes—Vista sold 11.5 million shares of the Company's stock at a price of $15.00 per share through a secondary offering (the "May 2023 Offering"), resulting in proceeds to Vista of $172.5 million.  After the May 2023 Offering, Vista

---

[7] Mr. Smith, who is the founder, Chairman, and CEO of Vista, is not named as a Defendant in this action.  Should Plaintiff learn of factual matters sufficient to link Mr. Smith personally to the matters alleged herein, Plaintiff will seek leave to amend this complaint for the purposes of naming Mr. Smith as a Defendant.

continued to own a majority of IAS's common stock, holding approximately 54% of the Company's voting power.

201.    One month later, on June 15, 2023—two days after the June 13, 2023 Investor Day where, as alleged herein, the Company continued to conceal its pricing struggles—Vista sold another 5.22 million shares of the Company's stock in a block trade at the artificially inflated price of $18.13 per share (the "June 2023 Sale"), earning Vista another approximately $94.64 million.

202.    Vista strategically timed the May 2023 Offering and June 2023 Sale to lock in a profit before the Company publicly disclosed its pricing and revenue struggles.  As described above, on of February 23, and May 11, 2023, Vista's representatives on the Board learned that the Company was experiencing pricing pressure due to competitors' aggressive pricing that would likely lead to slowing revenue growth.  Through these two sales, Vista reduced its position in IAS by more than 18%, dropping from 94,380,001 shares to 77,600,001 shares while in possession of this material nonpublic information and earning Vista $267.14 million from these sales at artificially inflated prices.

203.    Following the May 2023 Offering and June 2023 Sale, Vista, through its employees and representatives on the IAS Board, continued to learn material, adverse non-public information about the Company's pricing and competitive pressure.  For example, on August 1, 2023, there was an IAS Board meeting that confirmed that the Company experienced "lower than expected Optimization growth," and that this condition was "expect[ed] …to continue."  Similarly, during an "Executive Summary" presentation at the November 9, 2023 IAS Board meeting, the Vista-employees on the IAS Board learned that pricing pressures had worsened, namely that "[t]he competitive pricing environment has accelerated in the past few months and [is] expected to negatively impact 2024."

204.    On December 7, 2023, Vista conducted another underwritten secondary offering of 11 million shares of the Company's common stock at a price of $14.00 per share (the "December 2023 Offering").  Goldman Sachs & Co. ("Goldman") served as the underwriter for the December 2023 Offering.  Vista granted Goldman an option to purchase up to an additional 1.65 million shares from Vista. On January 4, 2024, Goldman exercised that option in full.  In total, Vista sold 12.65 million shares of IAS stock through the December 2023 Offering, all at a price of $14.00 per share.  Vista reaped proceeds of approximately $177 million from the December 2023 Offering.  As with the May 2023 Offering and June 2023 Sale, Vista strategically timed the December 2023 Offering to lock in a profit before the Company publicly disclosed its pricing and revenue struggles.

205.    Through the May 2023 Offering, June 2023 Sale, and December 2023 Offering, Vista reduced its position in IAS by more than 31%, from 94,380,001 shares to 65,010,000 shares. In total, Vista sold 29,370,000 shares of IAS common stock for total proceeds of more than $444 million.

206.    In addition, through these insider stock sales based on material nonpublic information, Vista avoided hundreds of millions of dollars in losses.  As detailed below, when corrective information entered the market in August 2023 and February 2024, IAS's share price dropped significantly, including over 41 % on February 28, 2024.  Had Vista held its 29.37 million shares through those corrective disclosures, it would have incurred over $269 million in losses.

207.    The amount of profit generated from these sales, as well as the losses avoided, are evidence of Vista's strong motive to withhold material insider information from investors and sell before the public learned of IAS's waning prospects.

