UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

OKLAHOMA FIREFIGHTERS PENSION AND
RETIREMENT SYSTEM,

Plaintiff,

-against-

INTEGRAL AD SCIENCE HOLDING CORP., et al.

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

25-cv-0847 (LAK)

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __3/2/2026__

**MEMORANDUM OPINION
GRANTING MOTIONS TO DISMISS**

Appearances:

Kathleen M. Donovan-Maher
Patrick T. Egan
Steven J. Buttacavoli
Christina L. G. Fitzgerald
Solal Wanstok
BERMAN TABACCO
*Attorneys for Plaintiff*

Sandra C. Goldstein, P.C.
Alexander J. Rodney
Jacob M. Rae
Stephanie Taylor
KIRKLAND & ELLIS LLP
*Attorneys for Defendants Integral Ad Science Holding Corp., Lisa
Utzschneider, Vista Equity Partners Fund VI, L.P., VEPF VI, GP,
Ltd., VEPF Management, L.P., VEP Group, LLC, and Vista Equity
Partners Management, LLC*

2

> Andrew St. Laurent
> Megan L. Gao
> HARRIS ST. LAURENT & WECHSLER LLP
> *Attorneys for Defendant Tania Secor*

LEWIS A. KAPLAN, *District Judge*.

"Where there's smoke, there's fire" may be a safe precept for protecting against fires, but it does not readily transfer to the securities markets. Not every drop in a stock price signals fraud.

Plaintiff Oklahoma Firefighters Pension and Retirement System brings this proposed class action for alleged violations of federal securities laws because the stock price of Integral Ad Science Holding Corp. ("IAS") fell by approximately 41 percent the day after IAS projected lower-than-expected revenue and profits for the next reporting periods due to increased competition. Seeing smoke, plaintiff shouts, "FIRE," and alleges that defendants – IAS as well as IAS officers and its controlling shareholder – failed to disclose earlier the competition IAS was facing and its effects on IAS's business. Defendants now move to dismiss the amended complaint with prejudice for failure to state a claim upon which relief may be granted.

### *Facts*

The following facts are drawn from the well-pleaded factual allegations in the amended complaint as well as documents incorporated by reference in or integral to the amended complaint.

*Intense Price Competition in the Digital Advertising Industry*

IAS is a New York-headquartered digital advertising company.[1]  Generally speaking, its business consists of two services: optimization and measurement.[2]  Optimization involves maximizing customers' returns on digital advertising by strategically matching customers with ad-space sellers.[3]  For example, it might make sense to place an alcoholic beverage company's ads alongside sports or betting content rather than wellness or sobriety content.  In turn, measurement entails determining how each ad placement performs with respect to ad fraud, brand safety and suitability, viewability, and geography.[4]  In other words, determining whether it truly is optimal to place, for example, a beer ad on a fantasy-football website requires after-the-fact monitoring.

IAS prices each service with a cost per mille ("CPM"), the cost that a customer pays for every 1,000 impressions of their ad.[5]  One impression equals one loading and display of an ad to a user's screen.[6]  Optimization and measurement services, as well as specific products within these services, carry different CPMs.[7]  IAS negotiates these CPMs with individual customers at the

---

[1]  Am. Compl. (Dkt 30) ¶ 32.

[2]  *Id.* ¶¶ 34 & 34 n.2.

[3]  *Id.* ¶ 35.

[4]  *Id.*

[5]  *Id.* ¶ 43 n.4

[6]  *Id.*

[7]  *See* Rodney Decl. Supp. IAS, Utzschneider, & Vista Defs.' Mot. Dismiss (hereinafter, "Rodney Decl."), Ex. 3 (Dkt 41-3) at 44, 47; Am. Compl. (Dkt 30) ¶¶ 134, 137.

4

outset of contracts, and CPMs then typically remain fixed for the duration of the contract.[8]  IAS's revenue thus is a function of the CPMs charged for particular services – which can vary also by customer – and the volume of impressions generated.[9]

Founded under a different name in 2009, IAS since has grown considerably, earning approximately $474 million in total revenue in 2023.[10]  In 2018, Vista Equity Partners Management, LLC ("Vista") – a private equity firm – acquired IAS.[11]  In 2021, it took IAS public through an initial public offering, and IAS continues to be publicly traded today.[12]  Vista continues to hold over 40 percent of IAS's common stock, which entitles it to select all members of the IAS board of directors (the "IAS Board").[13]  It has exercised that right to the extent of installing five of its own employees as members of the IAS Board.[14]

IAS historically has had one main competitor, DoubleVerify.[15]  IAS and DoubleVerify offer substantially similar services and compete for customers.[16]  IAS therefore long

---

[8]     *See* Rodney Decl., Ex. 3 (Dkt 41-3) at 44; Am. Compl. (Dkt 30) ¶ 134.

[9]     *See* Rodney Decl., Ex. 3 (Dkt 41-3) at 44; Am. Compl. (Dkt 30) ¶ 134.

[10]     *See* Am. Compl. (Dkt 30) ¶¶ 32, 35.

[11]     *Id.* ¶ 33.

[12]     *Id.*

[13]     *Id.* ¶¶ 33, 47-48.

[14]     *Id.* ¶ 48.

[15]     *Id.* ¶ 37.

[16]     *Id.* ¶ 39.

5

has offered discounts, waived fees, and otherwise adjusted prices to prevent existing customers from going to DoubleVerify and to steal prospective clients away from DoubleVerify.[17] The competitive landscape broadened, however, in recent years as customers turned to lower-priced or free services offered by ad-space sellers as add-ons to the ad space itself.[18]

Accordingly, in its 2022 Form 10-K, filed March 2, 2023 – the first day of the Relevant Period[19] – IAS identified "intense[]" competition, "both from established and new companies," as a risk factor that could impact its ability to achieve its expected future results.[20] Specifically, IAS stated that it expected "*competition to persist and intensify in the future, which could harm our ability to increase revenue and generate profits.*"[21] IAS further explained that:

> "*[C]ompetitors may be better able to* respond quickly to new technologies, develop deeper relationships, or *offer competitive services at lower prices. Any of these developments would make it more difficult for us to sell our platform and could result in increased pricing pressure,* increased sales and marketing expense or the

---

[17] *Id.* ¶¶ 66, 69-70, 74, 79-80.

One confidential witness described IAS as being in a "price war" with DoubleVerify in which both companies "race[d] to the bottom" in terms of pricing. *Id.* ¶ 78. Another confidential witness also characterized the price competition as a "race to the bottom." *Id.* ¶ 86.

[18] *Id.* ¶¶ 40-42.

[19] The Relevant Period is from March 2, 2023, through February 27, 2024. Plaintiff filed suit on behalf of itself and all similarly situated investors who acquired IAS stock during this period.

[20] Rodney Decl., Ex. 2 (Dkt 41-2) at 22, 29.

[21] *Id.* at 29 (emphasis added).

loss of market share, which could cause us to decrease the prices we charge or accept less favorable terms for our solutions in order to remain competitive."[22]

Additionally, IAS disclosed "payment-related risks" as another risk factor, explaining that "*growth and increased competitive pressure in the global digital advertising ecosystem is causing customers to demand lower costs*, more services and more rapid innovation or products, *resulting in overall increased focus by all industry participants on pricing*, transparency, and cash and collection cycles."[23]  Also with respect to pricing, IAS stated:

> "The intense competition we face in the sales of our products and services and general economic and business conditions could put pressure on us to change our prices.  *If our competitors offer deep discounts on certain products or services* or develop products that the marketplace considers more valuable, *we may need to lower prices*, introducing pricing models and offerings that are less favorable to us, or offer other favorable terms in order to compete successfully."[24]

IAS explained also that, "in emerging markets, the cost of our [measurement] services makes up a large percentage of the buyer's media budget . . . . Within these countries, we often adjust or make concessions to our pricing in order to enter and sell in such markets."[25]

These disclosures reflected what the IAS Board had been told one week earlier, on February 23, 2023, during a presentation detailing the challenges IAS was facing.  It was told that "client direct contracts and emerging markets growth are the largest contributors to [measurement]

---

[22]

    *Id.* (emphasis added); *accord id.* at 39 ("Factors that may cause our results of operations to fluctuate include . . . changes to availability of and pricing of competitive products and services, and their effects on our pricing.").

[23]

    *Id.* at 22, 33 (emphasis added).

[24]

    *Id.* at 34 (emphasis added); *accord id.* at 39.

[25]

    *Id.* at 36.

pricing pressure."[26]    Because of this increasing pressure, IAS sometimes had to reduce its measurement prices to renew existing contracts and secure new ones, including those with large, high-profile customers, or "marquee" customers as IAS referred to them.[27]

Despite such challenges, IAS ended Q4 and FY 2022 strong.  On its earnings call and in its press release, IAS – through Officer Defendants[28] – announced greater-than-expected growth and four new deals with marquee customers, attributing these successes to IAS's technology, customer service, and existing partnerships.[29]  With respect to pricing, they noted generally that IAS "was not immune to volatility in ad spend" and that customers were demanding greater returns on their investments.[30]  They explained, however, that the "differentiated" nature of IAS's pricing model and "the essential nature of [its] solutions provides [it] with *some level* of [pricing] insulation."[31]  In its Q4 and FY 2022 investor presentation, IAS emphasized its growth without mentioning explicitly price competition.[32]

---

[26] Am. Compl. (Dkt 30) ¶ 56.