**XI.    LOSS CAUSATION AND ECONOMIC LOSS**

208.    During the Class Period, Defendants made materially false and misleading statements and omissions and engaged in a scheme to deceive the market.  This course of conduct artificially inflated the price of IAS stock and operated as a fraud or deceit on the Class (as defined below).  Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market, the price of IAS shares fell precipitously as the prior artificial inflation came out of the price over time.  As a result of their purchases of IAS shares during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

209.    True facts about the Company's financial performance and economic condition were partially revealed to the market in two partial corrective disclosures.

210.    On August 3, 2023, after the market closed, the Company issued a press release announcing second quarter 2023 financial results.  In this press release, the Company revealed that optimization revenue growth has slowed to a mere 10%—a substantial decline compared to the Company's historical reporting since its IPO in June 2021.

211.    In response to the news, common shares of IAS fell $3.66 per share on August 4, 2023, down from the previous day's close of $18.83 to close at $15.17 per share (a decline of approximately 20%). On this day, IAS shares traded on heavy volume.

212.    On February 27, 2024, the Company surprised the market when it announced fourth quarter and full year ended December 31, 2023 financial results, reported lackluster guidance for 2024, and confirmed to the market for the first time that IAS had been experiencing "more competitive pricing" – a revelation that stunned investment analysts.

213.    Following this stunning revelation, IAS's stock price plummeted by $7.09 per share on February 28, 2024, a decline of approximately 41%, to close at $10.01 per share, down from

the previous day's close of $17.10 per share. The trading volume for IAS shares on this day was extremely high, with more than 15.7 million shares changing hands.

214.    The decline in IAS's stock price was a direct result of the nature and extent of Defendants' materially false and misleading statements and omissions being revealed to the market. The adverse consequences of these disclosures were entirely foreseeable to Defendants at all relevant times. There was no other direct or intervening or independent cause of the stock price declines alleged herein. The timing and magnitude of the stock price declines negates any inference that the loss suffered by Plaintiff and other members of the Class was caused by changed market conditions, macroeconomic or industry factors or other IAS-specific facts unrelated to Defendants' knowing or reckless conduct. The economic loss, *i.e.*, damages suffered by Plaintiff and other Class members was a direct result of Defendants' artificial inflation of the Company's stock price and the subsequent decline in value of the Company's stock when the Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## XII.    BASIC AND AFFILLIATED UTE PRESUMPTIONS OF RELIANCE

215.    Plaintiff is entitled to a presumption of reliance under the fraud on the market doctrine. The market for the Company's securities was, at all times, an efficient market that promptly digested current information with respect to the Company from all publicly available sources and reflected such information in the prices of the Company's securities. Throughout the Class Period:

 a.    The Company's stock was actively traded on the NASDAQ, a highly efficient domestic stock market;

 b.    The market price of the Company's stock reacted promptly to the dissemination of public information regarding the Company;

c.   The Company's stock was followed by several financial analysts who issued several periodic reports regarding the Company during the Class Period, including those cited herein. Thus, the Company's stock reflected the effect of information disseminated into the market;

d.   The average weekly trading volume for the Company's stock during the Class Period was approximately 4,274,695 for the weeks in the Class Period;

e.   The Company's market capitalization collapsed during the Class Period, from a high of over $3.26 billion on July 31, 2023 to approximately $1.59 billion on February 28, 2024; and

f.   During the Class Period, the total number of IAS shares outstanding ranged from approximately 154.41745 to 159.52009 million shares.

216.   Throughout the Class Period, market participants consistently followed the Company, including securities analysts and the business press. The market relied on the Company's public statements to accurately present the Company's performance, prospects, and compliance with applicable federal laws. During this period, Defendants continued to pump materially false information into the marketplace regarding the Company's ability to defend its independent pricing strategy. This includes but is not limited to Defendants' failure to disclose material information regarding IAS's rate cutting due to pricing pressure in the business. Analysts promptly reviewed and analyzed this information and assimilated the information into the price of the Company's securities.

217.   As a result of Defendants' misconduct (including the misstatements and omissions alleged herein), the market price for IAS common stock was artificially inflated. Under such circumstances, the presumption of reliance available under the "fraud-on-the-market" theory

applies.  Thus, Class members are presumed to have indirectly relied on the misrepresentations and omissions for which Defendants are each responsible.