[27] *Id.* ¶ 57.

[28] Officer Defendants are IAS's CEO, Lisa Utzschneider, and former CFO, Tania Secor.

[29] *Id.* ¶¶ 58-59, 93-95; Rodney Decl., Ex. 7 (Dkt 41-7) at 4-5; *id.*, Ex. 35 (Dkt 41-35) at 2.

[30] Rodney Decl., Ex. 7 (Dkt 41-7) at 5, 6, 10, 13.

[31] *Id.* at 6 (emphasis added).

[32] *See* Am. Compl. (Dkt 30) ¶ 99; Rodney Decl., Ex. 36 (Dkt 41-36) at 19, 22, 27.

*IAS's Prices Continue to Hold*

In both its Q1 and Q2 2023 Forms 10-Q filed with the SEC, IAS acknowledged the competitive nature of the industry in which it operated.  It referred back in each to its 2022 Form 10-K, stating that the previously described risk factors, including competition, payment-related, and international risks, had not changed materially through the first or second quarters of 2023.[33] Indeed, on May 11, 2023, the IAS Board was told that "lowlights" of the "state of the business" included "increased customer pressure to prove [optimization] value vs. agency or free alternatives" and "*continued pricing pressure to win [marquee] customers* and focus on [return-on-investment] and efficiency leading clients to look at lower-priced / free [optimization] solutions."[34]  The IAS Board was told further that one of IAS's "Top Loss Reasons" was competitors' "Aggressive Pricing."[35]

Despite the persistence of these risk factors, IAS continued to grow, exceeding its prior guidance for both revenue and profitability in Q1 2023.[36]  That spring and summer, on earnings calls and at investor conferences, Officer Defendants repeatedly attributed IAS's success, ability to win "competitive jump balls," and "customer loyalty" to seasonal demand as well as its superior,

---

[33]   Am. Compl. (Dkt 30) ¶¶ 111, 142; Rodney Decl., Ex. 4 (Dkt 41-4) at 39; *id.*, Ex. 5 (Dkt 41-5) at 43.

[34]   Am. Compl. (Dkt 30) ¶ 60 (emphasis added).

[35]   *Id.*

[36]   Rodney Decl., Ex. 37 (Dkt 41-37) at 4.

"innovative," and "differentiated technology," global presence, and quality customer service.[37] They emphasized that product innovation and differentiation was the "#1 criteria" for their customers as opposed to "price."[38]  Though they did not mention price competition explicitly, they noted often that customers in the then-current "down" "macroeconomic environment" "want to get more bang for their buck," "greater efficiencies," and increased return-on-investment.[39]  During one conference call, when an investor asked Officer Defendants whether IAS, like DoubleVerify, had raised its prices in the last year, defendant Utzschneider seemed to answer, "no," stating that IAS was first "proving out the value of differentiated products that we're launching" to "justify" any subsequent decision to increase prices.[40]  She summarized:

> "So we feel really bullish about our product and tech road map, and we are demonstrating both with the stickiness of our customer base and how loyal they are *and the fact that we've been able to hold price and maintain price and be able to increase price for these differentiated products.*"[41]

At other points during the call, Officer Defendants made clear that IAS did not charge the same prices across the board.  Defendant Secor specified that IAS charged a higher price for "our optimization business than we do for our measurement business.  As a result, the total cart value or

---

[37]
       *See* Am. Compl. (Dkt 30) ¶¶ 103-06, 112-20, 122-23, 126-27, 131-33; Rodney Decl., Ex. 3 (Dkt 41-3) at 5, 44; *id.*, Ex. 25 (Dkt 41-25) at 9; *id.*, Ex. 37 (Dkt 41-37) at 4, 6, 14; *id.*, Ex. 38 (Dkt 41-38) at 1, 5; *id.*, Ex. 39 (Dkt 41-39) at 8.

[38]
       Rodney Decl., Ex. 3 (Dkt 41-3) at 47; Am. Compl. (Dkt 30) ¶ 128.

[39]
       *See* Rodney Decl., Ex. 25 (Dkt 41-25) at 9; *id.*, Ex. 37 (Dkt 41-37) at 11-12; *id.*, Ex. 38 (Dkt 41-38) at 3-4; *id.*, Ex. 39 (Dkt 41-39) at 8.

[40]
       Rodney Decl., Ex. 3 (Dkt 41-3) at 47-48; Am. Compl. (Dkt 30) ¶ 129.

[41]
       Rodney Decl., Ex. 3 (Dkt 41-3) at 48 (emphasis added); Am. Compl. (Dkt 30) ¶ 129.

the cumulative CPM of our [optimization] offerings can be as high as 6x our Measurement CPM."[42] Defendant Utzschneider later agreed that IAS could increase its prices for certain differentiated optimization products.[43]

*IAS Experiences Decrease in Optimization Revenue Growth and Stock Price Drop*

At an August 1, 2023 board meeting, the IAS Board was informed that IAS experienced "lower than expected Optimization growth" in Q2 2023, that it "expect[ed] this trend to continue," and that there was "Continued Competition in [optimization]" because "Advertisers are increasingly cost conscious due to macroeconomic conditions."[44]

Two days later, on its Q2 2023 earnings call, IAS – again through Officer Defendants – disclosed these lower-than-expected results with respect to optimization growth.[45] They described IAS's "optimization revenue growth" as reflective of "maturing Context Control growth in line with our prior expectations, the contribution from new [customer] wins, and strength in the [consumer packaged goods] vertical, partially offset by slower demand from tech/telco clients."[46] They noted that while IAS "did see a slight decline in the average [optimization] CPM for the period," they did "not expect that trend to continue," in part because an "average is a reflection of shifts in our product

---

[42] Rodney Decl., Ex. 3 (Dkt 41-3) at 44; *see* Am. Compl. (Dkt 30) ¶ 130.

[43] Rodney Decl., Ex. 3 (Dkt 41-3) at 47; Am. Compl. (Dkt 30) ¶ 137.

[44] Am. Compl. (Dkt 30) ¶ 61.

[45] *Id.* ¶ 62.

[46] *Id.*; Rodney Decl., Ex. 8 (Dkt 41-8) at 7.

mix, shifts in our customers," which "can fluctuate from quarter-to-quarter."[47]  They noted also that, while the average optimization price decreased in Q2 2023, the average measurement price increased.[48]  Twice during the call, they again described the emphasis that customers were putting on return-on-investment and increased efficiency.[49]

The day after IAS disclosed its Q2 2023 results, on August 4, 2023, IAS's stock price declined by about 19 percent.[50]

*IAS's Prices and Messaging Remain Consistent with Note of Caution*

Notwithstanding the August 2023 stock price drop, Officer Defendants continued to defend the strength of IAS's business, about a month later at another investor presentation.[51]  They repeatedly emphasized that as customers had "raised the bar in terms of that demand of [return-on-investment]," IAS's range and quality of products set it apart from its competitors.[52]  Defendant Secor then explained how IAS's offerings enabled it to retain customers and increase revenue:

> "We have a really compelling business model, and you see it in our strong net revenue retention which was 115% in the second quarter.  And what's driving that is the customer journey typically starts with measurement.  Our pricing on measurement is at a certain level.  And then as the customer expands into our

[47]  Rodney Decl., Ex. 8 (Dkt 41-8) at 9.

[48]  *Id.*

[49]  *Id.* at 6, 10.

[50]  *See* Am. Compl. (Dkt 30) ¶ 149.

[51]  *See id.* ¶ 154; Rodney Decl., Ex. 1 (Dkt 41-1) at 6.

[52]  *See* Rodney Decl., Ex. 1 (Dkt 41-1) at 6, 13; Am. Compl. (Dkt 30) ¶¶ 154-56.

products, particularly on the optimization side, which has a much higher CPM. There's an opportunity to drive velocity in our pricing of up to 5x to 6x as the customer goes on that journey. So a lot of our revenue growth is driven by internal adoption. And what we're finding too is that our pricing, when the tech is there and we have such a strong customer value proposition, our pricing is higher."[53]

On November 2, 2023, in its Q3 2023 Form 10-Q, IAS again in relevant part stated that there were "*no material changes to the risk factors*" it had disclosed in its 2022 Form 10-K.[54] And in its Q3 2023 earnings call that same day, Officer Defendants maintained that IAS was "selected over competitors" primarily for its "product innovation," "expertise" in certain sectors, "extensive international footprint," "high-quality service," and existing base of "large customers."[55] Defendant Utzschneider stated that customers are "doubling down on [return-on-investment] and driving efficiency, which makes our products even more relevant today more than ever."[56]

Indeed, with respect to growth and profitability, Officer Defendants noted IAS's "above-expectation performance both on the measurement and optimization side" in Q3 2023.[57] They nevertheless *cautioned that IAS expected those trends "to moderate in the fourth quarter*."[58] Defendant Secor explained that optimization spend by customers in the digital media space – a

---

[53] Rodney Decl., Ex. 1 (Dkt 41-7) at 13; Am. Compl. (Dkt 30) ¶ 156.