218.    Plaintiff and other Class members justifiably relied on the integrity of the market price for the Company's securities and were substantially damaged as a direct and proximate result of their purchases of IAS common stock at artificially inflated prices and the subsequent decline in the price of those securities when, *inter alia*, the Company's rate cutting due to pricing pressure in the business was disclosed.

219.    Plaintiff and other Class members are also entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because claims asserted herein against Defendants are predicated on omissions of material fact that there was a duty to disclose. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's rate cutting due to pricing pressure in the business, which was material information that Defendants were obligated to disclose, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.

220.    Had Plaintiff and other members of the Class known of the material adverse information regarding the Company's rate cutting due to pricing pressure in the business that had not been disclosed by Defendants or been aware of the truth behind Defendants' material misstatements, they would not have purchased IAS common stock at artificially inflated prices.

## XIII.   NO SAFE HARBOR

221.    IAS's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

222.    Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement

was false or misleading, the statement was authorized and/or approved by an executive officer of IAS who knew that the statement was false, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## XIV.   CLASS ACTION ALLEGATIONS

223.   Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities that purchased shares of IAS common stock during the Class Period and were damaged upon the revelation of the alleged corrective disclosures (the "Class").

224.   Excluded from the Class are Defendants, directors and officers of IAS, their families and affiliates and their legal representatives, heirs successors or assigns and any entity in which Defendants have or had a controlling interest.

225.   The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. On February 23, 2024, IAS had 159,520,093 shares of common stock outstanding, owned by hundreds or thousands of investors. Record owners and other members of the Class may be identified from records maintained by IAS or its transfer agent.

226.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual class members include:

(a)    Whether Defendants violated the Exchange Act;

(b)    Whether Defendants omitted and/or misrepresented material facts;

(c)    Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    Whether Defendants are personally liable for the alleged misrepresentations and omissions described herein;

(e)    Whether Defendants engaged in a scheme to defraud investors;

(f)    Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(g)    Whether Defendants' conduct impacted the price of IAS common stock;

(h)    Whether the Vista Defendants engaged in insider trading on the basis of material non-public information;

(i)    Whether Defendants' conduct caused the members of the class to sustain damages; and

(j)    The extent of damage sustained by class members and the appropriate measure of damages.

227.    Plaintiff's claims are typical of those of the class because Plaintiff and the class sustained damages from Defendants' wrongful conduct.

228.    Plaintiff will fairly and adequately protect the interests of the class and has retained counsel competent and experienced in class action securities litigation.  Plaintiff has no interests that conflict with those of the Class.

229.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Joinder of all class members is impracticable.

## XV.    COUNTS

### COUNT I
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
### (Against IAS and the Officer Defendants)

230.    Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein.

231.    During the Class Period, IAS and the Officer Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (b) cause Plaintiff and other members of the Class to purchase IAS shares at artificially inflated prices.

232.    IAS and the Officer Defendants: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business that operated as a fraud and deceit upon the purchasers of the Company's shares in an effort to maintain artificially high market prices for IAS shares in violation of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

233.    IAS and the Officer Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations and prospects.

234.    During the Class Period, IAS and the Officer Defendants made the false statements specified above, which they knew or recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

235.    IAS and the Officer Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.  IAS and the Officer Defendants engaged in this misconduct to conceal IAS's true condition from the investing public and to support the artificially inflated prices of the Company's shares.

236.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for IAS shares.  Plaintiff and the Class would not have purchased the Company's shares at the prices they paid, or at all, had they been aware that the market prices for IAS shares had been artificially inflated by these Defendants' fraudulent course of conduct.

237.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's shares during the Class Period.

238.    By virtue of the foregoing, IAS and the Officer Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

## COUNT II
### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
### (Against Vista)

239.    Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein.