[54] Rodney Decl., Ex. 6 (Dkt 41-6) at 44 (emphasis added); Am. Compl. (Dkt 30) ¶ 159.

[55] Rodney Decl., Ex. 12 (Dkt 41-12) at 9; Am. Compl. (Dkt 30) ¶ 160.

[56] Rodney Decl., Ex. 12 (Dkt 41-12) at 10.

[57] *Id.* at 11.

[58] *Id.* (emphasis added); *accord id.* at 14.

driver of the growth seen in Q3 – "tends to be more variable."[59]  With respect to pricing, defendant Utzschneider noted the consistency of IAS's average CPMs despite its CPMs in international markets being "slightly lower."[60]  After a call participant asked about the prospect of IAS increasing prices, defendant Secor responded, "I would temper that . . . . We've taken a balanced approach to driving revenue growth and profitability, and we'll continue to maintain that balance."[61]

On November 9, 2023 – less than a week after IAS disclosed its Q3 2023 results – the IAS Board learned at a board meeting that "[t]he competitive pricing environment has accelerated in the past few months and [is] expected to negatively impact 2024."[62]  In turn, IAS continued to message through the end of FY 2023 that customers were "*doubl[ing] down on [return-on-investment]*" and "*really car[ing] about getting the best bang for every single dollar* that they invest in digital advertising," as well as IAS's "products hav[ing] never been as relevant as they are for brands today as they're doubling down . . . on the efficiency."[63]  Officer Defendants continued to reiterate also how investors should think about pricing for IAS's services:

> "We enter into one to three-year contracts with our clients and these are exclusive many times global contracts where we negotiate a CPM with these clients.  These are fixed CPM's.  But at times when we're introducing new technology . . . we're able to drive a bit of a price increase.  Now we're really focused on volume . . . . So volume growth across measurement and optimization . . . was up from the second quarter and we did that while pricing was still consistent.  And so pleased to see that

---

[59]  *See id.* at 13-14.

[60]  *Id.* at 18.

[61]  *Id.*

[62]  Am. Compl. (Dkt 30) ¶ 63.

[63]  Rodney Decl., Ex. 10 (Dkt 41-10) at 2 (emphasis added).

14

dynamic.  In terms of the customer journey, the customer typically starts with measurement and we're able to expand our optimization offering which is a higher premium-priced product given the value of our technology and the [return-on-investment]."[64]

The guidance for Q4 2023 that IAS previously had provided proved correct.  On its FY 2023 earnings call, IAS announced that its overall measurement and optimization volumes had grown in FY 2023 as compared to 2022, while its average prices remained consistent, notwithstanding a slight moderation in average CPMs during Q4 2023.[65]  IAS thus again exceeded its yearly guidance as to growth and profitability.[66]

*IAS Reacts to and Discloses Increased Price Competition*

Although IAS's prices remained consistent through FY 2023, Officer Defendants directly addressed increased price competition and its effects in that same FY 2023 earnings call on February 27, 2024.  With respect to IAS's "growth outlook for 2024," which was below analyst estimates,[67] defendant Utzschneider, in her opening remarks, told investors that IAS was seeing "more competitive pricing and measurement on a select group of large contract renewals in exchange for increased volume commitments and multiyear exclusive agreements."[68]  When defendant Secor addressed IAS's Q1 2024 guidance in her opening remarks, she repeated the same

---

[64] *Id.* at 6; Am. Compl. (Dkt 30) ¶ 162.

[65] *See* Rodney Decl., Ex. 18 (Dkt 41-18) at 15.

[66] *Id.* at 4.

[67] Am. Compl. (Dkt 30) ¶ 166.

[68] Rodney Decl., Ex. 18 (Dkt 41-18) at 6; Am. Compl. (Dkt 30) ¶ 167.

phrase verbatim.[69] She stated additionally that IAS "factored [also] into our Q1 [2024] outlook, the implementation of previously negotiated pricing by one optimization account."[70] She sought to reassure investors as to IAS's overall 2024 outlook by explaining that IAS "expect[ed] to ramp revenue growth from the first quarter levels as we move through the year, driven by robust new product launches in 2024."[71]

Investors on the call nevertheless had many questions regarding the "more competitive pricing" to which Officer Defendants referred in their opening remarks. In response to one call participant's question about that "pricing pressure," defendant Utzschneider instructed that:

> "The way to think about that is, *yes, we were facing those competitive dynamics*, but we thought . . . the strategic thing to do is to ensure that we renew these large accounts and ensure that they drive up volume. Also, our strategy has been to secure measurement renewals so that we can upsell and cross-sell our offerings, expand geographies and ramp over time."[72]

Another call participant then asked whether the pricing concessions were only "defensive in nature" or used also "aggressively as a lever to dislodge business from competitors."[73] To that, defendant Utzschneider answered:

> "So as you know, *it's a highly competitive market. And yes, we made the call to – in order to shore up and close just under a dozen large advertisers and renew them.*

---

[69] Rodney Decl., Ex. 18 (Dkt 41-18) at 7; Am. Compl. (Dkt 30) ¶ 168.

[70] Rodney Decl., Ex. 18 (Dkt 41-18) at 7; Am. Compl. (Dkt 30) ¶ 168.

[71] Rodney Decl., Ex. 18 (Dkt 41-18) at 7-8.

[72] *Id.* at 9-10 (emphasis added); Am. Compl. (Dkt 30) ¶¶ 169-70.

[73] Rodney Decl., Ex. 18 (Dkt 41-18) at 10 (emphasis added).

16

> *We agreed to reduce pricing again for higher volumes and also exclusivity in multiyear contracts.* And as you can imagine, we're always in a jump ball. So yes, in terms of pricing, we just ensure that we're maintaining a competitive price and were on par with what's happening in the industry."[74]

A third call participant asked whether "other companies . . . being more competitive on pricing" was a "new dynamic[]" to which defendant Utzschneider answered:

> "*Similar to the back half of 2023, . . . we talked a lot about marketers leaning into greater efficiencies, greater [return-on-investment], looking to generate more bang for the buck with their digital advertising investments.* And what we saw with some of these renewals and renegotiations is that marketers, they see so much value in our product offerings, yet they wanted to negotiate more competitive pricing in exchange for higher volume commitments, multiyear exclusive agreements, and we were comfortable with that, especially given all of the new products that we're launching in 2024 that drive high value, drive differentiation for the brands. And it's now our job to drive adoption with the marketers with these differentiated products."[75]

Later in the call, defendant Secor specified that the pricing concessions mostly were with respect to measurement service renewals and involved "offering rates on par with the industry."[76] On the optimization side, IAS offered "preferred optimization rates" to only "one large optimization client."[77] According to defendant Secor, that optimization pricing concession "really was a unique situation related to one client based on a previously negotiated pricing arrangement."[78] Defendant

---

[74] *Id.*; Am. Compl. (Dkt 30) ¶ 172.

[75] Rodney Decl., Ex. 18 (Dkt 41-18) at 12 (emphasis added); Am. Compl. (Dkt 30) ¶ 173.

[76] Rodney Decl., Ex. 18 (Dkt 41-18) at 13.

[77] *Id.*

[78] *Id.*

17

Secor furthermore denied that IAS expected customers going forward – other than those who already did – to receive lower prices.[79]

*IAS's Stock Price Falls*

On February 28, 2024 – one day after the FY 2023 earnings call on which IAS provided its guidance for Q1 and FY 2024 – several investors expressed surprise and concern over IAS's disclosure of pricing concessions for nearly a dozen large measurement customers and one large optimization customer.[80] Investors feared such concessions could portend a more "competitive market" and a "downward price spiral."[81] IAS's stock price fell about 41 percent amid high trading volume on that day.[82]

*Vista's Sale of IAS Stock*

In addition to claiming that IAS misled investors, the amended complaint charges Vista with insider trading. The alleged facts are these.

As noted previously, Vista was the controlling shareholder of IAS through the Relevant Period. As of March 2023, it owned 62 percent of IAS's common stock.[83] It began to sell

---

[79] *See id.* at 16.

[80] Am. Compl. (Dkt 30) ¶¶ 174-78.

[81] *Id.*

[82] *Id.* ¶ 179.

[83] *Id.* ¶ 46.