240.    This count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC against Defendant Vista, alleged below.  This count alleges material omissions in violation of the duties to disclose breached by insider trading, under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Vista is an insider under the federal securities laws.  The conduct at issue in this count also constitutes a "device, scheme, or artifice to defraud" and an "act, practice, or course of business which operates or would operate as a fraud or deceit upon any person," under Rule 10b-5(a)/(c).

241.    During the Class Period, IAS and the Officer Defendants carried out a plan, scheme and course of conduct that was intended to and, throughout the Class Period, did: (a) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (b) cause Plaintiff and other members of the Class to purchase IAS shares at artificially-inflated prices.

242.    Vista violated Section 10(b) of the Exchange Act and applicable rules and regulations thereto by selling IAS common stock while in possession of material non-public information about the adverse information detailed herein.  While IAS's securities traded at artificially and distorted prices, Vista sold more than 29.3 million shares of IAS common stock while in possession of material non-public information about IAS, reaping $443.5 million in illegal insider trading proceeds, as detailed above.  Vista had a duty to either refrain from selling stock or disclose the material facts they were aware of, including, *inter alia* that: (1) IAS was actively experiencing a material trend of pricing pressure forcing the Company to cut prices to compensate for weakening demand and slowing revenue growth; (2) IAS's pricing structure was no longer "favorable," and IAS could not sustain its pricing and drive price increases; and (3) the pricing pressure experienced by IAS was caused by IAS's competitors offering similar products and services at lower prices.

243.    Plaintiff and other members of the Class who traded in IAS securities contemporaneously with the sales of IAS stock by Vista have suffered substantial damages in that they paid artificially-inflated prices for IAS stock as a result of the violations of Section 10(b). Moreover, these Class members would not have traded IAS stock at the prices they paid or received, or at all, if they had been aware that the market prices had been artificially inflated by Defendants' false and misleading statements and scheme to defraud.

244.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's shares during the Class Period contemporaneous with Vista's insider sales.

245.    By virtue of the foregoing, Vista violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

246.    Vista is required to account for all such stock sales and to disgorge its profits or ill-gotten gains.

### COUNT III
### For Violations of Section 20(a) of the Exchange Act
### (Against the Officer Defendants and Vista)

247.    Plaintiff repeats, incorporates and realleges each and every allegation contained above as if fully set forth herein.

248.    By reason of the allegations listed herein, IAS, by and through its executive officers and directors, knowingly or recklessly, directly or indirectly violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes and artifices to defraud; (b) failed to disclose material information; or (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class in connection with their purchases of IAS common stock during the Class Period.

249. The Officer Defendants acted as controlling persons of IAS within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about IAS, the Officer Defendants had the power and ability to control the actions of IAS and its employees. By reason of such conduct, the Officer Defendants are liable pursuant to Section 20(a) of the Exchange Act.

250. At all relevant times, Vista was a controlling person of the Company through its direct and indirect control of the Company. Vista has controlled IAS since June 2018, when Vista purchased a majority stake in IAS. Vista has consistently maintained control over IAS, including through the Company's initial public offering in June 2021. Vista held more than 50% of the Company's outstanding common stock until June 2023, when Vista sold a significant block of its IAS shares as discussed herein. As of the proxy statement filed April 3, 2024, Vista owns 41% of the Company's stock. Vista effectively controls the Board's composition. Pursuant to a Director Nomination Agreement, Vista holds the right to designate a set number of nominees to the Board based on how much Company stock Vista beneficially owns. The Board consists of ten directors. Five directors are Vista employees: Fosnaugh, Aliabadi, Lema, Nakatsukasa and Taylor, all of which signed the Q4 2022 Form 10-K. Three other members of the Board also have ties to Vista: Utzschneider, Jill Putman ("Putman") and Bridgette Heller ("Heller"). Approximately one-third of Utzschneider's options award is contingent on the achievement of a 3x return on investment to Vista. Putman joined Vista in January 2021. Putman is the former CFO of Jamf. Putman joined Jamf when it was a private company in 2014, led "the sale of Jamf to Vista Equity Partners," and stayed after Vista took Jamf public in 2020. Heller joined the IAS Board in May 2021. Just four

months earlier, in January 2021, Heller joined the board of another Vista-owned company, Numerator. By reason of such conduct, Vista is liable pursuant to Section 20(a) of the Exchange Act.