18

shares on May 12, 2023, through a series of Vista-controlled entities: defendants Vista Equity Partners Fund VI, L.P, VEPF VI, GP, Ltd., VEPF Management, L.P., and VEP Group.[84]  On May 12, 2023, Vista sold 11.5 million shares for $172.5 million.[85]  After those sales, Vista owned approximately 54 percent of IAS's common stock.[86]  About one month later, on June 15, 2023, Vista sold 5.22 million shares for another $94.64 million.[87]  And on January 4, 2024, Vista sold 12.65 million more shares for approximately $177 million.[88]  Vista today nonetheless continues to hold a controlling stake in IAS.[89]

*The Amended Complaint*

Plaintiff alleges that through the Relevant Period, defendants' public statements about IAS's success and growth were materially false and misleading because they failed to disclose earlier that IAS was feeling pricing pressure and that, in response, IAS was reducing prices to win and retain customers.  Plaintiff contends that defendants knew or recklessly disregarded the falsity or misleading nature of their statements.  Given when defendants allegedly learned of information contradicting their public representations, plaintiff claims that the timing of Vista's stock sales both

---

[84]  *See id.* ¶¶ 25-29, 196-97.

[85]  *Id.* ¶ 200.

[86]  *Id.*

[87]  *Id.* ¶ 201.

[88]  *Id.* ¶ 204.

[89]  *Id.* ¶ 33.

19

proves *scienter* and constituted insider trading.    Plaintiff claims that defendants' alleged misrepresentations artificially inflated the price of IAS stock, which dropped sharply when defendants in August 2023, and again in February 2024, partially disclosed the pricing pressure IAS was feeling.  Plaintiff alleges that defendants' conduct thus caused economic losses to purchasers of IAS stock during the Relevant Period.

Plaintiff asserts four causes of action against defendants.  Plaintiff first alleges that IAS and Officer Defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act")[90] and Rule 10b-5[91] by making fraudulent misrepresentations.  Plaintiff then alleges that Vista violated the same provisions by committing insider trading.  Plaintiff lastly brings claims under Sections 20(a) and 20A of the Exchange Act,[92] respectively, against Officer Defendants and Vista for control person liability relating to the alleged misrepresentations and against just Vista for individual liability relating to the alleged insider trading.

*Prior Proceedings*

Plaintiff filed the complaint on January 29, 2025.  The Court soon thereafter appointed plaintiff to serve as lead plaintiff, and plaintiff filed the amended complaint on June 16, 2025.  IAS, defendant Utzschneider, and Vista, collectively, moved to dismiss the amended complaint, as did defendant Secor, separately.  Each filed with their motion numerous exhibits and lengthy appendices.  Plaintiff moved to strike this material as inappropriate for consideration on a

---

[90]    15 U.S.C. § 78j(b).

[91]    17 C.F.R. § 240.10b-5.

[92]    15 U.S.C. §§ 78t, 78t-1.

20

Rule 12(b)(6) motion.  The Court denied plaintiff's motion as moot on the ground that the Court would "exclude[] from consideration on the motions to dismiss all of (a) the exhibits and declarations outside of the amended complaint," – that is, material neither incorporated by reference in nor integral to the amended complaint – "and (b) the argumentative material included in the appendices."[93]

*The Motions to Dismiss*

Defendants seek to dismiss the amended complaint under Rule 12(b)(6) for failing to plead a material misstatement or omission.  According to defendants, IAS disclosed that it was experiencing pricing pressure and that such pressure was affecting its business.  In light of these disclosures, defendants argue, IAS's and Officer Defendants' statements were not misleading.  In defendants' view, without having pleaded a material misrepresentation or omission, plaintiff could not have pleaded *scienter*, loss causation, or insider trading.  Defendants argue additionally that even if defendants' statements were misleading, plaintiff still failed to plead *scienter*, loss causation, and, with respect to the insider trading claim, materiality.  Finally, defendants assert that because plaintiff's misrepresentation and insider-trading claims under Section 10(b) and Rule 10b-5 fail, so too do its claims under Sections 20(a) and 20A.

***Discussion***

The Court begins by reviewing the legal standard that governs motions to dismiss and the materials that appropriately are considered in resolving them.  The Court next addresses

---

[93]      Mem. & Order (Dkt 57) at 2.

defendants' overarching argument that the amended complaint must be dismissed because plaintiff has failed to plead a material misstatement or omission.  Should it prove necessary, the Court then will evaluate defendants' independent arguments as to *scienter*, loss causation, and materiality.

*Legal Standard*

To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege facts sufficient to "state a claim to relief that is plausible on its face."[94]  The court must be able "to draw the reasonable inference that the defendant is liable for the misconduct alleged."[95]  At the motion to dismiss stage, the court assumes the truth of all well-pleaded factual allegations in the complaint and draws reasonable inferences in the plaintiff's favor.[96]  In addition to the complaint, the court may consider, *inter alia*, documents incorporated by reference in the complaint and those upon which the complaint "relies heavily" for their "terms and effect," rendering them "integral" to the complaint.[97]  Should an incorporated or integral document contradict an allegation in the complaint, the document would control.[98]

---

[94]     *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[95]     *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[96]     *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 180 (2024).

[97]     *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (quoting *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)).

[98]     *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 146-47 (2d Cir. 2011) (per curiam).

In most cases, the pleading requirement is satisfied by "a short and plain statement of the claim showing that the pleader is entitled to relief."[99] But complaints alleging securities fraud under Section 10(b) are subject to a heightened pleading standard of particularity under Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA").[100] A plaintiff must plead with particularity "facts which, if proved, would establish the alleged fraud either directly or inferentially."[101]

Section 10(b) prohibits both buyers and sellers of securities from employing "any manipulative or deceptive device or contrivance in contravention of [SEC] rules and regulations."[102] Rule 10b-5, issued pursuant to Section 10(b), in relevant part makes it "unlawful for any person, directly or indirectly," to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, . . . in connection with the purchase or sale of any security."[103] To state a claim under Section 10(b) and Rule 10b-5(b), a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) *scienter*; (3) a connection between the

---

[99] Fed. R. Civ. P. 8(a)(2).

[100] 15 U.S.C. § 78u-4.

[101] *IWA Forest Indus. Pension Plan v. Textron Inc.*, 14 F.4th 141, 148 (2d Cir. 2021) (Kaplan, J., concurring in part and dissenting in part); *see* Fed. R. Civ. P. 9(b).

[102] 15 U.S.C. § 78j(b).

[103] 17 C.F.R. § 240.10b-5(b).

misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."[104]

*Whether Plaintiff Pleaded a Material Misrepresentation or Omission*

To plead with particularity a material misrepresentation or omission, a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."[105] There must be "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available."[106] Disclosure thus is not required for "any and all material information."[107] It is required "only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'"[108] "The literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of 'defendants' representations,

---

[104]    *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011) (quoting *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).

[105]    *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 462-63 (2d Cir. 2019) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).

[106]    *Matrixx Initiatives*, 563 U.S. at 38 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)) (internal quotation marks omitted).

[107]    *Matrixx Initiatives*, 563 U.S. at 45.

[108]    *Id.* (quoting 17 C.F.R. § 240.10b-5(b)).

24

taken together and in context.'"[109]  Because allegedly misleading statements must be evaluated in context, "the presence of cautionary language is a relevant factor to be considered in deciding whether a reasonable investor could have been misled."[110]

Here, in an 88-page, 258-paragraph amended complaint, plaintiff alleges that essentially all of defendants' statements regarding IAS's success and growth made over the better part of a year were misleading because they failed to disclose sufficiently the pricing pressure that IAS felt and the effect such pressure was having on IAS's business.  In the amended complaint, plaintiff marches through almost every month of the Relevant Period and – using extensive block quoting and bolding – repeats defendants' allegedly misleading statements.  Plaintiff concludes each section of the amended complaint with several lengthy, single-spaced paragraphs listing the topics of defendants' statements made that month and explaining why the statements were "materially false and misleading when made."[111]

Assuming that the amended complaint should not be dismissed outright as a "puzzle pleading,"[112] the amended complaint nevertheless suffers from a similar flaw in that it repeatedly

---

[109]
*In re Morgan Stanley Info. Fund Secs. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010) (quoting *DeMaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003)).

[110]
*Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002).

[111]
*E.g.*, Am. Compl. (Dkt 30) ¶ 101.

[112]
*See In re NTL, Inc. Secs. Litig.*, 347 F. Supp. 2d 15, 22 (S.D.N.Y. 2004) (Kaplan, J.); *Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*, 433 F. Supp. 3d 515, 530 (S.D.N.Y. 2020) (Puzzle pleading, which "fails to state a claim because it is insufficiently particular under the PSLRA," is "marked by lengthy block quotes followed by pro forma reasons why the statements quoted are allegedly false.").

asserts that dozens[113] of defendants' statements were misleading for essentially the same three reasons. In substance, plaintiff alleges that defendants failed to disclose that IAS was facing price competition, that such pricing pressure was causing IAS to reduce prices sometimes to stay competitive, and that pricing increasingly was the key differentiator between IAS and its competitors.[114] The Court addresses each of these alleged omissions in turn.