## COUNT IV
## Violation of Section 20A of the Exchange Act
## (Against Vista)

251.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein, particularly ¶¶ 196–207.

252.    This claim is brought pursuant to Section 20A of the Exchange Act, 15 U.S.C. § 78t-1, against Defendant Vista on behalf of all members of the Class damaged by the insider trading by Vista during the Class Period.

253.    As set forth in the sworn certification previously filed in this Action (ECF No. 19-2), Plaintiff purchased at least one share of IAS common stock contemporaneously with sales of IAS common stock by Vista.

254.    By virtue of Vista's representation on the IAS Board and the specific facts alleged herein, Vista was in possession of material, adverse, non-public information about IAS contemporaneously with when Vista sold IAS common stock in May, June, and December of 2023 and January 2024.

255.    As alleged above, Vista violated Sections 10(b) and 20(a) of the Exchange Act.

256.    Vista violated Section 20A of the Exchange Act and applicable rules and regulations thereto by selling IAS common stock while in possession of material non-public information about the adverse position of the business, as detailed herein. While IAS's securities traded at artificial and distorted prices, Vista sold more than 29.3 million shares of IAS common stock while in possession of this material non-public information about IAS, reaping $443.5 million in illegal insider trading proceeds, as detailed above.

257.    Plaintiff and other members of the Class who traded in IAS securities contemporaneously with the sales of IAS stock by Vista have suffered substantial damages in that they paid artificially inflated prices for IAS stock as a result of the violations of Sections 10(b), 20(a) and 20A herein described.  Moreover, these Class members would not have traded IAS stock at the prices they paid or received, or at all, if they had been aware that the market prices had been artificially inflated by Defendants' false and misleading statements and scheme to defraud.

258.    Vista is required to account for all such stock sales and to disgorge its profits or ill-gotten gains.

## XVI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff on its own behalf and on behalf of the Class, prays for relief and judgment as follows:

(a)    Determining that this action is a proper class action, certifying Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and appointing Lead Counsel as Class Counsel;

(b)    Determining and declaring that Defendants violated the Exchange Act by reason of the acts and omissions alleged herein;

(c)    Awarding compensatory damages and any other available damages and/or remedies in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

(d)    Awarding disgorgement of all insider profits in favor of Plaintiff and the other members of the Class who purchased contemporaneously with Defendants;

(e)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in

this action, including attorneys' fees and expert fees; and

(f)    Awarding such equitable, injunctive, or other further relief as the Court may deem

just and proper.

## <u>JURY DEMAND</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands

a trial by jury of all issues that may be so tried.

Dated: June 16, 2025                    Respectfully submitted,

**BERMAN TABACCO**

<u>*/s/ Patrick T. Egan*</u>

Kathleen M. Donovan-Maher (*Pro Hac Vice*
forthcoming)
Patrick T. Egan (PE-6812)
Steven. J. Buttacavoli (Admitted *Pro Hac Vice*)
Christina L. G. Fitzgerald (Admitted *Pro Hac Vice*)
Solal Wanstok (Admitted *Pro Hac Vice*)
One Liberty Square
Boston, MA 02109
Telephone: (617) 542-8300
Email: kdonovanmaher@bermantabacco.com
        pegan@bermantabacco.com
        sbuttacavoli@bermantabacco.com
        cfitzgerald@bermantabacco.com
        swanstok@bermantabacco.com

*Counsel for Plaintiff Oklahoma Firefighters*
*Pension and Retirement System*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 16th day of June, 2025, a true and correct copy of the foregoing document was served on all counsel of record through the Court's CM/ECF system.


Dated: June 16, 2025

*/s/ Patrick T. Egan*
Patrick T. Egan