*Defendants' Statements Regarding Price Competition*

Through the Relevant Period, IAS – on its 2022 Form 10-K and each subsequent Form 10-Q referring back to the 2022 Form 10-K – identified "intense[]" competition, "both from established and new companies," as a risk factor that could impact its ability to achieve its expected future results.[115] IAS explained how exactly competition could "result in increased pricing pressure."[116] Competitors might "respond quick[er] to new technologies, develop deeper relationships, or offer competitive services at lower prices."[117] Such competition, IAS wrote, "could cause [IAS] to decrease the prices [it] charges[s] or accept less favorable terms for [its] solutions

---

[113] Seventy-three by defendants' count. IAS, Utzschneider, Vista Defs.' Mem. Law Supp. Mot. Dismiss (Dkt 40) at 9; Secor's Mem. Law Supp. Mot. Dismiss (Dkt 43) at 12.

Defendants also are to blame in the difficulty of deciphering the pleadings and briefing in this case. Together and including appendices, defendants' two memoranda of law in support of their motions to dismiss ran 171 pages. Defendants together submitted also 62 exhibits, spanning 2,038 pages.

[114] *E.g.*, Am. Compl. (Dkt 30) ¶ 101.

[115] *E.g.*, Rodney Decl., Ex. 2 (Dkt 41-2) at 29.

[116] *Id.*

[117] *Id*.

26

in order to remain competitive."[118]  IAS repeated this risk and explanation in just as much detail five pages later.[119]

Plaintiff argues that these disclosures were "unremarkable," "boilerplate," "generic," and thus insufficient.[120]  But plaintiff fails to identify which "hard facts critical to appreciating the magnitude of the risks described" were missing from the disclosures.[121]  The disclosures, on their face, warned of increasing pricing pressure that could drive price cuts across the business.  The disclosures did not describe such a risk as "remote" or otherwise downplay its likelihood of coming to pass.[122]  Rather, they stated, in bold and italics, "***The market in which we participate is intensely competitive, both from established and new companies, and we may not be able to compete successfully with our current or future competitors.***"[123]  Such "cautionary language" is "too prominent and specific to be disregarded."[124]  Perhaps plaintiff believes that the disclosures should have used the specific phrases, "price war," or "race to the bottom,"[125] but there is no requirement

---

[118] *Id.*

[119] *Id.* at 34.

[120] Pl.'s Mem. Law Opp'n Defs.' Mots. Dismiss (Dkt 49) at 20.

[121] *See In re Am. Int'l Grp., Inc. 2008 Secs. Litig.*, 741 F. Supp. 2d 511, 531 (S.D.N.Y. 2010) (quoting *Credit Suisse First Boston Corp. v. ARM Fin. Grp., Inc.,* No. 99-cv-12046, 2001 WL 300733, at *8 (S.D.N.Y. Mar. 28, 2001)).

[122] *Am. Int'l Grp.*, 741 F. Supp. 2d at 532.

[123] Rodney Decl., Ex. 2 (Dkt 41-2) at 29.

[124] *Olkey v. Hyperion 1999 Term Tr., Inc.*, 98 F.3d 2, 5 (2d Cir. 1996).

[125] Pl.'s Mem. Law Opp'n Defs.' Mots. Dismiss (Dkt 49) at 20.

that a company make negative inferences or use the most extreme language possible in its risk disclosures.[126]  And the fact that IAS later – in its 2023 Form 10-K – inserted language that, in plaintiff's view,[127] more clearly described the existing price competition does nothing to change IAS's earlier disclosure obligations.[128]  "To hold an issuer who alters disclosures deemed adequate in the first instance suddenly liable because it found a better way to say what has already been said would perversely incentivize issuers not to strive for better, clearer disclosure language."[129]

Moreover, plaintiff's argument that IAS's 2023 Form 10-K after-the-fact adequately "acknowledge[d] the risk of . . . a price war or race to the bottom in pricing"[130] all but gives up the game.  The revised disclosure stated that one of fifteen "principal competitive factors in our market" was the "pricing of our and our competitors' solutions."[131]  It is true that the comparable bullet point in IAS's 2022 Form 10-K read only, "[the] price of our solutions,"[132] but time and time again in the subsequent pages of its 2022 Form 10-K, IAS noted the risk posed by competitors' ability to "offer

---

[126] *See In re ProShares Tr. Secs. Litig.*, 728 F.3d 96, 103 (2d Cir. 2013) ("[D]isclosure is not a rite of confession or exercise in common law pleading.") (quoting *Morgan Stanley Info. Fund*, 592 F.3d at 365); *Born v. Quad/Graphics, Inc.*, 521 F. Supp. 3d 469, 485-86 (S.D.N.Y. 2021) (finding that defendants "largely disclosed much of what Plaintiffs assert was missing, although in more circumscribed and less jarring terms").

[127] *See* Pl.'s Mem. Law Opp'n Defs.' Mots. Dismiss (Dkt 49) at 20.

[128] *Proshares Tr.*, 728 F.3d at 109 (holding that earlier disclosures adequately warned of a risk that came to pass despite later being revised to "use different, arguably clearer language").

[129] *Id.*

[130] Pl.'s Mem. Law Opp'n Defs.' Mots. Dismiss (Dkt 49) at 20.

[131] Rodney Decl., Ex. 26 (Dkt 41-26) at 16.

[132] *Id.*, Ex. 2 (Dkt 41-2) at 18.

competitive services at lower prices."[133]  If one bullet point characterizing competitors' pricing as a competitive factor sufficiently disclosed, in plaintiff's view, the risk of price competition that IAS faced, it is impossible to see how the detailed disclosures IAS issued before and during the Relevant Period did not.  Taken together, these disclosures were "more than '[a] generic warning of a risk.'"[134]  They warned investors of exactly the risk plaintiff claims was not disclosed.[135]

Confronted with this reality, plaintiff moves the goalpost and maintains that defendants' statements were misleading because the disclosures omitted that IAS already was experiencing price competition that was driving down IAS's prices.  But that simply is not true.  On the same page of the 2022 Form 10-K as many of the aforementioned disclosures, IAS stated that it expected "competition to *persist and intensify in the future*."[136]  IAS elsewhere explained that "growth and increased competitive pressure in the global digital advertising ecosystem *is causing* customers to demand lower costs . . . resulting in overall increased focus by all industry participants on pricing."[137]  The present-tense language IAS used in its disclosures conveyed the present nature of the pricing pressure IAS was feeling.  A comprehensive reading of IAS's SEC filings would have

---

[133] *Id.* at 29; *accord id.* at 34 ("competitors offer deep discounts on certain products or services"); *id.* at 39 ("availability of and pricing of competitive products and services").

[134] *In re Synchrony Fin. Secs. Litig.*, 988 F.3d 157, 171 (2d Cir. 2021) (quoting *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014)) (alteration in original).

[135] *Olkey*, 98 F.3d at 5; *see Gissin v. Endres*, 739 F. Supp. 2d 488, 510 (S.D.N.Y. 2010) ("Defendants' statements expressly cautioned investors about all of the factors plaintiffs blame for [the company's] eventual demise.").

[136] Rodney Decl., Ex. 2 (Dkt 41-2) at 29 (emphasis added).

[137] *Id.* at 33 (emphasis added).

revealed to a reasonable investor that IAS was experiencing price competition, that it expected such competition to "persist and intensify in the future," and that such competition was causing IAS "to decrease the prices [it] charges or accept less favorable terms for [its] solutions in order to remain competitive."[138]  IAS thus "fully disclosed that these pressures were a current reality—not a hypothetical possibility.  No reasonable investor could have doubted that [IAS] was in a volatile and competitive market" during the Relevant Period.[139]

Plaintiff moves the goalpost again and tries to minimize the import of some of the disclosures by suggesting that they were "part of an irrelevant disclosure concerning 'payment-related risks'" that "[n]o reasonable investor would read . . . as having anything to do with the loss of pricing power."[140]  But examining the disclosures "holistically and in their entirety," as the Court must do,[141] only reinforces that the disclosed payment-related risks were relevant and related to the price competition that IAS had disclosed that it was facing.  After all, the disclosure was within the subsection of risk factors entitled, "Risks Relating to Our Business and Strategy."[142]  It came four pages after a disclosure stating, "[t]he market in which [IAS] participate[s] is intensely competitive,"[143] and one page before a disclosure stating, "[IAS] may need to change [its] pricing

---

[138]

*Id.* at 29; *see Synchrony Fin.*, 988 F.3d at 171.

[139]

*Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 232 (S.D.N.Y. 1999); *see In re UiPath, Inc. Secs. Litig.*, 755 F. Supp. 3d 498, 513-514 (S.D.N.Y. 2024).

[140]

Pl.'s Mem. Law Opp'n Defs.' Mots. Dismiss (Dkt 49) at 20-21.

[141]

*Morgan Stanley Info. Fund*, 592 F.3d at 366.

[142]

Rodney Decl., Ex. 2 (Dkt 41-2) at 25.

[143]

*Id.* at 29.

30

models to compete successfully."[144]   It thus "was set out logically under appropriate headings, alongside related information."[145]   IAS's disclosures were about price competition and they meant what they said: "[G]rowth and increased competitive pressure in the global digital advertising ecosystem is causing customers to demand lower costs . . . , resulting in overall increased focus by all industry participants on pricing . . . ."[146]  Any reasonable investor exercising due care would have understood IAS's disclosures to convey as much.

Furthermore, Officer Defendants mirrored in their public statements the language IAS used in its SEC filings.  They consistently described how customers were demanding greater returns on their investments in digital advertising, seeking "more bang for their buck" or "greater efficiency."[147]  Although they did not use plaintiff's preferred language of "price war" or "race to the bottom," they still were under no obligation to do so.  Securities fraud precedent is replete with the notion that public statements are not actionable merely because they declined to "present an overly gloomy or cautious picture of current performance and future prospects."[148]  Nor did Officer Defendants need to spell out for investors that customers "really car[ing] about getting the best bang

---

[144]

*Id.* at 34.

[145]

*Singh v. Schikan*, 106 F. Supp. 3d 439, 448 (S.D.N.Y. 2015); *Rice ex rel. Richard E. and Melinda Rice Revocable Fam. Tr. 5/9/90 v. Intercept Pharms., Inc.*, No. 21-cv-36, 2022 WL 837114, at *18 (S.D.N.Y. Mar. 21, 2022).

[146]

Rodney Decl., Ex. 2 (Dkt 41-2) at 33.

[147]

*Id.*, Ex. 1 (Dkt 41-1) at 6, 13; *Id.*, Ex. 7 (Dkt 41-7) at 5, 6, 10, 13; *id.*, Ex. 8 (Dkt 41-8) at 6, 10; *id.*, Ex. 10 (Dkt 41-10) at 2; *id.*, Ex. 12 (Dkt 41-12) at 10; *id.*, Ex. 18 (Dkt 41-18) at 12; *id.*, Ex. 38 (Dkt 41-38) at 3.

[148]

*Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000); *accord Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004); *see Proshares Tr.*, 728 F.3d at 109.

31

for every single dollar that they invest in digital advertising,"[149] for example, meant that IAS was facing price competition. A company need not "address [reasonable investors] as if they were children in kindergarten."[150] Moreover, "there is no duty to disclose information to one who reasonably should be aware of it."[151] As previously discussed, IAS's SEC filings sufficiently disclosed the then-current nature of the price competition IAS was facing. A reasonable investor should have understood that risk factor.[152] "This is especially true because [IAS] made fulsome disclosures about its financial condition, none of which the [amended complaint] asserts [were] inaccurate. Therefore, investors were able to track, quarter by quarter," how IAS was affected by competition.[153]

Still, plaintiff disagrees. According to plaintiff, the adequacy of IAS's disclosures was "belied by the sudden stock price decline and severe analyst reaction" that occurred on February 28, 2024, after IAS, in plaintiff's view, "for the first time acknowledged that more competitive pricing was impacting IAS's business and prospects."[154] Plaintiff's argument has some superficial appeal. After all, why would a company's stock price drop so dramatically and investors express

---

[149] Rodney Decl., Ex. 10 (Dkt 41-10) at 3.

[150] *Proshares Tr.*, 728 F.3d at 102 (quoting *Greenapple v. Detroit Edison Co.*, 618 F.2d 198, 210 (2d Cir. 1980)) (alteration in original).

[151] *Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir. 1978).

[152] *Synchrony Fin.*, 988 F.3d at 171 ("[Plaintiff] may not cherry pick certain public statements for its complaint and divorce them from the universe of disclosed information to plausibly allege fraud.").

[153] *UiPath*, 755 F. Supp. 3d at 514.

[154] Pl.'s Mem. Law Opp'n Defs.' Mots. Dismiss (Dkt 49) at 48-49.

32

such surprise in response to a risk materializing if the company all along had sufficiently disclosed that risk?  Indeed, courts in this district occasionally have cited investors "react[ing] with shock and anger" as allegations, along with others, that have constituted adequate allegations of material misrepresentations.[155]

Such thinking, however, puts the cart before the horse.  Stock price movement, and thus the market's reaction, is not probative – at least not necessarily so – of whether there was a material misrepresentation or omission in the first instance.[156]  In other words, investors can be wrong without having been misled about the chance of a risk materializing or the magnitude of impact that risk would have on a company's growth or profits, for example.[157]  A contrary view would be inconsistent with the Second Circuit repeatedly affirming dismissals of alleged Section 10(b) misrepresentation cases on the ground that the plaintiff failed to allege with particularity a material misstatement or omission notwithstanding there having been significant stock price drops

---

[155]

    *E.g.*, *In re Facebook, Inc. IPO Secs and Deriv. Litig.*, 986 F. Supp. 2d 487, 517 (S.D.N.Y. 2013).

[156]

    *Cf. ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 104 (2d Cir. 2007) (rejecting the possibility that there must be fraud "whenever the stock price does not react" as one might expect in the context of a Section 10(b) market manipulation and short selling case in which the stock price declined 44 percent over five days); *United States v. Bilzerian*, 926 F.2d 1285, 1298 (2d Cir. 1991) ("[W]hether a public company's stock price moves up or down or stays the same after" disclosure of a large stock purchase "does not establish the materiality of the statements made, though stock movement is a factor the jury may consider relevant.").

[157]

    *See Plumbers and Steamfitters Local 137 Pension Fund v. Am. Express Co.*, No. 15-cv-5999, 2017 WL 4403314, at *14 (S.D.N.Y. Sept. 30, 2017) ("[T]hat a few analysts might have ignored the context in which [defendant]'s statements were made . . . does not make [defendant]'s statements misleading where the language and import of [defendant]'s statements are plain."), *aff'd sub nom. Pipefitters Union Local 537 Pension Fund v. Am. Express Co.*, 773 Fed. App'x 630 (2d Cir. 2019) (summary order).

33

after alleged corrective disclosures.[158] Evaluating whether there was a material misrepresentation or omission independently from why a stock price declined makes good analytical sense too. The former question is "determined in light of the circumstances existing at the time the alleged misstatement occurred."[159] It therefore is antecedent to the latter and later question of why the stock price declined, which would be addressed by the loss causation prong of the Section 10(b) analysis in those cases in which there are plausible claims of the falsity or deceptive nature of statements unexplained.

Undeterred, plaintiff continues to beg the question of whether there was a material misrepresentation or omission by asserting that the disclosures constitute "a premature 'truth on the market' defense,"[160] which "has no place in a motion to dismiss."[161] The so-called truth-on-the-market defense is an affirmative defense offered to prove that an established misrepresentation was immaterial because the correct information already was known to the market.[162] Here, defendants have not conceded nor has plaintiff established that IAS made affirmative misrepresentations

---

[158]

*E.g.*, *Ark. Pub. Emps.' Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343 (2d Cir. 2022) (stock price drops of 16 and 10 percent); *Singh v. Cigna Corp.*, 918 F.3d 57 (2d Cir. 2019) (stock price drop of 3 percent); *Martin v. Quarterman*, 732 F. App'x 37 (2d Cir. 2018) (summary order) (stock price drop of 30 percent).

[159]

*Ganino v. Citizens Util. Co.*, 228 F.3d 154, 165 (2d Cir. 2000); *see Pommer v. Medtest Corp.*, 961 F.2d 620, 623 (7th Cir. 1992) (Easterbrook, J.) ("The securities laws approach matters from an *ex ante* perspective: just as a statement true when made does not become fraudulent because things unexpectedly go wrong, so a statement materially false when made does not become acceptable because it happens to come true.").

[160]

Pl.'s Mem. Law Opp'n Defs.' Mots. Dismiss (Dkt 49) at 19.

[161]

*Id.* at 49.

[162]

*Ganino*, 228 F.3d at 167.

34

regarding the existence of price competition or its effects.  Indeed, IAS's disclosures establish the opposite.  Instead of serving to correct otherwise misleading statements, IAS's disclosures show there was no misrepresentation in the first place as to the price competition that IAS confronted.[163]

### *Defendants' Statements Regarding Price Reductions*

The second category of alleged material omissions is IAS's supposed failure to disclose that "IAS had been forced to aggressively cut prices (and/or offer free or discounted services) to win or retain customer accounts."[164]  But in IAS's 2022 Form 10-K, which was incorporated by reference in each subsequent Form 10-Q, IAS disclosed that because "in emerging markets, the cost of [its measurement] services makes up a large percentage of the buyer's media budget . . . . [IAS] often adjust[s] or make[s] concessions to [its] pricing in order to enter and sell in such markets."[165]  That specific disclosure, combined with the previously mentioned disclosures regarding price competition and reduction and IAS's undisputedly accurate quarterly disclosures of

---

[163]

    *See In re Bank of Am. AIG Disclosure Secs. Litig.*, 980 F. Supp. 2d 564, 577 (S.D.N.Y. 2013), *aff'd* 566 F. App'x 93 (2d Cir. 2014) (summary order); *Police and Fire Ret. Sys. City of Detroit v. Argo Grp. Int'l Holdings, Ltd.*, No. 22-cv-8971 (LAK), 2024 WL 5089970, at *8 n.88 (S.D.N.Y. Dec. 12, 2024) ("[M]arshaling of these risk disclosures does not constitute a 'truth-on-the-market defense.'").

[164]

    *E.g.*, Am. Compl. (Dkt 30) ¶ 101.

[165]

    Rodney Decl., Ex. 2 (Dkt 41-2) at 36.

35

financial data,[166] enabled reasonable investors "to track, quarter by quarter, whether revenue was adversely affected by competition" and whether IAS truly was unable to maintain prices.[167]

Plaintiff responds that such disclosures and IAS's other public statements failed to account for the pricing concessions IAS gave to win and retain marquee customers in existing markets. In plaintiff's view, "[a]ggregate figures can mask specific material changes requiring disclosure—and Defendants cannot hide behind such figures to escape liability."[168] That is true,[169] but plaintiff has not pleaded with particularity specific facts with respect to price reductions that required disclosure. All plaintiff has alleged is that February 2023 board materials showed that IAS was forced to cut "rates when renewing and securing contracts, including to win '[marquee] customers,'"[170] that a confidential witness believed that IAS frequently cut rates "to secure multi-year contracts with 'blue chip' customers," including AT&T,[171] and that another confidential witness believed that IAS serviced some "big-name clients . . . 'at cost,'" including "a large Consumer

---

[166] *See, e.g.*, Pl.'s Mem. Law Opp'n Defs.' Mots. Dismiss (Dkt 49) at 22 ("To be clear: Plaintiff does not allege financial statements fraud with respect to IAS's reported financial metrics, nor does Plaintiff allege that IAS concealed a decline in *total* revenue during the Class Period.").

[167] *UiPath*, 755 F. Supp. 3d at 514.

[168] Pl.'s Mem. Law Opp'n Defs.' Mots. Dismiss (Dkt 49) at 13.

[169] *Cf. Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 719 (2d Cir. 2011) (stating that defendant in Sections 11 and 12(a)(2) case "is not permitted, in assessing materiality, to aggregate negative and positive effects on its performance fees in order to avoid disclosure of a particular material negative event").

[170] Am. Compl. (Dkt 30) ¶ 57.

[171] *Id.* ¶ 80.

Package Goods . . . company."[172]  Assuming the truth of these allegations,[173] plaintiff nevertheless has failed to allege plausibly, let alone with particularity, that these price reductions were inconsistent with the very price reductions in emerging markets that IAS disclosed.

Furthermore, even assuming there was a misleading statement or omission, plaintiff would have failed to allege materiality because there would be no allegations that these price reductions "affected more than a tiny percentage of" IAS's business.[174]  Neither confidential witness described, for example, the amount by which IAS reduced its rates for marquee clients, what IAS received in exchange for such rate cuts, for how many such clients IAS reduced its rates, or how significant to IAS's overall business were the contracts for which IAS reduced its rates.[175]  The confidential witnesses' professed belief that the alleged price cuts were material would not make it so.  Standing alone, it would be insufficient to make a plausible case for materiality or an alleged

---

[172]
    *Id.* ¶ 90.

[173]
    While one confidential witness claimed that IAS offered price concessions to win AT&T, *id.* ¶ 80, another stated that IAS lost AT&T as a customer, *id.* ¶ 70.  Although perhaps contradictory "and therefore not properly particular," *Dresner v. Utility.com, Inc.*, 371 F. Supp. 2d 476, 500 (S.D.N.Y. 2005), the Court need not determine here whether such allegations are inconsistent to hold that plaintiff has failed to plead a material misrepresentation or omission.

[174]
    *See In re AT&T/DirecTV Now Secs. Litig.*, 480 F. Supp. 3d 507, 528 (S.D.N.Y. 2020), *aff'd sub nom. Steamfitters Local 449 Pension Plan v. AT&T Inc.*, No. 21-2698, 2022 WL 17587853 (2d Cir. Dec. 13, 2022) (summary order).

[175]
    *See Damri v. LivePerson, Inc.*, 772 F. Supp. 3d 430, 453 (S.D.N.Y. Mar. 19, 2025) (noting that courts view confidential witness allegations "with caution and care" when "the statements attributed to the CWs are general in nature and, with limited exceptions, devoid of details lending themselves to corroboration"), *appeal filed* No. 25-964 (2d Cir. Apr. 21, 2025).

misrepresentation or omission.[176]  Moreover, IAS disclosed each quarter its retention rate for all customers and for large customers in particular, as well as changes to its average CPMs, revenue, and growth rates across services.[177]  Investors therefore "were given the warning signs and numerical metrics they needed to determine whether" IAS's pricing was affecting its growth or profitability.[178]  Plaintiff thus has not pleaded plausibly that disclosure of the February 2023 board materials or what was allegedly known to the confidential witnesses would have altered the total mix of information available to a reasonable investor.[179]

Plaintiff further contends that IAS's statements regarding its ability to maintain and increase its price were misleading.  Specifically, plaintiff points to IAS, in August 2023, learning that it was experiencing "lower than expected Optimization growth," which it "expect[ed] . . . to continue,"[180] and that its average optimization CPM declined 3 percent for the quarter.[181]  To plaintiff, these facts plausibly suggest the falsity of any statements IAS made suggesting that its

---

[176]

*Synchrony Fin.*, 988 F.3d at 171-72.

[177]

*E.g.*, Rodney Decl., Ex. 4 (Dkt 41-4) at 26-27, 29.

[178]

*Synchrony Fin.*, 988 F.3d at 172.

[179]

*See Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 613 (S.D.N.Y. 2008), *aff'd* 347 F. App'x 665 (2d Cir. 2009) (summary order); *AT&T/DirecTV Now*, 480 F. Supp. 3d at 528; *Ohio Pub. Emps. Ret. Sys. v. Discovery, Inc.*, 715 F. Supp. 3d 483, 497 (S.D.N.Y. 2024) (holding no actionable omission when defendant's financial disclosures were accurate and included the data that plaintiff alleged should have been reported as separate subset), *aff'd* No. 24-646, 2024 WL 4647131 (2d Cir. Nov. 1, 2024) (summary order); *Asay v. Pinduoduo Inc.*, No. 18-cv-7625, 2020 WL 1530745, at *10 (S.D.N.Y. Mar. 30, 2020) (same), *aff'd* No. 20-1423, 2021 WL 3871269 (2d Cir. Aug. 31, 2021) (summary order).

[180]

Am. Compl. (Dkt 30) ¶ 61.

[181]

*See, e.g.*, Pl.'s Mem. Law Opp'n Defs.' Mots. Dismiss (Dkt 49) at 14.

38

prices were stable or fixed.  But, again, there is no apparent misrepresentation or omission.  As

defendants correctly point out, a "lower growth rate [does not imply] declining prices."[182]  And IAS

disclosed its average CPMs, revenue, and growth rates quarterly.[183]  Indeed, IAS's average CPMs

in 2023 were consistent with those from the prior year.[184]  Moreover, when defendant Secor

described IAS's CPMs as "fixed,"[185] it was clear in context that she meant that each contract with

each client for a given service carried a fixed price for that contract's duration.  Interpreting her

statement to mean that IAS's prices never varied would be unreasonable and an example of

confirmation bias.

Even if any of IAS's statements regarding its ability to maintain and increase price

was inconsistent with other statements, many, if not all, of them would have been nonactionable

puffery.  After all, no reasonable investor would take IAS's statements regarding its ability to "hold

price,"[186] for example, to mean that there never were any fluctuations in the prices IAS charged to

any of its customers for any of its services.  Nor would a reasonable investor take IAS's statements

---

[182]    IAS, Utzschneider, Vista Defs.' Mem. Law Supp. Mot. Dismiss (Dkt 40) at 14; *see Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996) (noting that continued profitability does not imply constant growth or prices).

[183]    *E.g.*, Rodney Decl., Ex. 5 (Dkt 41-5) at 32.

[184]    *Id.*, Ex. 18 (Dkt 41-18) at 15; *cf. Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 39 (2d Cir. 2017) (finding no reason for "a reasonable investor" to "harbor[] any solid expectations" that defendant's performance would differ materially from disclosed historic information).

[185]    Rodney Decl., Ex. 10 (Dkt 41-10) at 6; Am. Compl. (Dkt 30) ¶ 162.

[186]    Am. Compl. (Dkt 30) ¶ 129.

regarding its ability to "increase price for these differentiated [optimization] products,"[187] for instance, to mean that IAS never reduced the prices IAS charged to any of its customers for any of its other services. Such statements "are too general to cause a reasonable investor to rely upon them,"[188] and thus "cannot have misled a reasonable investor."[189] The statements were not "worded as guarantees," and plaintiff has failed to show that defendants did "not genuinely or reasonably believe" the statements when they were made.[190] That IAS ultimately reduced measurement prices for just under a dozen customers and optimization prices for one customer does not prove that IAS could not, and did not, onboard other customers – or even most customers – with its measurement services and then upsell customers its higher-priced optimization products, just as Officer Defendants represented that IAS planned to do.[191] And "even if defendants were ultimately wrong . . . 'misguided optimism is not a cause of action, and does not support an inference of fraud.'"[192] Plaintiff thus has failed to plead a material misrepresentation or omission with respect to defendants' statements regarding price reductions.

---

[187]

*Id.*

[188]

*In re Vivendi, S.A. Secs. Litig.*, 838 F.3d 223, 245 (2d Cir. 2016) (quoting *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009)).

[189]

*Vivendi, S.A.*, 838 F.3d at 245 (quoting *San Leandro Emer. Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 811 (2d Cir. 1996)).

[190]

*In re Int'l Bus. Machs. Corp. Secs. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998).

[191]

*E.g.*, Rodney Decl., Ex. 1 (Dkt 41-1) at 13; Am. Compl. (Dkt 30) ¶ 156.

[192]

*City of Taylor Gen. Emps. Ret. Sys. v. Magna Int'l Inc.*, 967 F. Supp. 2d 771, 796 (S.D.N.Y. 2013) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994)); *accord Stevelman v. Alias Rsch. Inc.*, 174 F.3d 79, 85 (2d Cir. 1999).

40

*Defendants' Statements Regarding Key Differentiators*

The final category of statements plaintiff alleges was materially misleading consists of claims that IAS was successful or differentiated from its competitors because of its technology, global presence, customer service, or any factor other than pricing. Plaintiff's argument that "pricing was increasingly the key differentiator"[193] in large part repeats plaintiff's already-rejected claim that it was materially misleading for IAS to fail to disclose the alleged price cuts it was offering to win and retain customers. Plaintiff does not allege that defendants' statements regarding its differentiated technology or best-in-class service were false in any other way.

Plaintiff offers an additional – yet equally unavailing – argument for why defendants' statements regarding IAS's global footprint were misleading. Plaintiff points to February 2023 board materials stating that "emerging markets growth" was one of the "largest contributors to [measurement pricing pressure]"[194] as proof that IAS's global presence was a weakness of the business rather than a strength. According to plaintiff, presenting IAS's global presence in any other way therefore was misleading. Plaintiff, however, misunderstands the board materials. In context, they indicated merely that the growth of emerging markets was contributing to price competition with respect to IAS's measurement services, not that IAS's presence in emerging markets was contributing to pricing pressure. That is entirely consistent with what IAS disclosed in its 2022 Form 10-K,[195] and it does not speak to whether customers hired IAS in part for its global scale and partnerships.

---

[193]    *E.g.*, Am. Compl. (Dkt 30) ¶ 101.

[194]    *Id.* ¶ 56.

[195]    Rodney Decl., Ex. 2 (Dkt 41-2) at 36.

41

In any case, even if any of IAS's statements regarding what differentiated it from its competitors was inconsistent with other statements, it would have been nonactionable puffery.[196] No reasonable investor would take statements touting IAS's superior technology, global reach, or customer service to mean that there were no other factors, such as price, on which it competed or that it never reduced its prices for any of its customers for any services.[197] Plaintiff thus has failed to plead a material misrepresentation or omission with respect to defendants' statements regarding IAS's key differentiators.

*        *        *

The unfortunate reality is that whenever a publicly traded company's stock price drops, some investors inevitably are harmed. There undoubtedly are instances in which unsuspecting investors were set up to take the fall because the company and those who controlled it affirmatively misled them or failed to disclose material information known only to corporate insiders. Misrepresentation claims under Section 10(b) and Rule 10b-5 can remedy such situations. But not every stock price decline signals fraud. Industries are competitive, investors are fallible, and the market can be hard to predict. So long as a company is truthful, accurate, and straightforward in its public statements when made, taken together and in context, it cannot be that the company is liable for the mistaken expectations of investors. Because defendants here disclosed everything

---

[196]

*Okla. Firefighters Pension and Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 569 (S.D.N.Y. 2018), *aff'd sub nom. Ark. Pub. Emps. Ret. Sys. v. Xerox Corp.*, 771 F. App'x 51 (2d Cir. 2019) (summary order).

[197]

*Marcu v. Cheetah Mobile Inc.*, No. 18-cv-11184, 2020 WL 4016645, at *5 (S.D.N.Y. July 16, 2020) ("The disclosures here did not, explicitly or implicitly, rule out other factors playing a role in generating revenue.").

42

plaintiff claims was omitted, plaintiff has failed to plead a material misrepresentation or omission and thus has failed to state a misrepresentation claim under Section 10(b) and Rule 10b-5.[198]

*Whether Plaintiff Pleaded the Remaining Counts*

To state an insider trading claim under Section 10(b) and Rule 10b-5, a plaintiff must allege that "a corporate insider trade[d] in the securities of his corporation on the basis of material, nonpublic information."[199]  Such allegations also must be pleaded with particularity.[200]  Where the alleged material, nonpublic information is the same information at issue in the misrepresentation claim, a finding that the plaintiff failed to plead a material misstatement or omission necessarily means that the plaintiff failed also to plead that the defendant was in possession of material, nonpublic information.[201]

Here, plaintiff alleges Vista committed insider trading when it sold IAS shares after allegedly learning of the price competition IAS was confronting and the effects it was having on

---

[198]

The Court accordingly need not, and does not, decide whether defendants' independent challenges as to *scienter*, materiality, and loss causation also prove that plaintiff has failed to state a claim.

[199]

*United States v. O'Hagan*, 521 U.S. 642, 651-52 (1997).

The plaintiff furthermore must allege *scienter*, *SEC v. Obus*, 693 F.3d 276, 286 (2d Cir. 2012), and loss causation, *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 967 F.2d 742, 746-47 (2d Cir. 1992).

[200]

*In re Archegos 20A Litig.*, 156 F.4th 108, 116 (2d Cir. 2025); *Stevelman*, 174 F.3d at 86.

[201]

*See Or. Pub. Emps. Ret. Fund v. Apollo Grp.*, 774 F.3d 598, 610 (9th Cir. 2014); *In re E-House Secs. Litig.*, No. 20-cv-2943, 2021 WL 4461777, at *17 (S.D.N.Y. Sept. 29, 2021), *aff'd sub nom. Maso Cap. Invs. Ltd. v. E-House (China) Holdings Ltd.*, No. 22-355, 2024 WL 2890968 (2d Cir. June 10, 2024) (summary order).

43

IAS's business.  Because this information is the same information underlying plaintiff's legally insufficient misrepresentation claim, plaintiff has failed to allege plausibly that Vista possessed material, nonpublic information and thus that Vista committed insider trading.

Finally, a prima facie case of either control person liability under Section 20(a) or individual liability for insider trading under Section 20A requires a showing of, *inter alia*, "a primary violation" – that is, a violation of Section 10(b).[202]

Here, because plaintiff has failed to plead a primary violation, so too has plaintiff failed to plead a violation of Sections 20(a) or 20A.

*Whether Plaintiff May Amend its Pleading*

Plaintiff requests leave to amend should the Court grant defendants' motions to dismiss.  Though "[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead," doing so is within the sound discretion of the district court, and there are instances in which leave to amend should not be given.[203]  It should be denied "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party."[204]  Repleading may be futile if a plaintiff "fails to specify . . . how amendment would cure the pleading deficiencies in its

---

[202]

*ATSI Commc'ns*, 493 F.3d at 108 (Section 20(a)); *Jackson Nat. Life Ins. Co. v. Merrill Lynch & Co., Inc.*, 32 F.3d 697, 704 (2d Cir. 1994) (Section 20A).

[203]

*Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991).

[204]

*McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).

44

complaint."[206]   A court may make a finding of futility even if the plaintiff has not yet had an opportunity to amend with the benefit of a ruling from the court.[207]

Here, the Court has determined that plaintiff failed to show so much as one material misrepresentation or omission in dozens of defendants' statements made over the better part of a year.  Moreover, plaintiff has identified no additional facts or legal theories it might assert if given leave to amend.[208]  Because this case at best is all smoke and there plainly is no fire, the Court denies plaintiff's request for leave to amend.

### Conclusion

For the foregoing reasons, defendants' motions to dismiss the amended complaint with prejudice (Dkts 39, 42) are granted in all respects.

SO ORDERED.

Dated:          March 2, 2026

_____
Lewis A. Kaplan
United States District Judge

---

[206] *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014).

[207] *See City of Pontiac Policemen's and Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 188 (2d Cir. 2014).

[208] *Id.*; *accord Porat v. Lincoln Towers Cmty. Ass'n*, 464 F.3d 274, 276 (2d Cir. 2006); *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999).